UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>JARED SAMUEL KASTNER,<br><br>*Defendant.* | No. 21-cr-725 (RDM) |

### ORDER

Pending before the Court is Defendant Jared Kastner's motion for reconsideration of the Court's Order denying his motion to modify conditions of release. Dkt. 37. For the following reasons, the Court will **DENY** the motion for reconsideration.

The events of January 6, 2021, "marked the most significant assault on the [United States] Capitol since the War of 1812." *Trump v. Thompson*, 20 F.4th 10, 18–19 (D.C. Cir. 2021). The assault "left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Id.* at 15. In the aftermath of the attacks, the Department of Justice charged (and continues to charge) hundreds of individuals with crimes committed at the Capitol. *See Capitol Breach Cases*, https://www.justice.gov/usao-dc/capitol-breach-cases (last visited May 9, 2022). "Every case is being prosecuted by the U.S. Attorney's Office for the District of Columbia," *id.*, but many defendants who live outside of the D.C. area have been released from pretrial detention and are awaiting trial under the courtesy supervision of pretrial services officers in their home districts. According to the Pretrial Services Agency for the District of Columbia, courtesy supervision of those defendants is essential to ensure community safety. *See* Dkt. 40 at 2.

Kastner is one such defendant. According to the government, on January 4, 2021, Kastner traveled from his home in Beavercreek, Ohio to the Washington, D.C. region. Dkt. 1-1 at 7. That night, Kastner, who held a concealed carry permit issued by the State of Ohio, allegedly Googled the phrases "[V]irginia [B]each gun laws" and "concealed carry magazine limit [W]ashington DC," Dkt. 22 at 1–2, and he visited a website titled "Large Capacity Magazines in Virginia," *id.* at 2. The following day, Kastner allegedly Googled "concealed carry on train in 'DC,'" just before researching "metro to DC from VA." *Id.* On January 6, Kastner parked his car at the Rosslyn Metro Station in Arlington, Virginia and rode the metro into the District. *Id.* at 2 n.1.

The government alleges that Kastner entered the Capitol within five minutes of the mob's "initial breach," at approximately 2:17 p.m. on January 6. *Id.* at 3. While inside, Kastner allegedly

> walked toward the Crypt, where he was confronted by a line of law enforcement officers who were preventing rioters from progressing into the building. During the standoff that ensued, rioters yelled at the law enforcement officers and moved forward toward the officers. Instead of leaving, Kastner remained in the Crypt until a crowd of rioters pushed forward into the law enforcement officers, eventually breaking the line. Ultimately, Kastner remained in the building for about 18 minutes.

*Id.* Based on this alleged conduct, the government charged Kastner by criminal complaint on December 7, 2021 with knowingly entering or remaining in a restricted building or grounds without lawful authority, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. §1752(a)(2); disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Dkt. 1 at 1. He was arrested in Ohio on December 8, 2021 and had an initial

appearance in the Southern District of Ohio, at which point he was released on personal recognizance pending trial.  Dkt. 22 at 3; *see also* Dkt. 20 at 2.  That same day, the government charged Kastner in a criminal information with committing the same four offenses listed in the criminal complaint.  *See* Dkt. 7; *see also* Dkt. 24 (superseding information).

Prior to his initial appearance before this Court, the Pretrial Services Agency for the District of Columbia ("PSA") prepared a report recommending that Kastner be placed under "USDC General Supervision," with courtesy supervision provided by U.S. Pretrial Services for the Southern District of Ohio, subject to the following conditions: (1) "Notify in advance the Southern District of Ohio-Dayton of all travel outside that jurisdiction;" (2) "All travel outside the continental U.S. must be approved by the Court;" (3) "Report to [U.S. Pretrial Services for the] Southern District of Ohio-Dayton;" (4) "Not possess firearms, destructive devices or other weapons;" (5) "Not obtain a passport or other international travel document;" (6) "Stay out of D.C. except for Court or PSA business;" and (7) "Report as soon as possible[] to the pretrial services office or supervising officer[] every contact with law enforcement personnel, including arrests, questioning, or traffic stops."  Dkt. 10 at 1; *see also* 18 U.S.C. § 3142(c)(1)(B)(viii). According to PSA, Kastner reported to U.S. Pretrial Services for the Southern District of Ohio that he had "firearms in [his] home."  *Id.* at 4.

