UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-CR-725 (RDM) |
| : | |
| JARED SAMUEL KASTNER, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO CONVERT HEARING FROM IN-PERSON TO VIDEOTELECONFERENCE ("VTC")**

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to Defendant Jared Kastner's ("Kastner") Motion to Convert Hearing from In-Person to VTC. ECF No. 46. On August 24, 2022, Kastner received a violation of the terms of his pretrial release from D.C. Pretrial services because there was a firearm located in the Defendant's home. ECF No. 45. The Court ordered an in-person hearing to discuss the Pretrial Violation Report. Minute Order, August 26, 2022. The Defendant is seeking to convert the hearing from in-person to VTC. The government opposes the motion and requests for the hearing to remain in-person.

**I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

    **A.    Events of January 6, 2021 and Kastner's arrest**

On January 6, 2021, thousands of rioters took part in an attack on the U.S. Capitol in an effort to stop the certification of the results of the 2020 presidential election. These rioters forced their way into the U.S. Capitol building, requiring elected officials and their staff to flee or shelter in place and injuring many law enforcement officers.

The government sets forth the details of Kastner's participation in this attack in its Opposition to Kastner's Motion to Modify Conditions of Release. ECF No. 22. In short, mere

1

minutes after the initial breach of the U.S. Capitol building, the Defendant unlawfully entered the building. The initial breach occurred at 2:12 p.m., and Kastner entered the Capitol at 2:17 p.m. After entering, he walked toward the Crypt, where he was confronted by a line of law enforcement officers who were preventing rioters from progressing into the building. During the standoff that ensued, rioters yelled at the law enforcement officers and moved forward toward the officers. Instead of leaving, Kastner remained in the Crypt while a crowd of rioters pushed forward into the law enforcement officers, eventually breaking the line. Ultimately, Kastner remained in the building for about 18 minutes.

   Also, the government has reason to believe that Kastner brought a firearm with him when he traveled to Maryland and, at a minimum, considered bringing the firearm with him into D.C. on January 6, 2021. Kastner's Google search history indicates as such. On January 4, 2021, at 7:04 p.m. ET, Kastner Googled "virginia beach gun laws", and subsequently visited the website "Large Capacity Magazines in Virginia." At 7:05 p.m. ET on the same day, Kastner, a concealed carry permit holder, Googled "concealed carry magazine limit washington DC." The next day, January 5, at 12:18 p.m. ET, he Googled "concealed carry on train in DC." Approximately one minute later, at 12:19 p.m. ET, Kastner Googled "concealed carry on train in 'DC.'" About ten seconds later, he visited a website titled "District of Columbia Concealed Carry Gun Law: CCPL… - USCCA." After, at 12:55 p.m. ET, the Defendant Googled "metro to DC from VA." Notably, Washington, D.C. does not allow firearms on any Metrorail transit system, including the metro. *See* https://mpdc.dc.gov/page/prohibited-places-carry-concealed-firearm. Kastner subsequently rode the D.C. metro into the District on January 5, 2021, and on January 6, 2021. Kastner's Google search history, as well as his possession of a concealed carry permit and the fact that he

subsequently rode the metro after Googling concealed carry laws on the metro, indicate that he traveled from Ohio with the firearm and contemplated bringing it with him to the Capitol.

Due to his participation in the riot, the Defendant was charged by criminal complaint on December 7, 2021, and arrested on December 8, 2021. ECF Nos. 1, 5. Also on December 8, 2021, the government filed a criminal information, charging Kastner with knowingly entering or remaining in a restricted building or grounds without lawful authority, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G), ECF No. 7.

**B.   The Court's Restriction on Kastner's Possession of Firearms as a Condition of Pretrial Release and Subsequent Litigation**

Magistrate Judge Faruqui set Kastner's conditions of release ("Order Setting Conditions of Bond") on December 13, 2021, at the Defendant's initial status conference in Washington, D.C. ECF No. 11. Prior to the initial status conference, the Pretrial Services Agency prepared a pretrial services report, which included a recommendation that Kastner not be allowed to possess firearms. ECF No. 10 at 1. At the initial appearance, consistent with this recommendation, the government requested that the Defendant not be permitted to possess firearms while on pretrial release; however, upon learning that the Defendant provides security for his church at services on Wednesdays and Sundays, the Court set the following condition related to firearms:

> Defendant is permitted to possess a firearm only while on the premises of the Wilmington Baptist Church (herein "Church"), during the services held on Wednesdays and those held twice on Sundays. The firearm is to be stored and secured on the Church's premises. Defendant is prohibited from taking the firearms off of the Church's grounds. Outside of that limited exception, Defendant is prohibited from possessing firearms at any other time outside of the services

3

mentioned. Defendant must also provide proof of the lawful ability to carry a firearm to Southern District of Ohio (Dayton) within 72 hours.

