UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case: 21-cr-725-1 (RDM) |
| | : |
| JARED SAMUEL KASTNER | : |
| | : |
| Defendant. | : |

DEFENDANT'MOTION TO MODIFY CONDITIONS ON SECOND AMENDMENT GROUNDS

COMES NOW, the Defendant, Jared Kastner, by and through counsel, and herewith respectfully moves the Court for an order striking his release conditions prohibiting Kastner and his wife from possessing firearms. Kastner is a nonviolent defendant facing mere victimless <u>misdemeanor</u> charges, whose rights to keep and bear arms under the Second Amendment are being violated.

Kastner herein makes the same challenge that was made in *United States v. Quiroz*, 2022 WL 4352482 (W.D.Tx 2022), which led the Western District Court of Texas, Pecos Division to strike down sections of 18 U.S.C. §922 as unconstitutional. (That decision is currently on appeal to the U.S. 5th Circuit.) *See also* Derek Hawkins, "U.S. can't ban gun sales to people indicted on felony charges, judge says," *Washington Post*, Sept. 20, 2022 (https://www.washingtonpost.com/nation/2022/09/20/texas-gun-ban-indictment-

unconstitutional/) (accessed 12/31/2022); "A U.S. law banning those under felony indictments from buying guns is unconstitutional, a federal judge in West Texas ruled Monday," *CBS News*, Sept. 19, 2022, https://www.cbsnews.com/news/texas-judge-gun-buying-ban-people-felony-indictment-unconstitutional/ (accessed 12/31/2022).

Kastner, unlike Quiroz, is facing mere misdemeanor charges. Thus the same principles which apply in *Quiroz* apply with much more weight in Kastner's case. Kastner requests an order striking all conditions of his pre-trial release which limit or interfere with his 2nd Amendment right to keep and bear arms or with the 2nd Amendment rights of his wife, family and household.

**I.   The Second Amendment's plain text, protecting the right to keep and bear arms, covers Kastner and his household.   A statute, or any rules or release conditions prohibiting persons under misdemeanor charges from receiving or possessing a firearm, are not consistent with the nation's historical tradition of firearm regulation, and thus, Kastner's release conditions violate the Second Amendment.**

**LEGAL STANDARD**

The Supreme Court's ruling in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, ⎯⎯ U.S. ⎯⎯ ⎯, 142 S. Ct. 2111, 2130, 2134, 213 L.Ed.2d 387 (2022) changed the applicable framework for analyzing firearm regulations under the Second Amendment. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *D.C. v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." And just last term, in *Bruen*, the Supreme Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."

## II. The Supreme Court in *Bruen* laid out a new standard for courts to use when analyzing firearm regulations.

Before *Bruen*, courts of appeals had "coalesced around a "two-step" framework" when assessing Second Amendment claims, combining a historical analysis with means-end scrutiny. For the first step, the court would establish the Second Amendment's original scope through a historical analysis. If the regulated conduct fell outside the Amendment's original scope, "the analysis can stop there; the regulated activity is categorically unprotected." But if not outside the Amendment's scope or "inconclusive," the court would proceed to step two.

In step two, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." If the "core" Second Amendment right—self-defense in one's home—was burdened, the court would apply strict scrutiny. Otherwise, it would apply intermediate scrutiny, considering whether the Government has shown that the regulation is "substantially related to the achievement of an important governmental interest."

But in *Bruen*, Justice Thomas stated the two-step approach was "one step too many." In its place, Justice Thomas enumerated a new standard courts must follow:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

So the threshold question is whether the Second Amendment's plain text covers Kastner's situation.

## III. *Bruen*'s First Step: keeping a firearm under the Second Amendment's plain text.

The right to "keep and bear arms" shall not be infringed. Defendant Kastner is charged with four misdemeanors relating to entry and "parading" in the U.S. Capitol on Jan. 6, 2021. Kastner's pretrial conditions of release purport to forbid him from even having lawful firearms in his own home.

Bruen's first step asks a strictly textual question: does the Second Amendment's plain text cover possession, ownership, and keeping of guns in the home? Without a doubt the answer here is yes. The Second Amendment's plain text does cover such conduct.

IV.   **Bruen's second step: the historical analysis**.

Next, the Government must justify its regulation through a historical analysis. To do so, the Government's historical inquiry must show that § 922(n) is consistent with the historical understanding of the Second Amendment. If a challenged regulation addresses a "general societal problem that has persisted since the 18th century," this historical inquiry is "straightforward." But other regulations may require a "more nuanced" approach. In those cases, courts can reason by analogy. which involves finding a historical analogue that is "relatively similar" to the modern regulation. As dictated by *Bruen* the Court will initially lay out § 922(n)'s history.

