# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-725 (MAU)** |
| | : | |
| **JARED SAMUEL KASTNER,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO MODIFY CONDITIONS ON SECOND AMENDMEN GROUNDS

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to Defendant Jared Kastner's ("Kastner") Motion to Modify Conditions on Second Amendment Grounds.[1] ECF No. 88. For the fourth time during the pendency of this matter, the Defendant is seeking to amend his conditions of pretrial release to alter or remove the firearms restriction. The government continues to oppose removing this condition of release.

The Court should deny the Defendant's motion under the standard of review for a motion for reconsideration. Kastner has not presented any intervening change in law with regards to conditions of pretrial release, any clear error, or new evidence not previously available when Judge Moss ruled on the Defendant's initial motion to remove the firearms restriction or on the Defendant's first motion for reconsideration. In the alternative, if the Court entertains the Defendant's arguments regarding the constitutionality of a firearms restriction as a condition of

---

[1] While the defendant's filing is styled as a "Motion to Modify Conditions on Second Amendment Grounds," the government contends that it is instead a second motion for reconsideration of Judge Moss's order denying the defendant's motion to modify the defendant's conditions of pretrial release to remove the firearms restriction. *See* Order Denying Motion to Modify Conditions of Release, ECF No. 35; *see also* Order Denying Motion for Reconsideration of Order Denying Motion to Modify Conditions of Release, ECF No. 42.

1

pretrial release, the Court should find that the law allowing a court to order that the Defendant "refrain from possessing a firearm" while on pretrial release when that is the least restrictive way to ensure community safety comports with the Second Amendment. 18 U.S.C. § 3142(c)(1)(B)(viii).

## I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### A.    Events of January 6, 2021 and Kastner's arrest

On January 6, 2021, thousands of rioters took part in an attack on the U.S. Capitol in an effort to stop the certification of the results of the 2020 presidential election. These rioters forced their way into the U.S. Capitol building, requiring elected officials and their staff to flee or shelter in place and injuring many law enforcement officers.

The government sets forth the details of Kastner's participation in this attack in its Opposition to Kastner's Motion to Modify Conditions of Release. ECF No. 22. In short, mere minutes after the initial breach of the U.S. Capitol building, the Defendant unlawfully entered the building. The initial breach occurred at 2:12 p.m., and Kastner entered the Capitol at approximately 2:17 p.m. After entering, he walked toward the Crypt, where he was confronted by a line of law enforcement officers who were preventing rioters from progressing further into the building. During the standoff that ensued, rioters yelled at the law enforcement officers and moved forward toward the officers. Instead of leaving, Kastner remained in the Crypt while a crowd of rioters pushed forward into the law enforcement officers, eventually breaking the line. Ultimately, Kastner remained in the Capitol building for about 18 minutes.

The government has reason to believe that Kastner brought firearms with him when he traveled from Ohio to Maryland and that, at a minimum, he considered bringing those firearms with him into Washington, D.C., on January 6, 2021. As further detailed below, in August 2022,

2

Kastner was found to be in violation of his pretrial release based on firearms being present in his residence. During a pretrial violation hearing, on September 6, 2022, Kastner testified that he brought firearms with him on his journey from Ohio to the Washington, D.C., area on January 4, 2021. However, Kastner denied bringing firearms with him to the rally or to the attack on the Capitol on January 6. *See* ECF 57. Consistent with the above admission, Kastner's Google search history revealed that he researched bringing firearms with him to the D.C. area. On January 4, 2021, at 7:04 p.m., Kastner Googled "virginia beach gun laws", and subsequently visited the website "Large Capacity Magazines in Virginia." At 7:05 p.m. on the same day, Kastner, a concealed carry permit holder, Googled "concealed carry magazine limit washington DC." The next day, January 5, at 12:18 p.m., he Googled "concealed carry on train in DC." Approximately one minute later, at 12:19 p.m., Kastner Googled "concealed carry on train in 'DC.'" About ten seconds later, he visited a website titled "District of Columbia Concealed Carry Gun Law: CCPL… - USCCA." After, at 12:55 p.m., Kastner Googled "metro to DC from VA." Notably, Washington, D.C. does not allow firearms on any Metrorail transit system, including the metro. *See* https://mpdc.dc.gov/page/prohibited-places-carry-concealed-firearm. Kastner subsequently rode the D.C. metro into the District on January 5, 2021, and on January 6, 2021. Kastner's testimony during a pretrial violation hearing for firearms possession, as well as Kastner's Google search history, revealed that he traveled from Ohio to the D.C. area with firearms and, at a minimum, contemplated bringing those firearms with him to D.C. on January 6.

Due to his participation in the riot, the Defendant was charged by criminal complaint on December 7, 2021, and arrested on December 8, 2021. ECF Nos. 1, 5. Also on December 8, 2021, the government filed a criminal information, charging Kastner with knowingly entering or remaining in a restricted building or grounds without lawful authority, in violation of 18 U.S.C.

§ 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of

18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building or grounds, in violation of 40

U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in

violation of 40 U.S.C. § 5104(e)(2)(G). ECF No. 7.

**B.      The Court's Restriction on Kastner's Possession of Firearms as a Condition of Pretrial Release and Subsequent Litigation**

Magistrate Judge Faruqui set Kastner's conditions of release ("Order Setting Conditions of

Bond") on December 13, 2021, at the Defendant's initial status conference in Washington, D.C.

ECF No. 11. Prior to the initial status conference, the Pretrial Services Agency prepared a pretrial

services report, which included a recommendation that Kastner not be allowed to possess firearms.

ECF No. 10 at 1. At the initial appearance, consistent with this recommendation, the government

requested that the Defendant not be permitted to possess firearms while on pretrial release;

however, upon learning that the Defendant provides security for his church at services on

Wednesdays and Sundays, Magistrate Judge Faruqui set the following condition related to

firearms:

> Defendant is permitted to possess a firearm only while on the premises of the
> Wilmington Baptist Church (herein "Church"), during the services held on
> Wednesdays and those held twice on Sundays. The firearm is to be stored and
> secured on the Church's premises. Defendant is prohibited from taking the firearms
> off of the Church's grounds. Outside of that limited exception, Defendant is
> prohibited from possessing firearms at any other time outside of the services
> mentioned. Defendant must also provide proof of the lawful ability to carry a
> firearm to Southern District of Ohio (Dayton) within 72 hours.

ECF No. 11 at 3.

On January 21, 2022, the Defendant filed a motion to modify conditions of release, in

which the Defendant argued that the above-described firearms restriction was not reasonable or

justified. ECF No. 20. In that brief, the Defendant asserted his right to possess firearms under the

4

Second Amendment. *Id.* at 4-5, *citing McDonald v. Chicago*, 561 U.S. 742 (2010) and *Heller v. District of Columbia*, 554 U.S. 570 (2008). However, the Defendant conceded that "[t]hat right may, of course, be subject to reasonable restrictions." ECF No. 20 at 4.

On January 28, 2022, the government filed its response in opposition to the Defendant's motion. ECF No. 22. On February 4, 2022, the Defendant filed a reply in support of his motion. ECF No. 23. On February 18, 2022, Judge Moss heard oral argument on the motion, including testimony from the D.C. Pretrial Services officer supervising the Defendant, who opposed modifying the firearms restriction. On February 28, 2022, Judge Moss issued a written order denying the Defendant's motion, finding that "the firearms restriction is reasonable under the circumstances." ECF No. 35 at 2. Judge Moss credited the views of the supervising D.C. Pretrial Services officer who "remains concerned that permitting Defendant to keep firearms at his residence poses an unreasonable risk to the officers who may need to conduct a home visit." *Id.* at 2-3. Judge Moss expressed concern based on Kastner's Google search history that he even considered bringing "a weapon equipped with a large capacity magazine to the rally-turned-riot." *Id.* at 3-4. Judge Moss found that "a partial restriction is appropriate" and noted that Magistrate Judge Faruqui's decision to allow Kastner to possess a firearm during limited time windows to provide security at his church "was reasonably tailored to Defendant's circumstances." *Id.* at 3-4.

