No. 22-50316

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOHN FENCL,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
21CR3101-JLS*

## RESPONSE OF THE UNITED STATES TO APPELLANT'S MEMORANDUM IN SUPPORT OF HIS FRAP 9(A) APPEAL

RANDY S. GROSSMAN
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

ZACHARY J. HOWE
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-8693*

**TABLE OF CONTENTS**

PAGE

Jurisdiction and Bail Status ....................................................1

Question Presented ................................................................2

Statement ............................................................................2

Summary of Argument.............................................................5

Argument ..............................................................................6

A. This Court reviews the constitutionality of the
condition *de novo* and the district court's factual
findings for clear error...........................................................6

B. This district court properly found that the pretrial-
release condition is constitutional. ....................................6

   1. Indictment can entail many restrictions, including a
ban on gun possession in appropriate circumstances,
that would otherwise violate constitutional rights. ......7

   2. *Bruen* does not cast doubt on the constitutionality
of pretrial-release conditions under the Bail Reform
Act. ...............................................................................10

   3. Historical analogues show that the pretrial-release
gun condition is valid. ................................................12

      a. Pretrial Detention ....................................................12

      b. Laws Disarming the Dangerous or
Untrustworthy......................................................16

      c. Surety Laws ...........................................................18

   4. The Second Amendment applies to law-abiding
citizens. .......................................................................21

5. Fencl offers no convincing reason to reverse. .............22

C. The relevant factors support applying the gun condi-
tion here.........................................................................24

Conclusion..............................................................................27

Certificate of Compliance

**TABLE OF AUTHORITIES**

Cases:

*Agostini v. Felton*, 521 U.S. 203 (1997)............................12

*Baze v. Rees*, 553 U.S. 35 (2008) ......................................14

*Bell v. Wolfish*, 441 U.S. 520 (1979)....................................7

*Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991) .......7

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006) .............................................6

*Dist. of Columbia v. Heller*,
554 U.S. 570 (2008)..............................................10, 11, 21

*Florence v. Bd. of Chosen Freeholders*,
566 U.S. 318 (2012) ...........................................................7

*Folajtar v. Att'y Gen.*,
980 F.3d 897 (3d Cir. 2020)................................15, 17, 18

*Johns v. Cnty. of San Diego*,
114 F.3d 874 (9th Cir. 1997) ..........................................25

*Kaley v. United States*, 571 U.S. 320 (2014).............7, 8, 15

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................17

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) .............................14, 15, 17

*Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009)......12

*N.Y. St. Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)...............................................passim

*Newbery Corp. v. Fireman's Fund Ins. Co.*,
  95 F.3d 1392 (9th Cir. 1996) .............................................6

*Peruta v. Cnty. of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) ..........................26

*Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022), *vacated
  upon grant of rehearing en banc*, 2023 WL 118469
  (Jan. 6, 2023). ...........................................................16, 18

*Sir. Johsn Knight's* Case,
  87 Eng. Rep. 75 (K.B. 1686) ....................................17-18

*Stack v. Boyle*, 342 U.S. 1 (1951).........................................1

*United States v. Edwards*,
  430 A.2d 1321 (D.C. 1981) (en banc) ..............................12

*United States v. Harris*, No. 16CR851-VSB,
  2020 WL 4699044 (S.D.N.Y. Aug. 12, 2020)
  (unpublished)..........................................................26-27

*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008) ..........6

*United States v. Kays*, --- F.Supp.3d ----,
  2022 WL 3718519 (W.D. Okla. 2022) .............................21

*United States v. Perez-Garcia*, --- F.Supp.3d ----,
  2022 WL 4351967 (S.D. Cal. 2022), *aff'd* 2022 WL
  17477918 (S.D. Cal. Dec. 6, 2022) (unpublished)..... 20-21

*United States v. Perry*, 788 F.2d 100 (3d Cir. 1986).........13

*United States v. Provenzano,*
605 F.2d 85 (3d Cir. 1979)..............................................26

*United States v. Quiroz,* No. 22CR104-DC,
2022 WL 4352482 (W.D. Tex. Sept. 19, 2022)
(unpublished) ....................................................................21

*United States v. Robinson*, 414 U.S. 218 (1973)................7

*United States v. Salerno,*
481 U.S. 739 (1987) ........................4, 8, 10, 12, 22, 23, 24

*United States v. Scott,*
450 F.3d 863 (9th Cir. 2006) ...........................8, 11, 22, 24