Kastner appeared virtually before Magistrate Judge Faruqui on December 14, 2021.  At the hearing, Kastner's counsel asked to be heard with respect to the firearm restriction that PSA had recommended as a condition of Kastner's release.  Kastner's counsel requested that the Court grant an exception to the firearm restriction so that Kastner could continue to provide volunteer armed security services at his Church three times weekly—twice on Sundays and once

weekly on Wednesdays.[1] Magistrate Judge Faruqui then engaged in an extended colloquy with Kastner, his counsel, counsel for the government, and PSA.  Among other things, he sought information regarding (1) whether Kastner's request for permission to carry a firearm was limited to the time he would spend at Church services, and (2) whether the firearm that Kastner typically used while providing security services could be stored at a location other than his home, such as at the Church.  Kastner affirmed that he was requesting permission to carry a firearm while "on the Church premises" and that he could arrange to have the firearm stored safely at the Church.  Based on those representations, Magistrate Judge Faruqui granted the request for an exception to the firearms restriction, permitting Kastner "to possess a firearm only on the premises of the Wilmington Baptist Church . . . during the services held on Wednesdays and those held twice on Sundays."  Dkt. 11 at 3.  Magistrate Judge Faruqui further ordered that "[t]he firearm is to be stored and secured on the Church's premises;" that "[Kastner] is prohibited from taking the firearms off of the Church's grounds;" and that "[o]utside of that limited exception, [Kastner] is prohibited from possessing firearms at any other time outside of the services mentioned."  *Id.*  Having set those and other conditions, Magistrate Judge Faruqui approved courtesy supervision by U.S. Pretrial Services for the Southern District of Ohio.  *Id.* at 1.

At a virtual status conference held on December 22, 2021, Kastner's counsel advised the Court that he intended to file a motion seeking to lift the remaining restrictions on Kastner's possession of firearms while on pretrial release.  That motion was filed on January 14, 2022.  Dkt. 20.  In his motion, Kastner observed that Magistrate Judge Faruqui was "charged with the responsibility of determining, under [the Bail Reform Act], 'the least restrictive further

---

[1] In the alternative, counsel requested that Kastner be placed under PSA's "remote" supervision, so that no supervising officers would be required to visit his home.

condition, or combination of conditions, that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Id.* at 2 (footnote omitted) (quoting 18 U.S.C. § 3142(c)(1)(B)). Stressing that "[t]he chargers he faces in the instant case are all non-violent misdemeanors" and that "[h]e has no criminal record," Kastner argued that he "does not present any factors that would suggest he's a danger to others." *Id.* at 4. He also asserted that he "sought and obtained . . . the positions of the pretrial services officers" providing courtesy supervision in the Southern District of Ohio and the PSA officer "providing nominal supervision in D.C." *Id.* at 3. Kastner represented that the officer providing courtesy supervision "d[id] not oppose lifting the restriction," "advise[d] that there is likely little need for home visits," and observed that, "should the need arise, he would advise defendant to store the firearms securely before he . . . visited the residence." *Id.* at 3-4. Kastner further represented that the PSA officer assigned to his case "takes no position on defendant's request to have the Court lift the restriction on firearms." *Id.* at 4. Given these circumstances, Kastner asserted that a restriction on his possession of firearms could only be the result of "a blanket application in the January 6 set of cases of the non-possession restriction," which, he argued, "violates a basic principle of our criminal justice system[] to treat defendants, and their cases, individually." *Id.* at 4.

On February 18, 2022, the Court heard argument on Kastner's motion and heard directly from the responsible PSA officer, whom the Court asked to join the hearing. The PSA officer indicated that, despite Kastner's understanding to the contrary, PSA opposes Kastner's motion. She explained that his request to possess firearms at his home while on pretrial release "raises concerns because of law enforcement contact on the premises." Hrg. Tr. (Rough at 6). According to the PSA officer, "at any time, there could be a reason for either the U.S. probation

officer to go to the home or [for] other law enforcement" to do the same. *Id.* In response, Kastner's counsel argued that the officer from U.S. Pretrial Services for the Southern District of Ohio, who was providing courtesy supervision, "has no problems with [Kastner]" and "doesn't oppose the lifting of the restriction." *Id.* (Rough at 8). According to counsel, "in the event [that officer] has to make a visit to the residence, he'll just call . . . Kastner, tell him he's coming and just tell him to put the firearms in a secure place." *Id.*