ECF No. 11 at 3.

On January 21, 2022, the Defendant filed a motion to modify conditions of release ("Motion"), in which the Defendant argued that the above-described firearms restriction was not reasonable or justified. ECF No. 20. On January 28, 2022, the government filed its response in opposition to the Defendant's motion. ECF No. 22. On February 4, 2022, the Defendant filed a reply in support of his motion ("Reply"). ECF No. 23. On February 18, 2022, the Court heard oral argument on the Motion, including testimony from the D.C. Pretrial Services officer supervising the Defendant, who opposed modifying the firearms restriction. On February 28, 2022, the Court issued a written order denying the Defendant's motion, finding that "the firearms restriction is reasonable under the circumstances." Order, ECF No. 35 at 2. The Court credited the views of the supervising D.C. Pretrial Services officer who "remains concerned that permitting Defendant to keep firearms at his residence poses an unreasonable risk to the officers who may need to conduct a home visit." *Id.* at 2-3. The Court expressed concern based on Kastner's Google search history that he even considered bringing "a weapon equipped with a large capacity magazine to the rally-turned-riot." *Id.* at 3-4. The Court found that "a partial restriction is appropriate" and noted that Magistrate Judge Faruqui's decision to allow Kastner to possess a firearm during limited time windows to provide security at his church "was reasonably tailored to Defendant's circumstances." *Id.* at 3-4.

On April 13, 2022, the Defendant filed the Motion for Reconsideration, again arguing that the firearms restriction was unreasonable and unjustified. ECF No. 37. On May 2, 2022, the government filed its response in opposition to the Defendant's motion. ECF No. 39. On May 13, 2022, the Court issued a written order denying the Defendant's motion, finding that "the standard

for reconsideration [had] not been met" and upholding the restriction as a condition of the Defendant's pretrial release. ECF No. 42 at 8-10. Again, the Court credited the views of Kastner's supervising D.C. Pretrial services officer, quoting extensively from the Pretrial Services Agency ("PSA") report filed at the Court's request in response to the Defendant's Motion for Reconsideration:

> Any doubt about whether justice requires reconsideration of this issue is put to rest by a report filed (at the Court's request) on May 4, 2022, by PSA. Dkt. 40; see also Minute Order (Apr. 19, 2022). That report explains why PSA "maintains that the current conditions of release are sufficient and [the] least restrictive" means of assuring the safety of other persons and the community. Dkt. 40 at 2. According to the report, "[i]n courtesy supervision cases[,] the lead office" for "decisions and statements" is "the office where the case originates"—in this case, PSA. *Id.* The report further explains that, although Kastner is not currently receiving home visits, "[that] does not preclude home visits from occurring should a law enforcement need arise," and, such "[h]ome visits are not always announced." *Id.* Given the risks associated with unannounced visits, the report continues, "officer safety is paramount." *Id.* Moreover, the report explains that during Kastner's post-arrest interview, he was "asked if he would remove the firearms from his home where he resided with his parents" and both Kastner and his father "indicated that they would remove the firearms but they would not be happy." *Id.* And finally, the report notes that PSA maintains its view that, notwithstanding Kastner's lack of prior convictions, "his alleged conduct prior to January 6 . . . as well as the violent criminal activity" that he was present for "support the currently imposed least restrictive conditions for this defendant while under active pretrial release." *Id.*

ECF. No. 42 at 9-10.

In the conclusion of the Court's order denying the Motion for Reconsideration, the Court credited the PSA report as a "reflect[ion] of the official views of the agency charged with Kastner's pretrial release" and noted that the PSA report "[took] into account the safety of the community and any officer who might be asked to conduct a home visit, with or without advance notice." *Id.* at 10.