A. **Under indictment: the Federal Firearms Act of 1938 to present.**

Section 922(n)'s history begins in 1938, when Congress passed the Federal Firearms Act ("FFA"). The FFA prohibited "individuals under indictment for, or convicted of, a crime of violence from shipping or transporting any firearms or ammunition in interstate commerce." The Act only covered those under indictment in federal court and "crimes of violence" was commonly understood to include only those offenses "ordinarily committed with the aid of firearms."

According to legislative history, Congress implemented the FFA to combat roaming criminals crossing state lines. Without federal laws, ex-convicts would simply cross state lines to circumvent conditions of probation or parole. The FFA's main goal then was to "eliminate the guns from the crooks' hands, while interfering as little as possible with the law-a-biding citizen." In Congress's eyes, those under indictment for, or convicted of, a crime of violence had already "demonstrated their unfitness to be entrusted with such dangerous instrumentalities."

Almost 25 years later, in 1961, Congress amended the FFA to cover "all individuals under indictment, regardless of the crime they were accused of." Congress also removed the "crimes of violence" language, replacing it with "crime punishable by imprisonment for a term exceeding one year."

Congress expanded gun regulations yet again with the Gun Control Act of 1968 ("GCA"). Key amendments included defining "indictment" to mean "an indictment ... in any court," thus adding persons indicted under state law. In full, the GCA criminalized receipt of a firearm or ammunition "by any person ... who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." In 1986, Congress combined all prohibitions against persons under indictment into what is now § 922(n)'s current form.

**B. The state's power to disarm in the early colonies.**

English law had a long history of disarming citizens for any reason or no reason at all. For example, Parliament granted officers of the Crown the power to disarm any person they judged "dangerous to the peace of the Kingdom." Or in 1688, Parliament disarmed Catholics because of their faith.

Yet even while still under English rule, the colonies' attitude toward disarming individuals diverged from its English roots. Indeed, when Virginia disarmed all citizens who refused to take an allegiance test, it did so only partially, allowing citizens to keep "such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the defense of his house and person." *So even "traitors" unwilling to swear allegiance to the Crown retained their weapons in colonial America.*

Leading up to the Second Amendment's adoption, the colonies "consistently refrained from exercising such a power over citizens." As one historian wrote, after he searched all existing printed session laws of the first fourteen states year by year from 1607 to 1815, he couldn't find "a single instance in which these jurisdictions exercised a police power to prohibit gun ownership by members of the body politic."

More evidence can be gleaned from the state conventions ratifying the Constitution. In February 1788, the Massachusetts Convention was the first to recommend amendments with its ratification.  John Hancock and Samuel Adams proposed several amendments that eventually appeared in the First, Second, and Fourth Amendments. One such amendment proposed that the Constitution "be never construed to authorize Congress ... to prevent the people of the United States, who are peaceable citizens, from keeping their own arms."

Massachusetts wasn't the only state, as New Hampshire copied nine of Massachusetts' proposals almost verbatim, while adding three of its own. One of the three involved the right to keep and bear arms: "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."

Until federalized by the FFA, prohibiting possession of a firearm, even by those convicted of violent crimes, was a rare occurrence. For instance, it wasn't until 1886 that a state court ruled on a firearm regulation that regulated "the condition of a person—rather than directly regulating his manner of carrying." There, in Missouri v. Shelby, the Supreme Court of Missouri upheld a ban on carrying a deadly weapon while intoxicated.

And even though other state courts eventually ruled on laws regulating the condition of a person, very few states prohibited felons—or any other type of person for that matter—from possessing a firearm. Indeed, by the mid-1920s, only six states had laws banning concealed carry by someone convicted of a crime involving a concealed weapon. And zero states banned possession of long guns based on a prior conviction.

Whether this Nation has a history of disarming felons is arguably unclear—it certainly isn't clearly "longstanding." And what's even more unclear—and still unproven—is a historical justification for disarming those indicted, but not yet convicted, of any crime. And in Kastner's case, the charges don't even rise to the level of felony allegations.

## CONCLUSION

The Second Amendment is not a "second class right." No longer can courts balance away a constitutional right. After *Bruen*, the Government must prove that laws regulating conduct covered by the Second Amendment's plain text align with this Nation's historical tradition. The pretrial conditions in this case are unconstitutional on their face.

ACCORDINGLY, Kastner asks that this Court remove all conditions of his pretrial release which limit his lawful possession and keeping of firearms while facing the misdemeanor charges in this case.

Dated: January 25, 2022

                                                  Respectfully submitted,
                                                  /s/ John M. Pierce
                                                  John M. Pierce
                                                  John Pierce Law P.C.
                                                  21550 Oxnard Street
                                                  3rd Floor PMB #172
                                                  Woodland Hills, CA 91367
                                                  P: (213) 349-0054
                                                  jpierce@johnpiercelaw.com

CERTIFICATE OF SERVICE

I, John M. Pierce, hereby certify that on this day, January 25, 2022, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.

*/s/ John M. Pierce*

John M. Pierce