On April 13, 2022, the Defendant filed a motion for reconsideration, again arguing that the firearms restriction was unreasonable and unjustified. ECF No. 37. On May 2, 2022, the government filed its response in opposition to the Defendant's motion. ECF No. 39. On May 13, 2022, Judge Moss issued a written order denying the Defendant's motion, finding that "the standard for reconsideration [had] not been met" and upholding the firearms restriction as a condition of the Defendant's pretrial release. ECF No. 42 at 8-10. Again, Judge Moss credited the

views of Kastner's supervising D.C. Pretrial services officer, quoting extensively from the Pretrial

Services Agency ("PSA") report filed at Judge Moss's request in response to the Defendant's

Motion for Reconsideration:

> Any doubt about whether justice requires reconsideration of this issue is put to rest
> by a report filed (at the Court's request) on May 4, 2022, by PSA. Dkt. 40; see also
> Minute Order (Apr. 19, 2022). That report explains why PSA "maintains that the
> current conditions of release are sufficient and [the] least restrictive" means of
> assuring the safety of other persons and the community. Dkt. 40 at 2. According to
> the report, "[i]n courtesy supervision cases[,] the lead office" for "decisions and
> statements" is "the office where the case originates"—in this case, PSA. *Id.* The
> report further explains that, although Kastner is not currently receiving home visits,
> "[that] does not preclude home visits from occurring should a law enforcement need
> arise," and, such "[h]ome visits are not always announced." *Id.* Given the risks
> associated with unannounced visits, the report continues, "officer safety is
> paramount." *Id.* Moreover, the report explains that during Kastner's post-arrest
> interview, he was "asked if he would remove the firearms from his home where he
> resided with his parents" and both Kastner and his father "indicated that they would
> remove the firearms but they would not be happy." *Id.* And finally, the report notes
> that PSA maintains its view that, notwithstanding Kastner's lack of prior
> convictions, "his alleged conduct prior to January 6 . . . as well as the violent
> criminal activity" that he was present for "support the currently imposed least
> restrictive conditions for this defendant while under active pretrial release." *Id.*

ECF. No. 42 at 9-10.

In the conclusion of his order denying the motion for reconsideration, Judge Moss credited

the PSA report as a "reflect[ion] of the official views of the agency charged with Kastner's pretrial

release" and noted that the PSA report "[took] into account the safety of the community and any

officer who might be asked to conduct a home visit, with or without advance notice." *Id.* at 10.

### C.    Kastner's Move to Indiana and Pretrial Violation for Firearms

On June 9, 2022, D.C. Pretrial Services Officer Katrina Stanford informed the government

that Kastner planned to move from the Southern District of Ohio to the Southern District of

Indiana. According to Officer Stanford, the move was scheduled to occur on June 25, 2022. As

result of the move, the responsibility for Kastner's courtesy pretrial supervision would be

transferred to the Southern District of Indiana. The Defendant cited his recent marriage as the basis for the move to Indiana. ECF. No. 45.

On July 26, 2022, Pretrial Services Officer Shallon Watson, acting as a courtesy supervision officer in the Southern District of Indiana, conducted a home visit at Kastner's new residence in Indiana. Kastner did not inform Officer Watson of the presence of firearms in his residence prior to Officer Watson's home visit. During an interview at Kastner's residence, Officer Watson asked Kastner whether there were any firearms located at the residence. Kastner disclosed that his wife, Kaitlyn, had firearms within the residence. Officer Watson was informed that there were three firearms in the residence, including two handguns and a rifle. Officer Watson was told that one of the handguns was secured in a lockbox, and the other handgun and rifle were not secured. Officer Watson did not observe any of the weapons; rather, she learned of the firearms from Kastner. After the home visit and based on advice from Kastner's supervisor PSA officer in D.C., Officer Watson subsequently instructed Kastner that firearms were not allowed in his residence. Rather than immediately comply, Kastner told Officer Watson that he would talk to his lawyer about the matter.

On August 22, 2022, Officer Stanford filed a Pretrial Violation Report. ECF No. 45. Officer Stanford advised:

> PSA recommends that the defendant be removed from Pretrial Supervision due to non-compliance. On 7/26/2022, the defendant relocated to the Southern District of Indiana. A home assessment was also conducted on 7/26/2022 and a firearm was discovered within the residence. The Southern District of Indiana instructed the defendant to remove the firearm from the residence. PSA was informed that the defendant stated that he will follow up with Defense Counsel concerning the removal of the firearm.

*Id.* at 2.

The cited bases for the recommendation included the Order Setting Conditions of Release issued by Judge Moss on December 14, 2021; the Order Denying the Defendant's Motion to Modify the Firearms Restriction issued on February 28, 2022; and the Order Denying the Defendant's Motion for Reconsideration of the Motion to Modify the Firearms Restriction issued on May 13, 2022. *See* ECF Nos. 11, 35, and 42. Based on the above, Officer Stanford advised, "The Defendant is fully aware that no firearm should be within his residence." ECF No. 45 at 1-2. After PSA issued a Pretrial Violation Report, Kastner denied being told by Officer Watson to remove the firearms from his residence. When Kastner eventually told Officer Watson that the firearms had been removed from his residence, he denied knowledge of where the firearms were relocated.

On August 26, 2022, in light of the Pretrial Violation Report, Judge Moss ordered Kastner, his attorney, the government, and a representative from PSA to appear for an in-person hearing on August 31, 2022. In response, on August 27, 2022, Kastner filed a Motion to Convert the In-person Hearing to VTC (ECF No. 46), which Judge Moss denied.

On September 6, 2022, Judge Moss held an in-person pretrial violation hearing, which included testimony from Officer Stanford, Officer Watson, Jared Kastner, David Kastner (the Defendant's father), and Kaitlyn Kastner (the Defendant's wife). Based on the testimony, Judge Moss issued an order finding by clear and convincing evidence that Kastner had violated the conditions of his release by having firearms in his residence and revising Kastner's conditions of pretrial release to include additional firearms restrictions. ECF No. 57. The government and PSA requested detention based on the violation; however, Judge Moss determined that there were conditions less restrictive than incarceration to ensure the safety of the community and issued the following revised conditions of pretrial release:

(1) Jared Samuel Kastner may not reside in any residence where any firearm is present, no matter how the firearm is stored or kept. In addition, should Kastner wish to stay with his father or anyone else during the period of his pretrial release, there may not be any firearm (no matter how the firearm is stored or kept) in that residence during his stay. [internal fn. omitted]

(2) So long as Kaitlyn Kastner resides with Jared Kastner, she may not possess any firearm in their shared residence, no matter how it is stored or kept, during the pendency of the proceedings against Jared Kastner. With Kaitlyn Kastner's consent, this order binds her as well as Jared Kastner, and any violation may subject either or both Jared and Kaitlyn Kastner to contempt of court.[2]

(3) The exemption providing that Jared Kastner could possess a firearm while on the premises of the Wilmington Baptist Church, Dkt. 11 at 3, is vacated. Kastner may not possess a firearm at any time and under any circumstances, including while at church.

(4) Jared Kastner is committed to Home Detention for a period of thirty (30) days, beginning September 15, 2022 and running through October 15, 2022. He will be restricted to his place of residence continuously during that period, except for authorized absences, enforced by an appropriate means of surveillance by the Pretrial Services Agency. In consultation with Pretrial Services, Kastner may receive authorization to leave his home for gainful employment, religious services, medical care and at such other times as may be specifically authorized by his supervising Pretrial Services officer. Electronic monitoring is an appropriate means of surveillance for home detention. Pretrial Services shall place Jared Kastner on home detention by September 15, 2022.

*Id.* at 11-12. [3]

On December 19, 2022, the Defendant made a motion for a trial by magistrate judge (ECF No. 69), which the government did not oppose (ECF No. 73). Judge Moss granted the motion and the case was reassigned to this Court. On January 25, 2023, Kastner filed

---

[2] During the pretrial violation hearing, Kaitlyn Kastner "agreed—on pain of contempt—to ensure that no weapons, whether his, hers, or anyone else's, are allowed in their mutual home, regardless of how any such weapon is stored or kept." *Id.* at 10-11.

[3] In his order, Judge Moss found Kastner's testimony about his understanding of the firearms restriction to be "not credible" and "gamesmanship designed to resist the Court's order and the clear direction of [PSA]." ECF 57 at 9. When Kastner was questioned about the number of firearms that he owned and his understanding of Magistrate Judge Faruqui's admonition that Kastner not have any firearms in his residence, Judge Moss found Kastner's responses to be "evasive or less than forthright." *Id.* Judge Moss informed Kastner that he was on "thin ice and that any future violations may require his incarceration pending trial." *Id.* at 10.

the instant motion, inviting this Court to revisit the firearms restriction as a condition of pretrial release.