*United States v. Slye,* No. 22MJ144,
2022 WL 9728732 (W.D. Pa. Oct. 6, 2022)
(unpublished) .............................................................14, 15

*United States v. Stambaugh*, No. 22CR218-PRW,
2022 WL 16936043 (W.D. Okla. Nov. 14, 2022)
(unpublished) ....................................................................21

*United States v. Stephens,*
594 F.3d 1033 (8th Cir. 2010) ............................. 12-13, 15

*United States v. Velez-Ramos*, No. 18CR767-PAD,
2019 WL 1771614 (D.P.R. Apr. 22, 2019)
(unpublished) ....................................................................27

*United States v. Watson*, 423 U.S. 411 (1976) ...................7

Constitution and Statutes:

U.S. Const., amend. II ...............................................passim

U.S. Const., amend. IV ....................................................9

U.S. Const., amend. V......................................................9

U.S. Const., amend. VI ....................................................9

iv

18 U.S.C. § 3142................................................................ passim

18 U.S.C. § 3231....................................................................1

26 U.S.C. § 5861(d) ..............................................................3

28 U.S.C. § 1291....................................................................1

Rules:

Fed. R. App. P. 4(b)(1)(A)(i) ..................................................1

Fed. R. App. P. 9(a)............................................................1, 3

Other Authorities:

1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay (1869) ........................................19

1 General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index (1840)..........................................................................19

1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven (1797) ..............................................19

1 The Public Acts of the General Assembly of North Carolina (1804) ...............................................................17

2 Statutes at Large of Pennsylvania from 1682 to 1801 (1896)............................................................................19

4 William Blackstone, Commentaries on the Laws of England (1769) ...................................................................18

5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay (1886) ............................17

7 Records of the Colony of Rhode Island and Providence
 Plantations, in New England ............................................. 17

9 Statutes at Large, Being A Collection of All the Laws of
 Virginia (1821) ................................................................. 17

9 Statutes at Large of Pennsylvania ................................ 17

13 Statutes at Large, Being a Collection of All the Laws of
 Virginia, from the first Session of the Legislature, in the
 Year 1619 (1823) .............................................................. 19

Acts and Laws of His Majesties Colony of Connecticut in
 New-England (1901) .......................................................... 19

Acts and Laws of His Majesty's Province of New-Hamp-
 shire: In New-England; with Sundry Acts of Parliament
 (1771) ................................................................................ 19

Ariz. Rev. Stat. § 13-3112(E)(3) ........................................ 22

Act of Sept. 24, 1789, § 33 (1789) ..................................... 22

George Webb, The Office and Authority of a Justice of
 Peace (1736) ..................................................................... 18

Jospeh G.S. Greenlee, *The Historical Justification for
 Prohibiting Dangerous Persons from Possessing*,
 *Firearms*, 20 Wyo. L. Rev. 249 (2020) ............................ 16

Ky. Rev. Stat. § 237.110(4)(a) ........................................... 22

La. Stat. § 40:1379.3(C)(10) .............................................. 22

Militia Act of 1662, 13 & 14 Car. 2, c.3 § 13 (1662) .......... 16

Rutgers, New Jersey Session Laws Online, Acts of the
 General Assembly of the State of New-Jersey
 (1777 law) ......................................................................... 17

Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490 (2018) .........................................................................13

Stuart Banner, The Death Penalty: An American History (2002).................................................................................14

Tenn. Code § 39-17-1351(c)(7) .........................................22

William Rawle, A View of the Constitution of the United States of America (2d ed. 1829) ....................................20

No. 22-50316

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOHN FENCL,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
21CR3101-JLS*

## JURISDICTION AND BAIL STATUS

The district court has jurisdiction in John Fencl's case under 18 U.S.C. § 3231 since he is charged with offenses against the United States. Appellant's Exhibit (Ex.) G. On December 7, 2022, the court denied Fencl's appeal from the magistrate judge and affirmed his pretrial-release conditions. Ex.A. That decision was immediately appealable as a final order. *See* Fed. R. App. P. 9(a); *Stack v. Boyle*, 342 U.S. 1, 4 (1951). Fencl timely appealed on December 21, 2022. Ex.I; Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291. Fencl is in not custody and is set for a status hearing on January 20, 2023. Clerk's Record (R) 76.

1

## QUESTION PRESENTED

Does the pretrial-release condition barring gun possession when that is the least restrictive way to ensure community safety violate the Second Amendment facially or as applied to Fencl?