On February 28, 2022, the Court denied Kastner's motion to modify on the ground that the firearms restriction—as previously modified to accommodate Kastner's volunteer services at his Church—is "necessary reasonably to assure the safety of the Pretrial Services officers during [Kastner's] supervision." Dkt. 35 at 4. The Court cited several factors supporting that conclusion. First, although Kastner based his motion on the premise that PSA did not oppose lifting the firearm restriction, the Court "credit[ed] [the] view" of the PSA officer who appeared at the Court's request and who represented that "Pretrial Services remains concerned that permitting [Kastner] to keep firearms at his residence poses an unreasonable risk to the officers who may need to conduct a home visit." *Id.* at 2–3. Second, although Kastner is charged with only non-violent misdemeanors, the Court noted that he "allegedly remained unlawfully in the Capitol building while rioters screamed and pushed against law enforcement." *Id.* at 3. Assuming the truth of the government's proffer, which Kastner does not challenge for present purposes, Kastner was aware that law enforcement officers were under assault, yet he knowingly remained in the Capitol. Although the government does not contend that Kastner personally assaulted or confronted anyone, his knowing and continued presence—along with a multitude of others—during this confrontation likely contributed to the inability of law enforcement to maintain control of a dangerous situation.

The Court's concern about this factual background was heightened by evidence that Kastner possesses firearms, including at least one firearm equipped with a large capacity magazine. As the Court noted, the government's proffer indicated that Kastner conducted Internet searches to determine whether he could bring a weapon equipped with a large capacity magazine with him on January 6, 2021. Although Kastner's counsel argued that these Internet searches revealed a desire to comply with the law, that answered only half of the Court's concerns because the desire to bring a weapon (and, in particular, one equipped with a large capacity magazine) to a highly charged political rally, even if it was legal to do so, bears on the risk that Kastner poses to the community while on pretrial release. In light of all the evidence and the relevant circumstances, the Court concluded that restricting Kastner's possession of firearms at home—while allowing him to carry them at Church—was "appropriate and that the Magistrate Judge's decision was reasonably tailored to [Kastner's] circumstances." *Id.* at 4.

The Court also rejected Kastner's argument that "the firearm restriction represents a failure to treat [him] 'individually.'" *Id.* "To the contrary," the Court explained, "although the government asked the Magistrate Judge to impose an absolute restriction on [Kastner's] possession of firearms, the Magistrate Judge, upon learning that [Kastner] serves as a security officer at his Church, rejected that request and, instead, allowed [Kastner] to carry a gun three times weekly while serving in the security detail at his Church." *Id.*

Kastner now moves for reconsideration. Dkt. 37. As an initial matter, the Court pauses to consider whether and under what standard it may consider a motion for reconsideration in a criminal case. Neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules of this Court expressly provide for motions for reconsideration in criminal cases. This Court, however, has explained that "it is . . . well understood that district courts may—and, at times,

7

should—[entertain motions for reconsideration] in criminal cases." *United States v. Trabelsi*, No. 06-cr-89, 2020 WL 1236652, at *7 (D.D.C. Mar. 13, 2020). When reconsideration of interlocutory orders is at issue, courts in this district "appl[y] the 'as justice requires' standard normally applied to motions under Rule 54(b) of the Federal Rules of Civil Procedure." *United States v. Hong Vo*, 978 F. Supp. 2d 41, 47 (D.D.C. 2013). "Considerations a court may take into account under the 'as justice requires' standard include whether the court 'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred. *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 70, 75 (D.D.C. 2008) (quoting *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)). At a minimum, "the efficient administration of justice requires that a court . . . have good reason to reconsider an issue which has already been litigated by the parties." *Id.* at 76. Deciding whether to grant reconsideration, moreover, "lies within the Court's sound discretion." *Pilkin v. Sony Interactive Entertainment LLC*, No. 17-cv-2501, 2020 WL 7339920 at *2 (D.D.C. Dec. 14, 2020); *see also Trabelsi*, 2020 WL 1236652, at *7.