C.      **Kastner's Move to Indiana and Violation for Firearms Possession**

On June 9, 2022, D.C. Pretrial Services Officer Katrina Stanford informed the government that Kastner planned to move from the Southern District of Ohio to the Southern District of Indiana.[1]

---

[1] Officer Stanford informed the government by email.

5

According to Officer Stanford, the move was scheduled to occur on June 25, 2022. As result of the move, the responsibility for Kastner's courtesy pretrial supervision would be transferred to the Southern District of Indiana. The Defendant cited his recent marriage as the basis for the move to Indiana. ECF. No. 45 at 1.

On July 26, 2022, Pretrial Services Officer Shallon Watson, acting as a courtesy supervision officer in the Southern District of Indiana, conducted a home visit at Kastner's new residence in Indiana. Kastner did not inform Officer Watson of the presence of firearms in his residence prior to Officer Watson's home visit. During an interview at Kastner's residence, Officer Watson asked Kastner whether there were any firearms located at the residence. Kastner disclosed that his wife, Kaitlyn, had firearms within the residence. Officer Watson discovered there were a total of three firearms in the residence, including two handguns and a rifle. One of the handguns was secured in a lockbox. The other handgun and rifle were not secured. Officer Watson did not observe any of the weapons; rather, she learned of the firearms from Kastner. Kastner continued, explaining to Officer Watson that he had an arrangement with the previous courtesy supervision officer in the Southern District of Ohio to surrender his firearms to his father and that his father had secured the firearms in a lockbox. Kastner and his father both lived in the same residence in Ohio prior to Kastner moving to Indiana. Kastner explained to Officer Watson that he thought he was still under the same arrangement when he moved to the Southern District of Indiana with his wife Kaitlyn.[2]

On July 28, 2022, Officer Watson sent Kastner a text message, which read, "Can you remind me what you had said regarding Kaitlyn's Firearms at the residence[?]" *See* ECF. No. 45, Exhibit 1. To the government's knowledge, Kastner did not respond to Officer Watson's text message about firearms in the residence on that date. On August 5, 2022, Kastner texted, "I'm following the rules of the agreement, still reside in the apartment in Scottsburg, have had no contact with law enforcement.

---

[2] Officer Stanford informed the government of the above conversation between Officer Watson and Kastner in a series of emails dated August 29, 2022.

I would be happy to fill things out on the app you told me about. Did you send me an email about it?" *Id.* Kastner did not respond to Officer Watson's prior question about the presence of firearms in his residence on that date.

On August 13, 2022, Kastner texted Officer Watson to inform her of travel plans. Officer Watson confirmed and advised, "[S]orry I didn't get back with you regarding firearms but [Kaitlyn] cannot have firearms in the residence. Wherever you are residing needs to be free of any firearms. I double checked with DC and your conditions… Does your wife have a place to store her firearms until the completion of this case?" Kastner replied, "Yes. There is a lockbox." *Id.* Officer Watson responded with a quoted message from D.C. supervising Officer Stanford, "All firearms should be removed from the residence. Mr. Kastner should already be aware of this condition of release. Nothing has changed in his conditions of release but his address. Let me know if you run into any issues about removing any firearms from the residence and I will notify the court." *Id.* Kastner disputed the conditions outlined by Officer Stanford, stating, "False. Conditions under [S]outhern Ohio were not so. Firearms were secured in the residence in the possession of another residence who could legally possess firearms. These INCLUDED firearms registered to the defendant. This is agree upon through Pretrial Services, and (as far as I am aware) checked and cleared with DC… DC Pretrial has made false statements and even in court before." Officer Watson replied, "The copy of the conditions I have that we went over and that you signed state you cannot have access to firearms outside the Wilmington church. Since you are no longer a member of that church you should not have access to firearms at all, at this time… If you disagree with this[,] I can let DC know and they can set the matter for a hearing to clear up any confusion." *Id.* Kastner advised Officer Watson that he would discuss the removal of Kaitlyn's firearms from the residence with his attorney. *Id.*

On August 22, 2022, Officer Stanford filed a Pretrial Violation Report. ECF No. 45. Officer Stanford advised, "PSA recommends that the defendant be removed from Pretrial Supervision due to non-compliance. On 7/26/2022, the defendant relocated to the Southern District of Indiana. A home