II.     **ARGUMENT**

    A.     **Kastner has failed to meet the standard of review for a motion to reconsider**

        i.   **Standard of Review**

Judges "regularly entertain motions for reconsideration in a criminal context, applying the analogous Federal Rules of Civil Procedure." *In Matter of Extradition of Liuksila*, 133 F. Supp. 3d 249, 255 (D.D.C. 2016). Typically, courts look to Federal Rule of Civil Procedure 60(b) when considering a motion for reconsideration; however, "the standard of review for interlocutory decisions differs from the standards applied to final judgments under" Rule 60(b). *Id.* (quoting *Williams v. Savage*, 569 F.Supp.2d 99, 108 (D.D.C. 2008)). Federal Rule of Civil Procedure 54(b) allows a district court to revise an interlocutory order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). "[R]econsideration of an interlocutory decision is available under the standard 'as justice requires.'" *Liuksila*, 133 F.Supp.3d at 256 (quoting *Judicial Watch v. Dep't of Army*, 466 F.Supp.2d 112, 123 (D.D.C. 2006)). To that end, a Court may consider "whether the court 'patently' misunderstood a party, made a decision beyond the adversarial issues presented to the court, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court. *Id.* (citing *Loumiet v. United States*, 65 F. Supp. 3d 19, 2014 WL 4100111, at *2 (D.D.C. 2014)).

Motions for reconsideration, however, "cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier.'" *Estate of Gaither ex rel. Gaither v. District of*

*Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 48 (D.D.C. 2013).

### ii. Kastner has failed to present facts or arguments to warrant reconsideration.

Kastner does not argue that there has been any clear error by Judge Moss, or any new evidence not previously available. The Defendant, instead, mistakenly argues that there has been an intervening change in law. Kastner relies primarily on an out-of-circuit district court opinion, *United States v. Quiroz,* 2022 WL 4352482 (W.D. Tx 2022), which concerns the constitutionality of criminal statute 18 U.S.C. § 922(n)—*not* the constitutionality of pretrial release conditions under 18 U.S.C. § 3142(c)(1)(B)(viii)—and which is currently under appeal in the Fifth Circuit Court of Appeals. The district court in *Quiroz* specifically declined to consider whether restricting a defendant's right to possess a firearm as a condition of pretrial release is constitutional. *Id.* at *11. Though *Quiroz* relied on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), *Bruen* did not create a change in law with respect to pretrial release. By citing inapplicable case law, Kastner has failed to provide any new change in law that would justify this Court revisiting Kastner's conditions of pretrial release.

The Bail Reform Act requires that a defendant on pretrial release be "subject to the least restrictive condition, or combination of conditions" that will "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). In a prior order, Judge Moss noted that Magistrate Judge Faruqui "struck a reasonable balance" by allowing Kastner to possess firearms three times per week while serving on his church's security detail and prohibiting Kastner from possessing firearms at his home to protect Pretrial Services officers who might visit the Defendant. ECF No. 35 at 3. However,

Kastner could not abide by those reasonable conditions, and he received a violation for having firearms in his household. ECF No. 45. After a violation hearing, Judge Moss found by clear and convincing evidence that Kastner had knowingly violated the terms of pretrial release. ECF No. 57. Judge Moss found that "a more restrictive combination of conditions of release is needed reasonably to assure the safety of the community." *Id.* at 1, *citing* 18 U.S.C. § 3148(b) and 18 U.S.C § 3142(c). These more restrictive conditions included the removal of the accommodation for Kastner to have a firearm while at church and clear conditions that both Kastner and his wife were restricted from having firearms in their shared household. ECF No. 57 at 11-12. The government contends that firearms conditions ordered by Judge Moss in this matter are reasonable, temporary, and justified.

Kastner has not specified any change in circumstance or facts that would explain the need for modification of this temporary restriction. Rather, Kastner references the same broad concerns for self-defense that Judge Moss already considered when denying the Defendant's previous motions. *See* ECF 88 at 1-2. Judge Moss did not commit an error in his analysis when determining that a more restrictive combination of conditions of release was needed reasonably to assure the safety of the community. ECF No. 57 at 1. The firearms restriction as a condition of the Kastner's pretrial release remains part of the least restrictive combination of conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

The position of the D.C. Pretrial Services officer who is supervising Kastner has not changed. The Court previously heard testimony from that officer in opposition to the Defendant's request to modify the conditions of his pretrial release to remove the firearms restriction. ECF No. 35 at 2-3, *see also* ECF No. 57 at 8-9. Judge Moss previously credited the views of the D.C. Pretrial

Services officer, who "remains concerned that permitting Defendant to keep firearms at his residence poses an unreasonable risk to the officers who may need to conduct a home visit." ECF No. 35 at 2-3. Kastner does not address the views (or safety) of Pretrial Services officers at all in the most recent motion.

Kastner has not presented any arguments with respect to his conduct on January 6 that Judge Moss did not already consider and reject. Although the defendant is charged with non-violent misdemeanors, Judge Moss noted that the defendant was "among the first people to breach the U.S. Capitol" and "remained unlawfully in the Capitol building while rioters screamed and pushed against law enforcement." ECF No. 35 at 3. Based on the Kastner's own admissions during a pretrial hearing, the government now understands that he traveled from Ohio to the D.C. area with firearms. ECF 57 at 2. Based on the Defendant's internet search history in the days preceding January 6, Judge Moss previously expressed concern about the defendant's "hope[] to bring a weapon equipped with a large capacity magazine to a rally-turned riot." ECF No. 35 at 3-4. Kastner may disagree with Judge Moss's characterizations of the above-described conduct on and around January 6, but the defendant has not disputed any of the facts set forth in prior orders.

In a prior motion to remove the firearms restriction, as further detailed above, the Defendant already recognized that his Second Amendment rights are "subject to reasonable restrictions" while on pretrial release. *See* ECF 20 at 4-5. Judge Moss has twice concluded that these restrictions are reasonable. As explained further below, neither *Bruen* nor *Quiroz* have called into question Kastner's prior concession that reasonable restrictions on firearm rights are permissible.

There has not been a change of law regarding the constitutionality of the firearms restriction as a condition of pretrial release. Kastner notes that in *Quiroz,* the District Court for

13

Western District of Texas recently held that 18 U.S.C. § 922(n), a statute that criminalizes the receipt of a firearm by a person under indictment, is unconstitutional. *See* 2022 WL 4352482 at *13. While the Defendant argues at length in his motion that § 922(n) is unconstitutional and that "the Government [] must show that § 922(n) is consistent with the historical understanding of the Second Amendment," Kastner is not charged with a violation of 18 U.S.C. § 922(n). ECF No. 88 at 4. Kastner is charged with violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). The Defendant requests that this Court remove "all conditions of his pretrial release which limit or interfere with his 2nd Amendment right to keep and bear arms or with the 2nd Amendment rights of his wife, family and household" based on the holding in *Quiroz*. However, the court in *Quiroz* specifically declined to comment on the constitutionality of the restricting a defendant's right to possess firearms as a condition of pretrial release. *See* 2022 WL 4352482 at *11. The government contends that the Defendant's reliance on *Quiroz* is unfounded and does not meet the "intervening change in law" standard of review for a motion to reconsider.

While *Quiroz* relies on *Bruen* to reach its conclusion, *Bruen* did not work a change in law with respect to conditions of pretrial release. *Bruen* set forth the appropriate framework for evaluating laws that burden the rights of law-abiding, responsible individuals. It did not purport to upset a long line of authority upholding liberty restrictions on those charged with crimes. In his reliance on *Quiroz*, Kastner has not informed the Court of any intervening change in law regarding the conditions of pretrial release or presented any new evidence that would justify the Court revisiting this issue. Rather, the defendant is using the motion as "an opportunity to reargue facts and theories upon which a court has already ruled." 729 F. Supp. 2d at 14.