## STATEMENT

This case arose out of Fencl's third gun-related arrest. Ex.A-6. In September 2019, officers arrested Fencl for illegally possessing a concealed gun without a license. Ex.A-1. He pled guilty to a misdemeanor. *Id.* In April 2021, officers arrested Fencl for carrying a privately made "ghost gun," but no charges resulted. R 1 at 3. During the arrest, Fencl said he would be armed every time officers contacted him. *Id.* Finally, in June 2021, officers arrested Fencl after finding more than 110 guns at his house, including 10 "ghost guns," four silencers, three short-barreled rifles, and 21 other guns that are illegal under state law. Ex.A-1−2. Officers also found thousands of rounds of ammunition, including armor-piercing and incendiary rounds, and a gas grenade. R 57-4, 57-6. Post-*Miranda*, Fencl said he manufactured several of the guns, including a short-barreled rifle, and indicated that he knew he was not supposed to possess short-barreled rifles. R 1 at 3-4.

2

The government ultimately charged Fencl with illegally possessing three unlicensed short-barreled rifles and four unlicensed silencers 26 U.S.C. § 5861(d). Ex.G. After a hearing, the magistrate judge set bond subject to various conditions. Ex.H. One was a statutory condition barring gun possession, which the magistrate judge modified to also bar gun-part possession. Ex.H at 1; *see* 18 U.S.C. § 3142(c)(1)(B)(viii).

In July 2022, Fencl—who still does not have a California gun license, *see* Ex.B-9 (noting that he "wish[es]" to get one)—moved to strike the gun condition so he could carry guns in public,[1] citing the Second Amendment and the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Ex.E; Ex.F. The government opposed. R 69. After hearing argument, the magistrate judge denied the motion in a written order. Ex.D. The judge concluded that the Second Amendment applies to "law-abiding citizens." Ex.D at 4 (quoting *Bruen*, 142 S. Ct.

---

[1] Fencl's brief in this Court concedes explicitly for the first time that he is barred from carrying guns in public by state laws that are not at issue here. Appellant's FRAP 9(a) Memorandum (Mem.) 11 & n.1. Despite this independent restriction, he argued in the district court that he wanted the gun condition of his release stricken so he can carry guns "for his work travels," which occur "at all times of the day and night, with great frequency." Ex.B-9; Ex.C-2; Ex.F-2 *see also* Ex.D-1; Ex.F-2.

at 2156). And since Fencl was "charged with a crime based on a finding of probable cause," he did not qualify. *Id.* Yet even if he did, found the judge, historical analogues to the gun condition showed that it was not an unconstitutional infringement on his right to bear arms. Ex.E-5–6. The magistrate judge also cited *United States v. Salerno*, 481 U.S. 739 (1987), which upheld pretrial detention based on danger to the community—a greater restriction than release with a gun condition—as support for the conclusion that the gun condition was constitutional. Ex.E-4–5.

Fencl appealed that order to the district court, and the government responded. Ex.B; Ex.C; R 79. The court denied the motion in a written order. Ex.A. Like the magistrate judge, the court found that Fencl was not a law-abiding citizen covered by the Second Amendment. Ex.A-3–4. It also found that historical analogues supported the law. Ex.A-4–6. As comparators, it cited surety laws requiring those reasonably likely to breach the peace to post surety bonds before carrying guns in public, legislatures' historically broad powers over bail and detention, and *Salerno*'s discussion of detention powers. Ex.A-3–6. The district court also confirmed that the condition was properly imposed on Fencl based on his individual circumstances. Ex.A-6.

This appeal follows. Ex.I.

## SUMMARY OF ARGUMENT

The district court did not violate the Constitution by imposing a condition barring Fencl from possessing guns while on bond to ensure community safety. For one, precedent confirms that those under indictment may be subjected to many liberty restrictions that would otherwise be unconstitutional, including detention and various pretrial-release conditions in appropriate circumstances. The gun condition here falls well within those permissible restrictions. *Bruen* did not upset that precedent or address rights that are necessarily restricted during pretrial release or detention, so it does not require a different conclusion.

Historical tradition also supports that conclusion. Legislatures have long possessed broad powers over bail and detention and have long exercised those powers to detain people charged with serious crimes. That history supports the lesser power of ordering release with a gun condition to protect the community. And founding-era laws barring gun possession by those deemed dangerous or untrustworthy likewise show that the condition here, which is tethered to community safety, is constitutional. That and other history all support upholding the law here.