      Kastner's motion for reconsideration offers no new facts or argument but, rather, rehashes the arguments that he previously made and that the Court previously rejected. He maintains (1) that the Court discounted his need to "protect himself and those close to him;" (2) that he is "charged with non-violent misdemeanor offenses" and that he "did not engage in violence" at the Capitol; (3) that the pretrial services officer providing courtesy supervision in the Southern District of Ohio "said that if he needs to visit [Kastner] in his home, he will call in advance" and that it was unreasonable for the Court to credit the views of the responsible PSA officer who is the "servicing officer in name only;" and (4) that "no one contends . . . that [he] is

8

a danger to the public at large." Dkt. 37 at 1–4.  Each of these arguments replows old ground and fares no better on a second outing.[2]  The Court, accordingly, has little difficulty concluding that the standard for granting reconsideration has not been met.

The only argument that Kastner makes that does not rely on facts highlighted in his previous filings and arguments is that two judges of this Court have recently lifted firearms restrictions in January 6 cases.  Dkt. 37 at 3–4.  To be clear, as the Court already explained, the Court "has [not] held that a firearms restriction should be imposed in every case."  Dkt. 35 at 4.  There may be context-dependent reasons for permitting defendants on pretrial release to possess firearms at home, such as a desire to protect children while parenting alone, combined with a determination that home visits need not be required, as was the case in *United States v. Logsdon*, No. 22-cr-23 (D.D.C. 2022).  *See* Dkt. 37 at 3–4.  "[O]n the facts of *this* case," however, for the reasons stated in the Court's Order denying Kastner's motion to modify, "a partial restriction is appropriate."  Dkt. 35 at 4 (emphasis added).

Any doubt about whether justice requires reconsideration of this issue is put to rest by a report filed (at the Court's request) on May 4, 2022, by PSA.  Dkt. 40; *see also* Minute Order (Apr. 19, 2022).  That report explains why PSA "maintains that the current conditions of release are sufficient and [the] least restrictive" means of assuring the safety of other persons and the community.  Dkt. 40 at 2.  According to the report, "[i]n courtesy supervision cases[,] the lead office" for "decisions and statements" is "the office where the case originates"—in this case,

---

[2] Kastner's argument that restricting his possession of firearms at home "defeat[s]" "the principal purpose of his having a firearm," Dkt. 35 at 5, is at odds with the argument that his counsel made to Magistrate Judge Faruqui, which stressed the unique importance of permitting Kastner to possess a firearm while on the premises of his Church and which made no mention of any unique risk that Kastner or his family faces while at home.  His argument, moreover, ignores the enhanced risk that law enforcement officers face when they visit the homes of those on pretrial release, regardless of whether those visits are preannounced.

9

PSA.  *Id.*  The report further explains that, although Kastner is not currently receiving home visits, "[that] does not preclude home visits from occurring should a law enforcement need arise," and, such "[h]ome visits are not always announced."  *Id.*  Given the risks associated with unannounced visits, the report continues, "officer safety is paramount."  *Id.*  Moreover, the report explains that during Kastner's post-arrest interview, he was "asked if he would remove the firearms from his home where he resided with his parents" and both Kastner and his father "indicated that they would remove the firearms but they would not be happy."  *Id.*  And finally, the report notes that PSA maintains its view that, notwithstanding Kastner's lack of prior convictions, "his alleged conduct prior to January 6 . . . as well as the violent criminal activity" that he was present for "support the currently imposed least restrictive conditions for this defendant while under active pretrial release."  *Id.*

To the extent Kastner argues that the Court should disregard the report because its author is not "the officer on the ground (in Ohio)," Dkt. 37 at 2, that argument misses the mark.  The report does not purport to reflect the author's personal concern for her own safety.  Rather, it reflects the official views of the agency charged with supervising Kastner's pretrial release, and it takes into account the safety of the community and any officer who might be asked to conduct a home visit, without or without advance notice.  The Court credits the report on that basis.

For all of these reasons, the Court will **DENY** Defendant's motion for reconsideration.

**SO ORDERED.**

/s/ Randolph D. Moss  
RANDOLPH D. MOSS  
United States District Judge

Date:  May 13, 2022