7

assessment was also conducted on 7/26/2022 and a firearm was discovered within the residence. The Southern District of Indiana instructed the defendant to remove the firearm from the residence. PSA was informed that the defendant stated that he will follow up with Defense Counsel concerning the removal of the firearm." *Id.* at 2. The basis for the recommendation cited included the Order Setting Conditions of Release issued by the Court on December 14, 2021, as well as the Court's Order Denying the Defendant's Motion to Modify the Firearms Restriction issued on February 28, 2022, and the Court's Order Denying the Defendant's Motion for Reconsideration of the Motion to Modify the Firearms Restriction issued on May 13, 2022. Based on the above, Officer Stanford advised, "The Defendant is fully aware that no firearm should be within his residence." *Id.* at 1-2.

On August 26, 2022, in light of the Pretrial Violation Report, the Court order Kastner, his attorney, the government, and a representative from PSA to appear for an in-person hearing on August 31, 2022. In response, on August 27, 2022, Kastner filed a Motion to Convert the In-person Hearing to VTC, citing hardship concerns involving travel to Washington, D.C., and potential impact on Kastner's new work in Indiana. ECF No. 45. On August 27, 2022, the Court ordered the government and pretrial services to respond to the Defendant's motion and re-calendared the hearing for September 1, 2022. Minute Order (August 27, 2022).

On August 29, 2022, Officer Watson exchanged a series of text messages with Kastner regarding the presence of firearms in his residence. *See* Exhibit 1 attached. Officer Watson asked, "[Were] you able to remove the firearms from your residence? If so, where were they relocated?" *Id.* Kastner replied, "Was I directed to do so? That was unclear." *Id.* Officer Watson replied with a screenshot of the above text message exchange from August 13, 2022, wherein Officer Watson told Kastner, "[Y]ou should not have access to firearms at all, at this time." *Id.* Kastner replied, "Kaitlyn has relocated them. I am not fully aware of the details at this time." *Id.* Officer Watson advised, "Let me know once you know. I will be out to meet with you within the next week to sign a firearms disposal form." Kastner replied, "I have all our messages. The image you just sent contains no

8

directions or clarification… A what form?" *Id.* Officer Watson replied, quoting from the prior text message on August 13, 2022, "'You should not have access to firearms at all, at this time.'" *Id.* Officer Watson continued, "If you are unclear[,] I am telling you now[,] they need to be out. My job is to ensure you abide by the conditions set forth by the sentencing court… I'm not into game[s] Mr. Kastner." *Id.* Officer Watson then replied to Kastner's question regarding the firearms disposal form, "This form will advise [that] firearms are out of the home and will state where they have been relocated… I will email you a copy." *Id.*

## II.  ARGUMENT

### A.  Standard of Review

Video-teleconferencing or "VTC" hearings are authorized pursuant to (1) § 15002(b)(1)(G) of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which allows the Chief Judge of a U.S. District Court to authorize such virtual appearances for pretrial release revocation hearings, and (2) D.C. Chief Judge Beryl A. Howell's standing orders since the beginning of the COVID-19 pandemic. The most recent order allowing virtual appearances for pretrial revocation cases was issued on May 12, 2022. COVID-19 Standing Order 22-27: In Re: Ninth Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings, https://www.dcd.uscourts.gov/sites/dcd/files/Final_SO%2022-27%209th%20Extension%20of%20SO%2020-17%20re%20use%20of%20VTC_20220512.pdf.

Courts have alluded to the fact that hearings may be conducted via VTC pursuant to Chief Judge Howell's standing order. *See Rogers v. Lumina Solar, Inc.*, No. 18-CV-2128 (KBJ), 2020 WL 3402360, at *2 n.4 (D.D.C. June 19, 2020) ("This Court held the fairness hearing telephonically and provided audio access to the public and the media via a teleconference number in light of COVID-19 pandemic and Chief Judge Beryl Howell's standing orders limiting in-person hearings due to pandemic-related exigencies."), *citing* COVID-19 Standing Order 20-19 (D.D.C. Apr. 20, 2020) and

COVID-19 Standing Order No. 20-9 (D.D.C. Mar. 17, 2020). However, courts have not noted any particular criteria or standards for when the standing orders should or should not be applied. The only requirement for such virtual appearance in the CARES Act is that the defendant consent after consultation with counsel. *See* §15002(b)(4). The CARES Act and Chief Judge Howell's Standing Order "authoriz[e]" but do not mandate virtual appearances. Therefore, whether to hold such virtual conferences appears left to the discretion of the Court.[3]

### B. Argument

The Defendant argues that he did not intend to "flout the Court's release order" and "remained in compliance with the order consistent with its practical enforcement." The government disagrees and requests the Court in its discretion to deny Defendant's Motion to Convert the Hearing to VTC.