### B.     A temporary firearms restriction is proper and justified

### i.   Certain rights must give way to reasonable restrictions on pretrial release to protect others' safety, lessen risk of flight, and ensure compliance with release conditions

While the Court need not decide the constitutional issue that Kastner raises, the temporary firearm restriction passes constitutional muster as it is consistent with the Nation's historical tradition of gun regulation and imposing reasonable conditions of release on defendants facing criminal charges.[4]

There is no absolute to right to pretrial release and no absolute right for a defendant to possess a firearm while on pretrial release. *E.g., United States v. Portes*, 786 F.3d 758, 766 (7th Cir. 1985); *United States v. Snead*, No. 12-132M, 2014 WL 4473773, at *8 (D.R.I. Feb. 4, 2014). Logically, if the government has the power to detain a defendant pending trial and deny him his liberty and freedom of movement, and to deny him the right to possess a firearm altogether, the government must also have the lesser power to release him subject to appropriate conditions, such as a firearm restriction.

The Supreme Court upheld the constitutionality of the provisions of the 1984 Bail Reform Act allowing pretrial detention based on potential dangerousness. *United States v. Salerno*, 481 U.S. 739 (1987). Federal courts have also upheld the pretrial firearm restriction in

---

[4] Attached as Exhibit A is the "Response of the United States to Appellant's Memorandum," *U.S. v. Fencl*, 22-50316, ECF No. 16 (9th Cir. Jan. 13, 2023). In *Fencl*, the Ninth Circuit is considered the question: "Does the pre-trial release condition barring gun possession when that is the least restrictive way to ensure community safety violate the Second Amendment facially or as applied to Fencl?" The Ninth Circuit affirmed the district court's denial of the defendant's motion to modify the conditions of release and indicated that an opinion explaining that disposition will follow. *Fencl*, No. 22-50316, ECF No. 24 (Jan. 26, 2023). To avoid unnecessary exposition, government adopts and incorporates by reference the arguments regarding the constitutionality of firearms restrictions as a condition of pretrial release made in Exhibit A.

§ 3142(c)(1)(B)(viii) as constitutional. *Snead*, 2014 WL 4473773, at *8; *United States v. Campbell*, 309 F. Supp. 3d 738, 750 (D.S.D. 2018), *aff'd* No. 18-1578, 2018 WL 11392845 (8th Cir. May 4, 2018). In fact, "the imposition of a pretrial restriction on the possession of firearms has been found to be critical 'in most cases' because it safeguards the Pretrial Services officers who visit the home in the course of supervision." *Snead*, 2014 WL 4473773, at *8 (*citing United States v. Smedley*, 611 F.Supp.2d 971, 974 (E.D.Mo.2009)), *see also* ECF No. 35 and 42 (Judge Moss explaining in the instant matter why a temporary firearms restriction is necessary for the protection of Pretrial Services officers assigned to Kastner). Federal courts have found that the "prohibition from possession of firearms is not an unreasonable restriction on liberty and serves the interest in assuring the defendant's presence for trial." *E.g., Campbell*, 309 F. Supp. 3d at 750. In sum, the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S.at 748.

### ii. Kastner's *Bruen* challenge lacks merit

Kastner incorrectly contends that the firearm-prohibition conditions of his pretrial release "are unconstitutional on their face" after *Bruen*. ECF No. 88 at 7. His claim fails. To prevail on a facial challenge to a statute, "the challenger must establish that no set of circumstances exist under which the [statute] would be valid." *Salerno*, 481 U.S. at 745. A facial challenge carries a "heavy burden", and it is "the most difficult challenge to mount successfully." *Id*. The standard condition is a discretionary and temporary condition. A court may impose it after an individualized assessment of the defendant's circumstances and determination that it is needed to reasonably assure the defendant's appearance as required and the safety of any other person and the community. 18 U.S.C. § 3142(c)(B)(viii) (the court may impose the condition). The condition is

discretionary, and it no longer applies if charges are dismissed or a defendant is found not guilty, and the Court can modify it as needed.

Moreover, in *Bruen*, the U.S. Supreme Court repeatedly confirmed that the Second Amendment presumptively guarantees the right of "ordinary, law-abiding," "responsible" citizens to keep and carry firearms. *Bruen*, 142 S. Ct. at 2134; *see also District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Simply put, Kastner falls outside the Second Amendment's protection because he isn't an "ordinary, law-abiding" citizen. Second Amendment rights are not unlimited. *See Heller*, 554 U.S. at 592; *see also Bruen*, 142 S. Ct. at 2128 ("From Blackstone through 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."), *see also Fecl* brief, Exhibit A at 21-22 ("The Second Amendment applies to law abiding citizens"). Kastner has been charged with four misdemeanor offenses arising out of the January 6 attack on the U.S. Capitol. In lieu of detention pending trial, he has been released subject to conditions that place reasonable limitations on his liberty to ensure his appearance as required and the safety of any other person and the community.

Under § 3142, a federal court can order a defendant detained pending trial, *Salerno*, 481 U.S. at 741, where he would necessarily be precluded from possessing any type of firearm while in custody. This is consistent with our Nation's historical tradition of firearms regulation, as there is no constitutional right to bail. *See Slye*, 2022 WL 9728732, at *3. And based on historical tradition, if the government has the greater power to put a defendant in custody pending trial and deny him the right to possess a firearm altogether, it must also have the lesser power to release him subject to reasonable conditions. *See United States v. Slye*, No. 1:22-MJ-144, 2022 WL

9728732, at *2 (W.D. Pa. Oct. 6, 2022). Imposing a standard condition restricting firearms possession does not offend Kastner's constitutional rights under the Second Amendment.

If an indictment for a crime and the interests in community safety can justify restrictions on Fourth, Fifth, and Sixth Amendment rights and even outright detention pending trial, then they can also justify the restriction of a defendant's Second Amendment rights as a temporary and judicially authorized condition of pretrial release. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights"); *id*. at 2156 (the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees"). Restrictions on a defendant's liberty while charges are pending, even those as significant as detention, are necessary regulatory measures that do not violate the Constitution or the presumption of innocence. *Salerno*, 481 U.S. at 748; *Thomas*, 540 F. Supp. 3d at 371 (explaining that 18 U.S.C. § 3142(c)(1)(B) expressly provides that a pretrial release condition may require a person to refrain from possessing a gun notwithstanding the person's Second Amendment rights). Because the Second Amendment's protections are limited to "law-abiding, responsible citizens" and Kastner has not affirmatively demonstrated that he falls within that group of people, he is not entitled to Second Amendment protection here.

Even if Kastner were treated as a law-abiding citizen, the restriction temporarily barring gun possession as a condition of pretrial release when that is the least restrictive way to protect the community is consistent with historical tradition. As explained more fully in Exhibit A, that tradition includes: (1) historical restrictions on indicted defendants, including pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy; and (3) historical surety laws restricting the gun rights of people accused of posing a threat. *See* Exhibit A at 12-21 ("Historical analogues show that the pretrial-release gun condition is valid").

18

**Conclusion**

For these reasons, the government respectfully requests that the Court deny the Defendant's

motion to remove the firearms restriction as a condition of his pretrial release.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

_____
WILL N. WIDMAN
NC Bar No. 48158
Trial Attorney, Detailee
1301 New York Avenue NW, 8th Floor
Washington, DC 20530
(202) 353-8611
Will.Widman@usdoj.gov

No. 22-50316

# United States Court of Appeals
FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOHN FENCL,
DEFENDANT-APPELLANT

---

*On Appeal from the United States District Court
for the Southern District of California
21CR3101-JLS*

---

**RESPONSE OF THE UNITED STATES TO
APPELLANT'S MEMORANDUM IN SUPPORT
OF HIS FRAP 9(A) APPEAL**

---

RANDY S. GROSSMAN
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

ZACHARY J. HOWE
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-8693*

**TABLE OF CONTENTS**

PAGE

Jurisdiction and Bail Status ...................................................1

Question Presented .................................................................2

Statement .................................................................................2

Summary of Argument.............................................................5

Argument ..................................................................................6

A. This Court reviews the constitutionality of the
   condition *de novo* and the district court's factual
   findings for clear error...........................................................6

B. This district court properly found that the pretrial-
   release condition is constitutional. ....................................6

   1. Indictment can entail many restrictions, including a
      ban on gun possession in appropriate circumstances,
      that would otherwise violate constitutional rights. ......7

   2. *Bruen* does not cast doubt on the constitutionality
      of pretrial-release conditions under the Bail Reform
      Act. ...............................................................................10

   3. Historical analogues show that the pretrial-release
      gun condition is valid. ................................................12

      a. Pretrial Detention ...................................................12

      b. Laws Disarming the Dangerous or
         Untrustworthy.......................................................16

      c. Surety Laws .............................................................18

   4. The Second Amendment applies to law-abiding
      citizens. .......................................................................21

i

5. Fencl offers no convincing reason to reverse. ..............22

C. The relevant factors support applying the gun condi-
tion here........................................................................24