Striking down the gun condition would also have the perverse effect of causing courts to deny bail when a gun condition might have sufficed to safeguard the community, thus leaving more people in prison while they await trial. For the reasons discussed, this Court should uphold the condition and affirm.

### ARGUMENT

A.  This Court reviews the constitutionality of the condition *de novo* and the district court's factual findings for clear error.

This Court reviews the constitutionality of pretrial-release conditions *de novo* and the district court's factual findings under the "deferential, clearly erroneous standard." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citation omitted). The Court may affirm the district court's decision on any ground supported by the record. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 941 (9th Cir. 2006); *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996).

B.  This district court properly found that the pretrial-release condition is constitutional.

The district court's decision upholding the pretrial-release condition is correct in light of Supreme Court precedent, the history of bail and detention, and the history of laws denying guns to those deemed dangerous or disruptive. This Court should affirm.

1.  *Indictment can entail many restrictions, including a ban
    on gun possession in appropriate circumstances, that
    would otherwise violate constitutional rights.*

The district court correctly held that the law allowing a court to
order that the defendant "refrain from possessing a firearm" while
on pretrial release when that is the least restrictive way to ensure
community safety comports with the Second Amendment. 18 U.S.C.
§ 3142(c)(1)(B)(viii).

A grand jury's indictment charging a person with a crime has
important legal consequences. *See Kaley v. United States*, 571 U.S.
320, 328-29 (2014). While a defendant is presumed innocent until
proven guilty, *see Bell v. Wolfish*, 441 U.S. 520, 533 (1979), he may
still be arrested, *see United States* v. *Watson*, 423 U.S. 411, 417
(1976); searched incident to arrest, *see United States* v. *Robinson*,
414 U.S. 218, 236 (1973); strip-searched in jail, *see Florence* v. *Bd.
of Chosen Freeholders*, 566 U.S. 318, 322-23 (2012); and jailed pend-
ing arraignment, *see Cnty. of Riverside* v. *McLaughlin*, 500 U.S. 44,
52, 58 (1991). And the government can, in some instances, freeze a
defendant's assets—even those needed to pay a lawyer. *See Kaley*,
571 U.S. at 326-27.

Even after arraignment, a defendant may be denied bail pending
trial. The Bail Reform Act allows a court to detain a defendant if it
finds that no release conditions will reasonably assure community

safety. *See* 18 U.S.C. § 3142(e)-(f). The Supreme Court has held that this part of the Act "fully comports with constitutional requirements." *Salerno*, 481 U.S. at 741. In reaching that conclusion, the Court noted that it had "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S. at 748-49. The Court noted the Act's "extensive safeguards" and "procedural protections" in concluding that the Act complies with the Due Process and Excessive Bail Clauses. *Id.* at 752, 755.

The same reasons that support the Bail Reform Act's pretrial-detention provision also support the imposition of judicially administered release conditions under the Act. *See, e.g.*, *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) (reading *Salerno* as "uph[olding] the constitutionality of [the] bail system" in the Bail Reform Act and applying same framework to analysis of bail-condition validity). That makes sense. The greater power to take away the "fundamental" and "strong interest in liberty" altogether pending trial based on danger to the community, *Salerno*, 481 U.S. at 750, necessarily implies the lesser power of granting release with conditions reasonably necessary to prevent danger to the community. *Cf. Kaley*, 571 U.S. at 330 ("'[I]t would be odd to conclude that

8

the Government may not restraint property' on the showing often sufficient to 'restrain *persons*." (citation omitted)).

There is no reason to apply a different rule to a pretrial-release gun condition. If an indictment for a crime and the interests in community safety can justify restrictions on Fourth, Fifth, and Sixth Amendment rights and even outright detention pending trial, then they can also justify the restriction of a defendant's Second Amendment rights as a temporary and judicially authorized condition of pretrial release. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights"); *id.* at 2156 (the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees").

The statutory gun restriction is a carefully circumscribed release condition that complies with constitutional guarantees. The condition may only be imposed if it is "the least restrictive" way to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). Thus, just as the "Government's regulatory interest in community safety can . . . outweigh an individual's liberty interest" and justify pretrial detention, that same interest can justify

9

temporarily disarming an indicted person whose release is otherwise appropriate. *Salerno*, 481 U.S. at 748.