First, Kastner argues that the Magistrate Judge the Southern District of Ohio did not prohibit Kastner's possession of firearms as a condition of pretrial release. ECF No. 46 at 1. This fact is irrelevant based on the subsequent and numerous instructions from the Court, Magistrate Judge Faruqui, and PSA, overriding any initial conditions of pretrial release set in the Southern District of Ohio. As the Court previously noted, Kastner was informed by PSA prior to his initial appearance in the District of Columbia via a report that PSA would be requesting a prohibition

---

[3] The Court, in its discretion, previously held, "Because the Court concluded that the hearing could not be conducted in person without seriously jeopardizing public health and safety and that video teleconferencing was not reasonably available, the Court exercised its authority, pursuant to Chief Judge Howell's March 30, 2020 Standing Order, see In Re: Use of Video Conferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings, Standing Order No. 20-17 (Mar. 30, 2020)(BAH), and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), H.R. 748, Div. B, Title V, § 15002(b)(1), to conduct the proceeding via telephone conference. The defendant, after consulting with his counsel, consented to proceeding in this manner. Dkt. 95; April 15, 2020 Hrg. Tr. (Rough at 1)." *United States v. Thomas*, 456 F. Supp. 3d 69, 75 n.1 (D.D.C. 2020). Noting the Court's prior reference to "public health and safety" as an additional determining factor for whether to proceed virtually, the government notes that the Defendant has not raised similar concerns. If the Court were to raise the issue of "health and public safety" *sua sponte* and determine that the proceeding could not occur in a safe manner, the government is prepared to proceed via VTC.

against the possession of firearms as a condition of pretrial release. Order Denying Motion for Reconsideration, ECF No. 42 at 3. On December 14, 2021, Magistrate Judge Faruqui set the conditions of Kastner's pretrial release, which superseded any conditions set by the Southern District of Ohio. Magistrate Judge Faruqui forbade the possession of firearms in the home but allowed Kastner to possess firearms at Wilmington Baptist Church as part of a security detail. ECF No. 10. The Court previously held that "restricting Kastner's possession of firearms at home—while allowing him to carry them at Church—was 'appropriate and that the Magistrate Judge [Faruqui's] decision was reasonably tailored to [Kastner's] circumstances.'" *Id.* at 7, *quoting* Order Denying Motion to Modify Firearms Restriction, ECF No. 35 at 4. Since Magistrate Judge Faruqui set conditions, the Defendant has twice moved for the Court to modify the restriction on firearms possession and the Court has twice denied those motions. *See* ECF Nos. 25 and 42. In denying Kastner's requests, the Court repeated the instruction that Kastner not possess firearms in the home as a condition of pretrial release. *Id.* The Defendant was well noticed not to possess firearms and any argument regarding initial conditions set by the Magistrate Judge in the Southern District of Ohio should be disregarded.

      Second, the Defendant argues that the courtesy supervisor Pretrial Officer Joshua Bohman in the Southern District of Ohio allowed Kastner to turn over his firearms to his father, David Kastner, who kept the firearms in a lockbox at their shared residence. ECF No. 46 at 1-2. The defendant states that he continued to reside with his father at his father's residence until he married and moved to Indiana. *Id.* Kastner argues that he believed a similar arrangement was in place when he moved to the Southern District of Indiana and that his wife's firearms could remain in the residence. *Id.* The government disagrees and urges the Court to reject the position that Kastner

11

reasonably believed firearms could be located in his father's residence or at his shared residence with his wife.