Conclusion...............................................................................27

Certificate of Compliance

**TABLE OF AUTHORITIES**

Cases:

*Agostini v. Felton*, 521 U.S. 203 (1997)............................12

*Baze v. Rees*, 553 U.S. 35 (2008) .......................................14

*Bell v. Wolfish*, 441 U.S. 520 (1979)...................................7

*Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991) .......7

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006) ............................................6

*Dist. of Columbia v. Heller*,
554 U.S. 570 (2008)..............................................10, 11, 21

*Florence v. Bd. of Chosen Freeholders*,
566 U.S. 318 (2012) ...........................................................7

*Folajtar v. Att'y Gen.*,
980 F.3d 897 (3d Cir. 2020)................................15, 17, 18

*Johns v. Cnty. of San Diego*,
114 F.3d 874 (9th Cir. 1997) ..........................................25

*Kaley v. United States*, 571 U.S. 320 (2014).............7, 8, 15

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................17

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) .............................14, 15, 17

*Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009)......12

*N.Y. St. Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)................................................passim

*Newbery Corp. v. Fireman's Fund Ins. Co.*,
  95 F.3d 1392 (9th Cir. 1996) ...............................................6

*Peruta v. Cnty. of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) ..........................26

*Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022), *vacated
  upon grant of rehearing en banc*, 2023 WL 118469
  (Jan. 6, 2023). ...........................................................16, 18

*Sir. Johsn Knight's* Case,
  87 Eng. Rep. 75 (K.B. 1686) ...................................... 17-18

*Stack v. Boyle*, 342 U.S. 1 (1951)........................................1

*United States v. Edwards*,
  430 A.2d 1321 (D.C. 1981) (en banc) .............................12

*United States v. Harris*, No. 16CR851-VSB,
  2020 WL 4699044 (S.D.N.Y. Aug. 12, 2020)
  (unpublished)......................................................... 26-27

*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008) ..........6

*United States v. Kays*, --- F.Supp.3d ----,
  2022 WL 3718519 (W.D. Okla. 2022) .............................21

*United States v. Perez-Garcia*, --- F.Supp.3d ----,
  2022 WL 4351967 (S.D. Cal. 2022), *aff'd* 2022 WL
  17477918 (S.D. Cal. Dec. 6, 2022) (unpublished)..... 20-21

*United States v. Perry*, 788 F.2d 100 (3d Cir. 1986)..........13

*United States v. Provenzano*,
   605 F.2d 85 (3d Cir. 1979)..............................................26

*United States v. Quiroz*, No. 22CR104-DC,
   2022 WL 4352482 (W.D. Tex. Sept. 19, 2022)
   (unpublished) ...............................................................21

*United States v. Robinson*, 414 U.S. 218 (1973).................7

*United States v. Salerno*,
   481 U.S. 739 (1987) ........................4, 8, 10, 12, 22, 23, 24

*United States v. Scott*,
   450 F.3d 863 (9th Cir. 2006) ...........................8, 11, 22, 24

*United States v. Slye*, No. 22MJ144,
   2022 WL 9728732 (W.D. Pa. Oct. 6, 2022)
   (unpublished) ............................................................14, 15

*United States v. Stambaugh*, No. 22CR218-PRW,
   2022 WL 16936043 (W.D. Okla. Nov. 14, 2022)
   (unpublished) ...............................................................21

*United States v. Stephens*,
   594 F.3d 1033 (8th Cir. 2010) ............................ 12-13, 15

*United States v. Velez-Ramos*, No. 18CR767-PAD,
   2019 WL 1771614 (D.P.R. Apr. 22, 2019)
   (unpublished) ...............................................................27

*United States v. Watson*, 423 U.S. 411 (1976) ...................7

Constitution and Statutes:

U.S. Const., amend. II ..............................................passim

U.S. Const., amend. IV ......................................................9

U.S. Const., amend. V.......................................................9

U.S. Const., amend. VI .....................................................9

18 U.S.C. § 3142 ...................................................... passim

18 U.S.C. § 3231 ..................................................................1

26 U.S.C. § 5861(d) ...........................................................3

28 U.S.C. § 1291 ................................................................1

Rules:

Fed. R. App. P. 4(b)(1)(A)(i) ...................................1

Fed. R. App. P. 9(a) ..........................................................1, 3

Other Authorities:

1 Acts and Resolves, Public and Private, of the Province of
the Massachusetts Bay (1869) .......................................19

1 General Public Statutory Law and Public Local Law of
the State of Maryland, from the Year 1692 to 1839 Inclu-
sive: With Annotations Thereto, and a Copious Index
(1840) ................................................................................19

1 Laws of the State of Delaware from the Fourteenth Day
of October, One Thousand Seven Hundred, to the Eight-
eenth Day of August, One Thousand Seven Hundred and
Ninety-Seven (1797) .......................................................19

1 The Public Acts of the General Assembly of North Caro-
lina (1804) .......................................................................17

2 Statutes at Large of Pennsylvania from 1682 to 1801
(1896) ...............................................................................19

4 William Blackstone, Commentaries on the Laws of Eng-
land (1769) .......................................................................18

5 The Acts and Resolves, Public and Private, of the Prov-
ince of the Massachusetts Bay (1886) ...........................17

7 Records of the Colony of Rhode Island and Providence Plantations, in New England ........................................... 17

9 Statutes at Large, Being A Collection of All the Laws of Virginia (1821) ................................................. 17

9 Statutes at Large of Pennsylvania ................................. 17

13 Statutes at Large, Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619 (1823) ............................................... 19

Acts and Laws of His Majesties Colony of Connecticut in New-England (1901) ............................................... 19

Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament (1771) ................................................................. 19

Ariz. Rev. Stat. § 13-3112(E)(3) ................................. 22

Act of Sept. 24, 1789, § 33 (1789) .............................. 22

George Webb, The Office and Authority of a Justice of Peace (1736) .......................................................... 18

Jospeh G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing, Firearms*, 20 Wyo. L. Rev. 249 (2020) ........................ 16

Ky. Rev. Stat. § 237.110(4)(a) ................................. 22

La. Stat. § 40:1379.3(C)(10) ................................. 22

Militia Act of 1662, 13 & 14 Car. 2, c.3 § 13 (1662) .......... 16

Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey (1777 law) ......................................................... 17

Case 1:21-cr-00229-MAC-... Document 105-78 Filed 04/20/23 Page 87 of 65

Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490 (2018) .........................................................................13

Stuart Banner, The Death Penalty: An American History (2002)...............................................................................14

Tenn. Code § 39-17-1351(c)(7) ........................................22

William Rawle, A View of the Constitution of the United States of America (2d ed. 1829) ...................................20

No. 22-50316

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOHN FENCL,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
21CR3101-JLS*

## JURISDICTION AND BAIL STATUS

The district court has jurisdiction in John Fencl's case under 18
U.S.C. § 3231 since he is charged with offenses against the United
States. Appellant's Exhibit (Ex.) G. On December 7, 2022, the court
denied Fencl's appeal from the magistrate judge and affirmed his
pretrial-release conditions. Ex.A. That decision was immediately
appealable as a final order. *See* Fed. R. App. P. 9(a); *Stack v. Boyle*,
342 U.S. 1, 4 (1951). Fencl timely appealed on December 21, 2022.
Ex.I; Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under
28 U.S.C. § 1291. Fencl is in not custody and is set for a status hear-
ing on January 20, 2023. Clerk's Record (R) 76.

1

### QUESTION PRESENTED

Does the pretrial-release condition barring gun possession when that is the least restrictive way to ensure community safety violate the Second Amendment facially or as applied to Fencl?

### STATEMENT

This case arose out of Fencl's third gun-related arrest. Ex.A-6. In September 2019, officers arrested Fencl for illegally possessing a concealed gun without a license. Ex.A-1. He pled guilty to a misdemeanor. *Id.* In April 2021, officers arrested Fencl for carrying a privately made "ghost gun," but no charges resulted. R 1 at 3. During the arrest, Fencl said he would be armed every time officers contacted him. *Id.* Finally, in June 2021, officers arrested Fencl after finding more than 110 guns at his house, including 10 "ghost guns," four silencers, three short-barreled rifles, and 21 other guns that are illegal under state law. Ex.A-1−2. Officers also found thousands of rounds of ammunition, including armor-piercing and incendiary rounds, and a gas grenade. R 57-4, 57-6. Post-*Miranda*, Fencl said he manufactured several of the guns, including a short-barreled rifle, and indicated that he knew he was not supposed to possess short-barreled rifles. R 1 at 3-4.