> 2. Bruen *does not cast doubt on the constitutionality of pretrial-release conditions under the Bail Reform Act.*

The Second Amendment reads: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *District of Columbia v. Heller*, the Supreme Court held "that the Second Amendment conferred an individual right to keep and bear arms" and that the District of Columbia's "ban on handgun possession in the home" violated that right. 554 U.S. 570, 625, 635 (2008).

In *Bruen*, the Court made *Heller* "more explicit." 142 S. Ct. at 2131, 2134. It clarified "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. In that case, a regulation is valid if the government shows "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Court noted that circuit courts, while applying a similar test as a "first step," had also applied a "means-end scrutiny" "second step." *Id.* at 2125-27. The Court deemed the second step "one step too many" and rejected it. *Id.* at 2127. Applying the clarified test, the Court held that the Second Amendment protects the "right to carry a handgun

for self-defense outside the home" and that a law "condition[ing] is-
suance of a license to carry on a citizen's showing of some additional
special need" violated that right. *Id.* at 2122.

In reaching those conclusions, the Court "decide[d] nothing
about who may lawfully possess a firearm." *Id.* at 2157 (Alito, J.,
concurring). Nor did it address the extent to which constitutional
rights may be restricted because of pretrial detention or as a condi-
tion of bail. *See* Ex.C-4 (Fencl agreeing that "*Bruen* did not address
this issue."). Indeed, *Bruen* reaffirmed *Heller*'s observation that,
[l]ike most rights, the right secured by the Second Amendment is
not unlimited" and is "not a right to keep and carry any weapon
whatsoever in any manner whatsoever and for whatever purpose."
*Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). And it
clarified that the Second Amendment is equal to other rights, but
never suggested that it received *extra* protections. *See Bruen*, 142
S. Ct. at 2130 ("Th[e] Second Amendment standard accords with
how we protect other constitutional rights.").

In sum, *Bruen* does not call into question *Salerno*'s conclusion
that the Bail Reform Act's pretrial detention provision is constitu-
tional, which by close analogy confirms the validity of the Act's pre-
trial-release conditions. *See Scott*, 450 F.3d at 874. This Court must

11

follow "on point" Supreme Court decisions even if "subsequent decisions cast strong doubt on" them. *Musladin v. Lamarque*, 555 F.3d 830, 837 (9th Cir. 2009*)*; *see Agostini v. Felton*, 521 U.S. 203, 237 (1997). Here, *Bruen* casts no doubt on *Salerno* or other decisions upholding significant restrictions on the liberty interests of those charged with crimes. This Court can thus uphold the challenged condition without proceeding further. Still, as explained below, the historical analysis confirms the condition's validity.

> 3. *Historical analogues show that the pretrial-release gun condition is valid.*

Temporarily barring gun possession as a condition of pretrial release when that is the least restrictive way to protect the community is consistent with historical tradition. That tradition includes: (1) historical restrictions on indicted defendants, including pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy; and (3) historical surety laws restricting the gun rights of people accused of posing a threat.

> a. *Pretrial Detention*

The historical record confirms that there was no "fundamental right to bail" at the time of the founding and that legislatures possessed broad powers over bail and detention. *United States v. Edwards*, 430 A.2d 1321, 1329 (D.C. 1981) (en banc); *see also United*

*States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) ("Congress may ban bail in entire classes of cases."); *United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986) (most "federal courts that have addressed the issue have held that there is no absolute right to bail").

In exercising their broad powers, legislatures have historically made some offenses nonbailable or presumptively nonbailable. For example, "[c]apital defendants have been excluded from bail since colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—was generally consistent with that practice. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which cases it shall not be admitted but by [a court or judge], who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the founding, detention swept broadly because many crimes were punishable by death. Capital punishment for felonies was

13

"ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (citing Stuart Banner, The Death Penalty: An American History 23 (2002)). Capital crimes "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

As one court summarized, "history recognized detention as a restriction that could be imposed upon a person who was accused, but not convicted[,] of a crime. Inherent in this severe restriction of liberty is the temporary abridgement of numerous core constitutional rights[,] including . . . the right to bear arms." *United States v. Slye*, No. 22MJ144, 2022 WL 9728732, at *2 (W.D. Pa. Oct. 6, 2022) (unpublished). It would thus "be illogical to conclude that the Court has the authority to set conditions temporarily depriving an accused of all of [those] constitutional protections by ordering his detention but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* Stated differently, it is difficult to conclude that the public, in 1791, would have understood someone facing outright pretrial detention

14

to be within the scope of those entitled to possess arms. *Cf. Folajtar v. Att'y Gen.*, 980 F.3d 897, 905 (3d Cir. 2020) ("it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture" (*i.e.*, a felon) "to be within the scope of those entitled to possess arms" (quoting *Medina*, 913 F.3d at 158).