As noted above, during Kastner's post-arrest interview, he was "asked if he would remove the firearms from his home where he resided with his parents" and both Kastner and his father "indicated that they would remove the firearms, but they would not be happy." Pretrial Services Report, ECF No. 40. Accordingly, both Kastner and his father were on notice even before the initial appearance in the District of Columbia before Magistrate Judge Faruqui that all firearms were to be removed from the residence. It is clear from the Motion to Convert the Hearing to VTC that Kastner and his father never removed any firearms from the household. Instructions by Magistrate Judge Farqui and supervisory D.C. PSA were clear, regardless of whatever arrangement Kastner and his father believed to be in place with courtesy Officer Bohman.

The government asked PSA Officer Stanford whether she was previously aware of any such arrangement with courtesy Officer Bohman for Kastner's firearms to remain in his father's residence while Kastner lived there. Officer Stanford advised that Officer Bohman had not made her aware of any such arrangement. Officer Stanford further advised that had she been made aware by Officer Bohman of any firearms in Kastner's residence in the Southern District of Ohio, it would have constituted a violation of Kastner's conditions of pretrial release and she would have issued a violation report.

The Court should reject any argument that firearms were allowed in father's residence by Officer Bohman and, thus, Kastner reasonably believed that his wife's firearms could be present in their shared residence in Indiana. Even if Officer Bohman allowed firearms to be in a lockbox in Kastner's father's residence in violation of Kastner's pretrial service conditions, Officer Bohman was not supervisory officer in Kastner's pretrial release and any such arrangement

contravened the Court's numerous orders that firearms not be possessed within the home. Prior to the Defendant moving to Indiana, the Court and PSA made clear that the condition prohibiting Kastner's possession of firearms was in place for the protection of the courtesy officer conducting home visits and considering Kastner's judgement about firearms as evidenced by his internet search history on and before January 6. Based on the interview conducted by courtesy Officer Watson in Indiana, Kastner advised that there were three firearms in the residence. Only one Kastner's wife's handguns was secured in a lockbox, meaning Kastner had access to an unsecured handgun and rifle. Kastner neglected to inform Officer Watson of the firearms in the residence prior to her home visit. The Court previously expressed concern about this exact scenario and sought to avoid it by prohibiting firearms in the Defendant's residence. *See* Order Denying Motion for Reconsideration, ECF No. 42 at 9-10.

The restriction against Kastner's possession of firearms continues to be an issue. Since his initial appearance in the District of Columbia, Kastner has opposed the imposition of the restriction. Kastner was granted an exception to that condition, but that was not enough. Kastner made a motion to remove the condition entirely, which the Court denied. Kastner remained dissatisfied with condition remaining in place and filed a motion for the Court to reconsider. The Court denied the motion, stating that the Defendant was making the same unsuccessful arguments as before. When Kastner moved to Indiana, firearms came with his wife to their shared residence. Kastner was no longer attending the Church where the restriction was lifted. Firearms remained prohibited in Kastner's home. Kastner admitted that three of his wife's firearms were in their shared residence during a home visit by Officer Watson. Kastner advised that only one such firearm was secured in a lockbox where he could not possess it. As evidenced by the text messages included as Exhibits to Defendant's Motion, Kastner was subsequently instructed that firearms

were not allowed in his residence by Officer Watson based on advice from D.C. PSA. Rather than immediately comply, Kastner told Officer Watson that he would talk to his lawyer about the matter. After PSA issued a Pretrial Violation Report, text messages from today, August 29, 2022, between Officer Watson and Kastner today show that Kastner denied being told by Officer Watson to remove the firearms from his residence. *See* Exhibit. When Kastner eventually told Officer Watson that the firearms had been removed, he denied knowledge of where the firearms were relocated. *Id.* Based on the above, the government asserts that the Defendant has not demonstrated good cause to proceed virtually. The government is asking the Defendant to present himself in-person with counsel to the Court to explain the circumstances that formed the basis of the Pretrial Violation Report.

## CONCLUSION

WHEREFORE, for the above-stated reasons, the Court should deny Kastner's Motion to Convert Hearing from In-Person to Video-teleconference ("VTC").

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: *[signature]*
_____
WILL N. WIDMAN
NC Bar No. 48158
Trial Attorney, Detailee
1301 New York Avenue NW, 8th Floor
Washington, DC 20530
(202) 353-8611
Will.Widman@usdoj.gov