The government ultimately charged Fencl with illegally possessing three unlicensed short-barreled rifles and four unlicensed silencers 26 U.S.C. § 5861(d). Ex.G. After a hearing, the magistrate judge set bond subject to various conditions. Ex.H. One was a statutory condition barring gun possession, which the magistrate judge modified to also bar gun-part possession. Ex.H at 1; *see* 18 U.S.C. § 3142(c)(1)(B)(viii).

In July 2022, Fencl—who still does not have a California gun license, *see* Ex.B-9 (noting that he "wish[es]" to get one)—moved to strike the gun condition so he could carry guns in public,[1] citing the Second Amendment and the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Ex.E; Ex.F. The government opposed. R 69. After hearing argument, the magistrate judge denied the motion in a written order. Ex.D. The judge concluded that the Second Amendment applies to "law-abiding citizens." Ex.D at 4 (quoting *Bruen*, 142 S. Ct.

---

[1] Fencl's brief in this Court concedes explicitly for the first time that he is barred from carrying guns in public by state laws that are not at issue here. Appellant's FRAP 9(a) Memorandum (Mem.) 11 & n.1. Despite this independent restriction, he argued in the district court that he wanted the gun condition of his release stricken so he can carry guns "for his work travels," which occur "at all times of the day and night, with great frequency." Ex.B-9; Ex.C-2; Ex.F-2 *see also* Ex.D-1; Ex.F-2.

at 2156). And since Fencl was "charged with a crime based on a finding of probable cause," he did not qualify. *Id.* Yet even if he did, found the judge, historical analogues to the gun condition showed that it was not an unconstitutional infringement on his right to bear arms. Ex.E-5–6. The magistrate judge also cited *United States v. Salerno*, 481 U.S. 739 (1987), which upheld pretrial detention based on danger to the community—a greater restriction than release with a gun condition—as support for the conclusion that the gun condition was constitutional. Ex.E-4–5.

Fencl appealed that order to the district court, and the government responded. Ex.B; Ex.C; R 79. The court denied the motion in a written order. Ex.A. Like the magistrate judge, the court found that Fencl was not a law-abiding citizen covered by the Second Amendment. Ex.A-3–4. It also found that historical analogues supported the law. Ex.A-4–6. As comparators, it cited surety laws requiring those reasonably likely to breach the peace to post surety bonds before carrying guns in public, legislatures' historically broad powers over bail and detention, and *Salerno*'s discussion of detention powers. Ex.A-3–6. The district court also confirmed that the condition was properly imposed on Fencl based on his individual circumstances. Ex.A-6.

This appeal follows. Ex.I.

## SUMMARY OF ARGUMENT

The district court did not violate the Constitution by imposing a condition barring Fencl from possessing guns while on bond to ensure community safety. For one, precedent confirms that those under indictment may be subjected to many liberty restrictions that would otherwise be unconstitutional, including detention and various pretrial-release conditions in appropriate circumstances. The gun condition here falls well within those permissible restrictions. *Bruen* did not upset that precedent or address rights that are necessarily restricted during pretrial release or detention, so it does not require a different conclusion.

Historical tradition also supports that conclusion. Legislatures have long possessed broad powers over bail and detention and have long exercised those powers to detain people charged with serious crimes. That history supports the lesser power of ordering release with a gun condition to protect the community. And founding-era laws barring gun possession by those deemed dangerous or untrustworthy likewise show that the condition here, which is tethered to community safety, is constitutional. That and other history all support upholding the law here.

Striking down the gun condition would also have the perverse effect of causing courts to deny bail when a gun condition might have sufficed to safeguard the community, thus leaving more people in prison while they await trial. For the reasons discussed, this Court should uphold the condition and affirm.

### ARGUMENT

A.   This Court reviews the constitutionality of the condition *de novo* and the district court's factual findings for clear error.

This Court reviews the constitutionality of pretrial-release conditions *de novo* and the district court's factual findings under the "deferential, clearly erroneous standard." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citation omitted). The Court may affirm the district court's decision on any ground supported by the record. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 941 (9th Cir. 2006); *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996).

B.   This district court properly found that the pretrial-release condition is constitutional.

The district court's decision upholding the pretrial-release condition is correct in light of Supreme Court precedent, the history of bail and detention, and the history of laws denying guns to those deemed dangerous or disruptive. This Court should affirm.

6

1.  *Indictment can entail many restrictions, including a ban on gun possession in appropriate circumstances, that would otherwise violate constitutional rights.*

The district court correctly held that the law allowing a court to order that the defendant "refrain from possessing a firearm" while on pretrial release when that is the least restrictive way to ensure community safety comports with the Second Amendment. 18 U.S.C. § 3142(c)(1)(B)(viii).

A grand jury's indictment charging a person with a crime has important legal consequences. *See Kaley v. United States*, 571 U.S. 320, 328-29 (2014). While a defendant is presumed innocent until proven guilty, *see Bell v. Wolfish*, 441 U.S. 520, 533 (1979), he may still be arrested, *see United States* v. *Watson*, 423 U.S. 411, 417 (1976); searched incident to arrest, *see United States* v. *Robinson*, 414 U.S. 218, 236 (1973); strip-searched in jail, *see Florence* v. *Bd. of Chosen Freeholders*, 566 U.S. 318, 322-23 (2012); and jailed pending arraignment, *see Cnty. of Riverside* v. *McLaughlin*, 500 U.S. 44, 52, 58 (1991). And the government can, in some instances, freeze a defendant's assets—even those needed to pay a lawyer. *See Kaley*, 571 U.S. at 326-27.

Even after arraignment, a defendant may be denied bail pending trial. The Bail Reform Act allows a court to detain a defendant if it finds that no release conditions will reasonably assure community

7

safety. *See* 18 U.S.C. § 3142(e)-(f). The Supreme Court has held that this part of the Act "fully comports with constitutional requirements." *Salerno*, 481 U.S. at 741. In reaching that conclusion, the Court noted that it had "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S. at 748-49. The Court noted the Act's "extensive safeguards" and "procedural protections" in concluding that the Act complies with the Due Process and Excessive Bail Clauses. *Id.* at 752, 755.

The same reasons that support the Bail Reform Act's pretrial-detention provision also support the imposition of judicially administered release conditions under the Act. *See, e.g.*, *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) (reading *Salerno* as "uph[olding] the constitutionality of [the] bail system" in the Bail Reform Act and applying same framework to analysis of bail-condition validity). That makes sense. The greater power to take away the "fundamental" and "strong interest in liberty" altogether pending trial based on danger to the community, *Salerno*, 481 U.S. at 750, necessarily implies the lesser power of granting release with conditions reasonably necessary to prevent danger to the community. *Cf. Kaley*, 571 U.S. at 330 ("'[I]t would be odd to conclude that

8

the Government may not restraint property' on the showing often sufficient to 'restrain *persons*." (citation omitted)).

There is no reason to apply a different rule to a pretrial-release gun condition. If an indictment for a crime and the interests in community safety can justify restrictions on Fourth, Fifth, and Sixth Amendment rights and even outright detention pending trial, then they can also justify the restriction of a defendant's Second Amendment rights as a temporary and judicially authorized condition of pretrial release. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights"); *id.* at 2156 (the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees").

The statutory gun restriction is a carefully circumscribed release condition that complies with constitutional guarantees. The condition may only be imposed if it is "the least restrictive" way to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). Thus, just as the "Government's regulatory interest in community safety can . . . outweigh an individual's liberty interest" and justify pretrial detention, that same interest can justify

temporarily disarming an indicted person whose release is otherwise appropriate. *Salerno*, 481 U.S. at 748.

> ### 2. Bruen *does not cast doubt on the constitutionality of pretrial-release conditions under the Bail Reform Act.*

The Second Amendment reads: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *District of Columbia v. Heller*, the Supreme Court held "that the Second Amendment conferred an individual right to keep and bear arms" and that the District of Columbia's "ban on handgun possession in the home" violated that right. 554 U.S. 570, 625, 635 (2008).