In sum, § 3142(c)(1)(B)(viii)'s gun-restriction condition imposes a far lesser burden on an indicted defendant than does pretrial detention. Pretrial detention strips a defendant of all Second Amendment rights and severely restricts many other "core constitutional rights," like freedom of speech, freedom of association, and reasonable privacy expectations. *See Slye*, 2022 WL 9728732, at *2 & n.4. In contrast, § 3142(c)(1)(B)(viii) imposes a narrower prohibition—temporarily disarming a person subject to release—that squares with the historical tradition of affording legislatures broad powers of bail and detention and of detaining defendants charged with serious crimes. The power to detain necessarily encompasses the power to impose that lesser liberty restriction. *Cf. Kaley*, 571 U.S. at 330 ("it would be odd to conclude" that the government cannot seize forfeitable assets on a grand jury's probable-cause finding when that showing is often sufficient to "restrain *persons*" (citation omitted)); *Stephens*, 594 F.3d at 1039 (Congress's power to ban bail

15

in some cases implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" requiring a curfew and electronic monitoring).

> b.   *Laws Disarming the Dangerous or Untrustworthy*

Historical laws barring guns to people or groups deemed dangerous or untrustworthy, as well as laws making it an offense to misuse guns, support the constitutionality of the bail condition.

In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). England also disarmed "entire group[s]" for "their perceived disrespect for and disobedience to the Crown and English law." *Range v. Att'y Gen.*, 53 F.4th 262, 275 (3d Cir. 2022), *vacated upon grant of rehearing en banc*, 2023 WL 118469 (Jan. 6, 2023). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons— violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history).

States in the period around the American Revolution took similar measures. Some states barred guns for those "[r]efusing to swear an oath, defaming acts of Congress, or failing to defend the colonies." *Folajtar*, 980 F.3d at 908 & n.11; *see also Medina*, 913 F.3d at 159 (discussing similar laws); *Kanter v. Barr*, 919 F.3d 437, 454-58 (7th Cir. 2019) (Barrett, J., dissenting) (same). In fact, at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states. *See* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large, Being A Collection of All the Laws of Virginia 281-82 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

Aside from laws disarming groups, laws also made it an offense to use guns to terrify the public. In England, "the act of 'go[ing] armed to *terrify* the King's subjects' was 'a great offence at the *common law*,'" so long as it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 87 Eng.

17

Rep. 75, 76 (K.B. 1686)). Similarly, in America, the colonies (and later the states) enacted laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. As *Bruen* observed, such statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)).

Those provisions show that legislatures had the authority to restrict gun possession by individuals or groups deemed to "act counter to society's welfare," *Folajtar*, 980 F.3d at 909, or who fail to comply with "legal norms," *Range*, 53 F.4th at 278. The law here is falls well within that historical tradition because a person may be subjected to the pretrial-release gun condition only after a court finds: (1) probable cause to believe that the defendant committed a crime and (2) that the condition is "the least restrictive" way to assure his appearance and "the safety of any other person or the community," 18 U.S.C. § 3142(c)(1)(B).

### c. Surety Laws

Colonial surety laws also support the gun condition. At common law, the surety system allowed any person with "just cause to fear" another person to "demand surety of the peace." 4 William Blackstone, Commentaries on the Laws of England 252 (1769).

18

In America, two colonies required those who went "armed offensively" to obtain sureties and required the offending party to forfeit his weapons. 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament 17 (1771) (1701 statute). Four other colonies or states also codified the common-law surety system before 1791. *See* 2 Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); 13 Statutes at Large, Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619, pg. 41 (1823) (1789 statute). And Maryland's 1776 Declaration of Rights assumed the existence of the common-law surety system in its section on oaths. 1 General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index, pg. xxx (1840).

Thus, in 1829, before the passage of the surety statutes discussed in *Bruen*, *see* 142 S. Ct. at 2148, William Rawle explained that "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace" and that "[i]f he refused he would be liable to imprisonment." William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).