In *Bruen*, the Court made *Heller* "more explicit." 142 S. Ct. at 2131, 2134. It clarified "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. In that case, a regulation is valid if the government shows "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Court noted that circuit courts, while applying a similar test as a "first step," had also applied a "means-end scrutiny" "second step." *Id.* at 2125-27. The Court deemed the second step "one step too many" and rejected it. *Id.* at 2127. Applying the clarified test, the Court held that the Second Amendment protects the "right to carry a handgun

10

for self-defense outside the home" and that a law "condition[ing] issuance of a license to carry on a citizen's showing of some additional special need" violated that right. *Id.* at 2122.

In reaching those conclusions, the Court "decide[d] nothing about who may lawfully possess a firearm." *Id.* at 2157 (Alito, J., concurring). Nor did it address the extent to which constitutional rights may be restricted because of pretrial detention or as a condition of bail. *See* Ex.C-4 (Fencl agreeing that "*Bruen* did not address this issue."). Indeed, *Bruen* reaffirmed *Heller*'s observation that, [l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). And it clarified that the Second Amendment is equal to other rights, but never suggested that it received *extra* protections. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights.").

In sum, *Bruen* does not call into question *Salerno*'s conclusion that the Bail Reform Act's pretrial detention provision is constitutional, which by close analogy confirms the validity of the Act's pretrial-release conditions. *See Scott*, 450 F.3d at 874. This Court must

11

follow "on point" Supreme Court decisions even if "subsequent decisions cast strong doubt on" them. *Musladin v. Lamarque*, 555 F.3d 830, 837 (9th Cir. 2009*)*; *see Agostini v. Felton*, 521 U.S. 203, 237 (1997). Here, *Bruen* casts no doubt on *Salerno* or other decisions upholding significant restrictions on the liberty interests of those charged with crimes. This Court can thus uphold the challenged condition without proceeding further. Still, as explained below, the historical analysis confirms the condition's validity.

### 3.   *Historical analogues show that the pretrial-release gun condition is valid.*

Temporarily barring gun possession as a condition of pretrial release when that is the least restrictive way to protect the community is consistent with historical tradition. That tradition includes: (1) historical restrictions on indicted defendants, including pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy; and (3) historical surety laws restricting the gun rights of people accused of posing a threat.

### a.   *Pretrial Detention*

The historical record confirms that there was no "fundamental right to bail" at the time of the founding and that legislatures possessed broad powers over bail and detention. *United States v. Edwards*, 430 A.2d 1321, 1329 (D.C. 1981) (en banc); *see also United*

*States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) ("Congress may ban bail in entire classes of cases."); *United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986) (most "federal courts that have addressed the issue have held that there is no absolute right to bail").

In exercising their broad powers, legislatures have historically made some offenses nonbailable or presumptively nonbailable. For example, "[c]apital defendants have been excluded from bail since colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—was generally consistent with that practice. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which cases it shall not be admitted but by [a court or judge], who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the founding, detention swept broadly because many crimes were punishable by death. Capital punishment for felonies was

13

"ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (citing Stuart Banner, The Death Penalty: An American History 23 (2002)). Capital crimes "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

As one court summarized, "history recognized detention as a restriction that could be imposed upon a person who was accused, but not convicted[,] of a crime. Inherent in this severe restriction of liberty is the temporary abridgement of numerous core constitutional rights[,] including . . . the right to bear arms." *United States v. Slye*, No. 22MJ144, 2022 WL 9728732, at *2 (W.D. Pa. Oct. 6, 2022) (unpublished). It would thus "be illogical to conclude that the Court has the authority to set conditions temporarily depriving an accused of all of [those] constitutional protections by ordering his detention but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* Stated differently, it is difficult to conclude that the public, in 1791, would have understood someone facing outright pretrial detention

14

to be within the scope of those entitled to possess arms. *Cf. Folajtar v. Att'y Gen.*, 980 F.3d 897, 905 (3d Cir. 2020) ("it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture" (*i.e.*, a felon) "to be within the scope of those entitled to possess arms" (quoting *Medina*, 913 F.3d at 158).

In sum, § 3142(c)(1)(B)(viii)'s gun-restriction condition imposes a far lesser burden on an indicted defendant than does pretrial detention. Pretrial detention strips a defendant of all Second Amendment rights and severely restricts many other "core constitutional rights," like freedom of speech, freedom of association, and reasonable privacy expectations. *See Slye*, 2022 WL 9728732, at *2 & n.4. In contrast, § 3142(c)(1)(B)(viii) imposes a narrower prohibition— temporarily disarming a person subject to release—that squares with the historical tradition of affording legislatures broad powers of bail and detention and of detaining defendants charged with serious crimes. The power to detain necessarily encompasses the power to impose that lesser liberty restriction. *Cf. Kaley*, 571 U.S. at 330 ("it would be odd to conclude" that the government cannot seize forfeitable assets on a grand jury's probable-cause finding when that showing is often sufficient to "restrain *persons*" (citation omitted)); *Stephens*, 594 F.3d at 1039 (Congress's power to ban bail

15

in some cases implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" requiring a curfew and electronic monitoring).

          *b.*    *Laws Disarming the Dangerous or Untrustworthy*

Historical laws barring guns to people or groups deemed dangerous or untrustworthy, as well as laws making it an offense to misuse guns, support the constitutionality of the bail condition.

In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). England also disarmed "entire group[s]" for "their perceived disrespect for and disobedience to the Crown and English law." *Range v. Att'y Gen.*, 53 F.4th 262, 275 (3d Cir. 2022), *vacated upon grant of rehearing en banc*, 2023 WL 118469 (Jan. 6, 2023). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons— violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history).

States in the period around the American Revolution took similar measures. Some states barred guns for those "[r]efusing to swear an oath, defaming acts of Congress, or failing to defend the colonies." *Folajtar*, 980 F.3d at 908 & n.11; *see also Medina*, 913 F.3d at 159 (discussing similar laws); *Kanter v. Barr*, 919 F.3d 437, 454-58 (7th Cir. 2019) (Barrett, J., dissenting) (same). In fact, at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states. *See* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large, Being A Collection of All the Laws of Virginia 281-82 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

Aside from laws disarming groups, laws also made it an offense to use guns to terrify the public. In England, "the act of 'go[ing] armed to *terrify* the King's subjects' was 'a great offence at the *common law*,'" so long as it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 87 Eng.

Rep. 75, 76 (K.B. 1686)). Similarly, in America, the colonies (and later the states) enacted laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. As *Bruen* observed, such statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)).

Those provisions show that legislatures had the authority to restrict gun possession by individuals or groups deemed to "act counter to society's welfare," *Folajtar*, 980 F.3d at 909, or who fail to comply with "legal norms," *Range*, 53 F.4th at 278. The law here is falls well within that historical tradition because a person may be subjected to the pretrial-release gun condition only after a court finds: (1) probable cause to believe that the defendant committed a crime and (2) that the condition is "the least restrictive" way to assure his appearance and "the safety of any other person or the community," 18 U.S.C. § 3142(c)(1)(B).

### c. *Surety Laws*

Colonial surety laws also support the gun condition. At common law, the surety system allowed any person with "just cause to fear" another person to "demand surety of the peace." 4 William Blackstone, Commentaries on the Laws of England 252 (1769).

In America, two colonies required those who went "armed offensively" to obtain sureties and required the offending party to forfeit his weapons. 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament 17 (1771) (1701 statute). Four other colonies or states also codified the common-law surety system before 1791. *See* 2 Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); 13 Statutes at Large, Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619, pg. 41 (1823) (1789 statute). And Maryland's 1776 Declaration of Rights assumed the existence of the common-law surety system in its section on oaths. 1 General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index, pg. xxx (1840).

19

Thus, in 1829, before the passage of the surety statutes discussed in *Bruen*, *see* 142 S. Ct. at 2148, William Rawle explained that "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace" and that "[i]f he refused he would be liable to imprisonment." William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).