In *Bruen*, the Court deemed later, 19th-century surety laws insufficiently analogous to the New York law at issue because the surety "laws were not *bans* on public carry, and they typically targeted only those threatening to do harm." 142 S. Ct. at 2148. The law here bears more similarities to surety laws, as it allows for a gun restriction only after (1) a grand jury finds probable cause that a crime was committed and (2) a court determines that the condition is "the least restrictive" way to assure community safety, 18 U.S.C. § 3142(c)(1)(B). And like surety laws, the gun condition restricts rights only temporarily. Courts have thus held that surety laws are similar enough to support the bail condition's constitutionality. *See* Ex.D-5−6; *United States v. Perez-Garcia*, --- F.Supp.3d --- -, 2022 WL 4351967, at *1 (S.D. Cal. 2022), *aff'd* 2022 WL 17477918

(S.D. Cal. Dec. 6, 2022) (unpublished); *United States v. Kays*, ---
F.Supp.3d ----, 2022 WL 3718519, \*4-5 (W.D. Okla. 2022); *but see*
*United States v. Stambaugh*, No. 22CR218-PRW, 2022 WL
16936043, at \*3-6 (W.D. Okla. Nov. 14, 2022) (unpublished) (finding
different law barring gun possession insufficiently similar to surety
laws since surety laws did not bar gun possession); *United States v.*
*Quiroz*, No. 22CR104-DC, 2022 WL 4352482, \*7 (W.D. Tex. Sept.
19, 2022) (unpublished) (same).

    4.   *The Second Amendment applies to law-abiding citizens.*

The court here also upheld the pretrial gun condition on the
grounds that those under felony indictment are not protected by the
Second Amendment. *Heller* indicated that the Second Amendment
protects "law-abiding citizens." 554 U.S. at 625, 635; *see also id.* at
644 (Stevens, J., dissenting) ("the Court limits the protected class
to 'law-abiding, responsible citizens'"). *Bruen* did the same. Indeed,
it used the term "law-abiding" 14 times. 142 S. Ct. at 2122, 2125,
2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156.

And *Bruen* did not call into question the "shall-issue" licensing
regimes in 43 states, which impose "narrow, objective, and definite
standards" meant to ensure "that those bearing arms in the juris-
diction are, in fact, law-abiding, responsible citizens." *Id.* at 2138

21

n.9. Many of those states deny firearm-carry licenses to persons under a felony indictment. *See, e.g.*, Ariz. Rev. Stat. § 13-3112(E)(3); Ky. Rev. Stat. § 237.110(4)(a); La. Stat. § 40:1379.3(C)(10); Tenn. Code § 39-17-1351(c)(7). Yet under Fencl's interpretation of *Bruen*, those shall-issue licensing schemes that *Bruen* endorsed would be unconstitutional. *Bruen* does not support that view.

### 5. *Fencl offers no convincing reason to reverse.*

Fencl discusses the surety law and law-abiding-citizen rationales at length. Mem. 12-18, 27-32. He addresses *Salerno* and the history of bail and detention by arguing that barring guns during detention is too dissimilar to a pretrial gun condition to support its constitutionality. Mem. 18-25. He does not address laws barring guns to those deemed dangerous or disruptive.

Fencl's arguments offer no reason not to apply *Salerno* here. *Salerno* affirmed the constitutionality of detention based on danger to the community. *See* 481 U.S. at 741. As noted, this Court has applied *Salerno* to bail conditions without suggesting that a different rule applies. *See Scott*, 450 F.3d at 874. And *Bruen* did not purport to upset that system or even address bail and detention. *See supra*

22

§ (A)(2). Thus, this Court should apply *Salerno* and leave to the Supreme Court the prerogative of limiting that precedent in the context of guns if it deems doing so necessary.

As for the history, Fencl appears not to contest that legislatures have long possessed broad powers over bail and detention. He argues only that the powers they exercised are too dissimilar to the law here. *See* Mem. 20. But to support a gun law, the government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster" if it "impose[s] a comparable burden" that "is comparably justified." *Id.* That is, while "analogical reasoning under the Second Amendment" is not "a regulatory blank check," it is not "a regulatory straightjacket" either. *Id.* Here, history showing that legislatures have long possessed and exercised power that is not just comparable to but far greater than the burden imposed by the bail law is "analogous enough" to support its constitutionality. *Id.*