In *Bruen*, the Court deemed later, 19th-century surety laws insufficiently analogous to the New York law at issue because the surety "laws were not *bans* on public carry, and they typically targeted only those threatening to do harm." 142 S. Ct. at 2148. The law here bears more similarities to surety laws, as it allows for a gun restriction only after (1) a grand jury finds probable cause that a crime was committed and (2) a court determines that the condition is "the least restrictive" way to assure community safety, 18 U.S.C. § 3142(c)(1)(B). And like surety laws, the gun condition restricts rights only temporarily. Courts have thus held that surety laws are similar enough to support the bail condition's constitutionality. *See* Ex.D-5–6; *United States v. Perez-Garcia*, --- F.Supp.3d ---, 2022 WL 4351967, at *1 (S.D. Cal. 2022), *aff'd* 2022 WL 17477918

(S.D. Cal. Dec. 6, 2022) (unpublished); *United States v. Kays*, ---
F.Supp.3d ----, 2022 WL 3718519, *4-5 (W.D. Okla. 2022); *but see
United States v. Stambaugh*, No. 22CR218-PRW, 2022 WL
16936043, at *3-6 (W.D. Okla. Nov. 14, 2022) (unpublished) (finding
different law barring gun possession insufficiently similar to surety
laws since surety laws did not bar gun possession); *United States v.
Quiroz*, No. 22CR104-DC, 2022 WL 4352482, *7 (W.D. Tex. Sept.
19, 2022) (unpublished) (same).

> **4.** *The Second Amendment applies to law-abiding citizens.*

The court here also upheld the pretrial gun condition on the
grounds that those under felony indictment are not protected by the
Second Amendment. *Heller* indicated that the Second Amendment
protects "law-abiding citizens." 554 U.S. at 625, 635; *see also id.* at
644 (Stevens, J., dissenting) ("the Court limits the protected class
to 'law-abiding, responsible citizens'"). *Bruen* did the same. Indeed,
it used the term "law-abiding" 14 times. 142 S. Ct. at 2122, 2125,
2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156.

And *Bruen* did not call into question the "shall-issue" licensing
regimes in 43 states, which impose "narrow, objective, and definite
standards" meant to ensure "that those bearing arms in the juris-
diction are, in fact, law-abiding, responsible citizens." *Id.* at 2138

n.9. Many of those states deny firearm-carry licenses to persons under a felony indictment. *See, e.g.*, Ariz. Rev. Stat. § 13-3112(E)(3); Ky. Rev. Stat. § 237.110(4)(a); La. Stat. § 40:1379.3(C)(10); Tenn. Code § 39-17-1351(c)(7). Yet under Fencl's interpretation of *Bruen*, those shall-issue licensing schemes that *Bruen* endorsed would be unconstitutional. *Bruen* does not support that view.

> 5.    *Fencl offers no convincing reason to reverse.*

Fencl discusses the surety law and law-abiding-citizen rationales at length. Mem. 12-18, 27-32. He addresses *Salerno* and the history of bail and detention by arguing that barring guns during detention is too dissimilar to a pretrial gun condition to support its constitutionality. Mem. 18-25. He does not address laws barring guns to those deemed dangerous or disruptive.

Fencl's arguments offer no reason not to apply *Salerno* here. *Salerno* affirmed the constitutionality of detention based on danger to the community. *See* 481 U.S. at 741. As noted, this Court has applied *Salerno* to bail conditions without suggesting that a different rule applies. *See Scott*, 450 F.3d at 874. And *Bruen* did not purport to upset that system or even address bail and detention. *See supra*

22

§ (A)(2). Thus, this Court should apply *Salerno* and leave to the Supreme Court the prerogative of limiting that precedent in the context of guns if it deems doing so necessary.

As for the history, Fencl appears not to contest that legislatures have long possessed broad powers over bail and detention. He argues only that the powers they exercised are too dissimilar to the law here. *See* Mem. 20. But to support a gun law, the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster" if it "impose[s] a comparable burden" that "is comparably justified." *Id.* That is, while "analogical reasoning under the Second Amendment" is not "a regulatory blank check," it is not "a regulatory straightjacket" either. *Id.* Here, history showing that legislatures have long possessed and exercised power that is not just comparable to but far greater than the burden imposed by the bail law is "analogous enough" to support its constitutionality. *Id.*

Fencl and several amici also cite substantive-due-process cases about the liberty interests of those awaiting trial. Mem. 22-25. But

at best, those cases suggest a limitation on historical bail and detention powers (or, implicitly, a narrower reading of that history) by indicating that people awaiting trial possess a liberty interest that cannot be restricted absent individualized (or in some circumstances legislative) findings relating to flight risk, danger to the community, or another compelling government interest. *See, e.g.*, *Scott*, 450 F.3d at 872 n.12 (noting that bail condition "may well be justified based on a legislative finding . . . or an individualized finding" relating to government interest); *id.* at 874 (discussing *Salerno* and noting that conditions meeting requirements in Bail Reform Act would be valid). But here, Fencl is attacking a law that *does* require findings that justify restricting his liberty interests. So the cases he cites do not advance his challenge here.

In short, Fencl has not addressed the history of gun restrictions on those deemed dangerous or disruptive, and his responses to *Salerno* and the history of bail and detention offer no convincing reason to set aside that precedent or history. The Court should thus affirm the gun condition based on that authority.

C.     The relevant factors support applying the gun condition here.

Fencl argues that judges in the Southern District of California presumptively apply the gun condition. Mem. 1, 18. But how judges

apply the condition in other cases is not at issue. *See Johns v. Cnty. of San Diego*, 114 F.3d 874, 876 (9th Cir. 1997) ("constitutional claims are personal and cannot be asserted vicariously"). Here, Fencl does not dispute that the district court found that the condition was proper based on his individual circumstances here. Ex.A-6. To the extent he suggests that the court erred in concluding as much because he would not be a danger to the community if allowed to possess guns, that is an argument for striking the condition but not for declaring it unconstitutional. Still, the district court did not err based on the relevant factors. *See* 18 U.S.C. § 3142(g).

First, the crime involves illegal possession of a gun, Ex.G, and the evidence against Fencl is strong. Officers found the short-barreled rifles and silencers in Fencl's house alongside many other guns, and Fencl said he manufactured a short-barreled rifle (and other guns) and knew he wasn't supposed to possess one.

Second, Fencl's history and characteristics, and other factors, suggest a danger to the community. Notably, Fencl: (1) possessed 110 guns, including 10 ghost guns, four silencers, three short-barreled rifles, and 21 other guns that were illegal under state law; (2) possessed thousands of rounds of ammunition, including armor-piercing rounds, incendiary rounds, and a gas grenade; (3) has three

gun-related arrests, including the one in this case, and one convic-
tion for carrying a loaded gun in a public place; and (4) has said that
he builds guns and will always be armed. And perhaps most im-
portantly, Fencl says he wants to carry a gun since he "travel[s] into
less-populated areas, at all times of the day and night, with great
frequency." Ex.C-2; *see supra* n.1. Yet California law would bar him
from carrying a gun on those trips absent a license. *See Peruta v.
Cnty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc) (dis-
cussing California law). And Fencl concedes that he does not have
a California license. Mem. 11 & n.1; Ex.B-9 (noting that he
"wish[es]" to get one). So, in essence, Fencl wants to break the law
by continuing to illegally carry guns.

Those factors show a serious danger that Fencl will continue to
build and possess illegal guns, continue to illegally carry loaded
guns in public places, and otherwise continue to illegally use or pos-
sess guns. That is enough to show a danger to the community. *See,
United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) ("[A]
defendant's propensity to commit crime generally, even if the re-
sulting harm would be not solely physical, may constitute a suffi-
cient risk of danger to come within the contemplation of [the Bail
Reform Act]."); *cf. United States v. Harris*, No. 16CR851-VSB, 2020

WL 4699044, at *5 (S.D.N.Y. Aug. 12, 2020) (unpublished) (detaining defendant based on gun possession at time of arrest); *United States v. Velez-Ramos*, No. 18CR767-PAD, 2019 WL 1771614, at *4 (D.P.R. Apr. 22, 2019) (unpublished) (releasing defendant who possessed gun at time of arrest but imposing bail condition barring gun possession). The court thus rightly imposed the condition here.

## CONCLUSION

The Court should affirm the district court's decision upholding Fencl's pretrial-release conditions.

Respectfully submitted,

RANDY S. GROSSMAN
 *United States Attorney*

DANIEL E. ZIPP
 *Assistant U.S. Attorney*
 *Chief, Appellate Section*
 *Criminal Division*

s/ZACHARY J. HOWE
 *Assistant U.S. Attorney*

JANUARY 13, 2023.

27

## CERTIFICATE OF COMPLIANCE

1.     This response complies with the length limitation of Ninth Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,537 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

2.     This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 2020.

s/ ZACHARY J. HOWE
*Assistant U.S. Attorney*

JANUARY 13, 2023.