Fencl and several amici also cite substantive-due-process cases about the liberty interests of those awaiting trial. Mem. 22-25. But

at best, those cases suggest a limitation on historical bail and detention powers (or, implicitly, a narrower reading of that history) by indicating that people awaiting trial possess a liberty interest that cannot be restricted absent individualized (or in some circumstances legislative) findings relating to flight risk, danger to the community, or another compelling government interest. *See, e.g.*, *Scott*, 450 F.3d at 872 n.12 (noting that bail condition "may well be justified based on a legislative finding . . . or an individualized finding" relating to government interest); *id.* at 874 (discussing *Salerno* and noting that conditions meeting requirements in Bail Reform Act would be valid). But here, Fencl is attacking a law that *does* require findings that justify restricting his liberty interests. So the cases he cites do not advance his challenge here.

In short, Fencl has not addressed the history of gun restrictions on those deemed dangerous or disruptive, and his responses to *Salerno* and the history of bail and detention offer no convincing reason to set aside that precedent or history. The Court should thus affirm the gun condition based on that authority.

C.   The relevant factors support applying the gun condition here.

Fencl argues that judges in the Southern District of California presumptively apply the gun condition. Mem. 1, 18. But how judges

24

apply the condition in other cases is not at issue. *See Johns v. Cnty. of San Diego*, 114 F.3d 874, 876 (9th Cir. 1997) ("constitutional claims are personal and cannot be asserted vicariously"). Here, Fencl does not dispute that the district court found that the condition was proper based on his individual circumstances here. Ex.A-6. To the extent he suggests that the court erred in concluding as much because he would not be a danger to the community if allowed to possess guns, that is an argument for striking the condition but not for declaring it unconstitutional. Still, the district court did not err based on the relevant factors. *See* 18 U.S.C. § 3142(g).

First, the crime involves illegal possession of a gun, Ex.G, and the evidence against Fencl is strong. Officers found the short-barreled rifles and silencers in Fencl's house alongside many other guns, and Fencl said he manufactured a short-barreled rifle (and other guns) and knew he wasn't supposed to possess one.

Second, Fencl's history and characteristics, and other factors, suggest a danger to the community. Notably, Fencl: (1) possessed 110 guns, including 10 ghost guns, four silencers, three short-barreled rifles, and 21 other guns that were illegal under state law; (2) possessed thousands of rounds of ammunition, including armor-piercing rounds, incendiary rounds, and a gas grenade; (3) has three

25

gun-related arrests, including the one in this case, and one conviction for carrying a loaded gun in a public place; and (4) has said that he builds guns and will always be armed. And perhaps most importantly, Fencl says he wants to carry a gun since he "travel[s] into less-populated areas, at all times of the day and night, with great frequency." Ex.C-2; *see supra* n.1. Yet California law would bar him from carrying a gun on those trips absent a license. *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc) (discussing California law). And Fencl concedes that he does not have a California license. Mem. 11 & n.1; Ex.B-9 (noting that he "wish[es]" to get one). So, in essence, Fencl wants to break the law by continuing to illegally carry guns.

Those factors show a serious danger that Fencl will continue to build and possess illegal guns, continue to illegally carry loaded guns in public places, and otherwise continue to illegally use or possess guns. That is enough to show a danger to the community. *See, United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) ("[A] defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of [the Bail Reform Act].");  *cf. United States v. Harris*, No. 16CR851-VSB, 2020

WL 4699044, at *5 (S.D.N.Y. Aug. 12, 2020) (unpublished) (detaining defendant based on gun possession at time of arrest); *United States v. Velez-Ramos*, No. 18CR767-PAD, 2019 WL 1771614, at *4 (D.P.R. Apr. 22, 2019) (unpublished) (releasing defendant who possessed gun at time of arrest but imposing bail condition barring gun possession). The court thus rightly imposed the condition here.

CONCLUSION

The Court should affirm the district court's decision upholding Fencl's pretrial-release conditions.

Respectfully submitted,

> RANDY S. GROSSMAN
> *United States Attorney*
>
> DANIEL E. ZIPP
> *Assistant U.S. Attorney*
> *Chief, Appellate Section*
> *Criminal Division*
>
> s/ZACHARY J. HOWE
> *Assistant U.S. Attorney*
>
> JANUARY 13, 2023.

**CERTIFICATE OF COMPLIANCE**

1.     This response complies with the length limitation of Ninth Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,537 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

2.     This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 2020.

s/ ZACHARY J. HOWE
*Assistant U.S. Attorney*

JANUARY 13, 2023.