UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case: 21-cr-725-1 (RDM) |
| | : **MOTION TO SUPPRESS** |
| JARED SAMUEL KASTNER | :           **EVIDENCE** |
| | : |
| Defendant. | : |

**DEFENDANT'S MOTION TO SUPPRESS ALL EVIDENCE GAINED FROM <u>GEO-FENCING AND CELLULAR LOCATION DATA</u>**

COMES NOW, the Defendant, Jared Kastner, by and through counsel, and herewith respectfully moves the Court to suppress all evidence obtained from geo-fencing and cell location data due to the case originating with a massive violation of the Fourth Amendment. (All evidence collected following the FBI's warrants was fruit of the poisonous tress, and thus this case must be dismissed.)

I.   INTRODUCTION

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and <u>particularly describing</u> the place to be searched, and the <u>persons</u> or things to be seized" (emphasis added). Yet the entire Complaint against Defendant originated with an unlawful blanket

general warrant of cellphone location data, which plainly lacked requisite specificity. Investigators then used the geo-fencing and cellular location data to identify Kastner, rather than first having probable cause to identify Kastner and probable cause to believe that Kastner had committed an offense, as required by the Fourth Amendment.

Agents then obtained a copy of Kastner's driver's license and compared that photo to photos and videos from the Capitol on January 6, 2021. After comparing the photo in the driver's license to images from the Capitol, agents surmised that the man in the photo form the Capitol was the same man in the driver's license photo. Based on this information obtained from google, agents were able to question two witness, Kastner's supervisor and someone who lived in North Beach where Kastner stayed for one night.  All of this evidence is fruit of the poisonous tree. Accordingly, this case must be dismissed *en toto.*

The Criminal Complaint in this case is based solely on the sworn affidavit of Kyle G. Metz, Task Force Officer assigned to FBI Cincinnati's Joint Terrorism Task Force.  In this affidavit, Officer Metz admitted on page 2 that:

> During the FBI's investigation of the events of January 6, 2021, the FBI obtained information that a device associated with a Google email account jaredk\*\*\*\*\*\*\*\*@gmail.com and a telephone number ending with -2605 was present at the U.S. Capitol on January 6, 2021. Your affiant began investigating the subscriber and user of this email account and telephone number. Records from Google listed Jared Kastner as the subscriber of the

account and showed that a device associated with his email and Google accounts identified above was within the Capitol building from approximately 2:14 p.m. to 2:52 p.m. … Your affiant then used this information to physically identify Kastner. Agents obtained a copy of Kastner's driver's license photograph and compared this photograph to images and videos from the Capitol Attack on January 6, 2021. Your affiant identified Kastner, by comparing his driver's license image to publicly available photographs from the events of January 6, 2021. Your affiant specifically identified Kastner….

On page seven of the same affidavit Officer Metz also admits that via a second warrant served on google they were able to scour through records and pinpoint Kastner's location from January 3 through January 7th.

Agents further reviewed location information from the records Google provided pursuant to the second search warrant. On January 4, 2021, Kastner traveled from a location in Beavercreek Ohio, later determined to be Kastner's home … Kastner arrived in Maryland at approximately 5:28 a.m. on January 5, 2021. … The Google records further show that approximately 12:15 a.m. on January 7, 2021 Kastner once again stopped at the Wilmington, Ohio residence. …Thereafter, at about 11:40 a.m. on January 7, 2021, Kastner traveled south to Blanchester, Ohio …

In summary, from the admissions of the investigating officer, we know that:

1. The FBI began its investigation into (later to be identified) Kastner, <u>without any probable cause</u> to suspect Kastner of any crime;

2. The FBI used <u>two blanket general warrants</u> to scavenge through

location data records from google and other general metadata to then identify Kastner as a <u>potential</u> suspect in a crime (although what crime, if any, the FBI did not know);

      3.  Even after identifying Kastner as a potential suspect via these general warrants, the FBI still lacked probable cause to arrest him for any specific crime;

      4.  The FBI then questioned two witnesses <u>to determine if there was</u> any probable cause to charge Kastner with a crime or crimes; and

      5.  Only after questioning the two witnesses did the FBI believe they had probable cause to charge Kastner with any crime (2 misdemeanors).

    The warrants in this case plainly lacked probable cause with any particularity regarding the person and things to be searched or even the crimes to be alleged. Indeed, it is plain that this case was initiated by one of the worst general warrants in American history. Counsel suspects that there may be other January 6 defendants who were similarly identified by these general warrants and asks the Court to utilize its inherent powers to open a more wide-ranging inquiry into the FBI's use of these unconstitutional warrants.

**Kastner requests an evidentiary hearing in which all agents responsible for these warrants shall be made to appear, testify, and provide all supporting affidavits and/or documents.**

II. **THE SEARCH IN THIS CASE IS PRECISELY THE TYPE OF SEARCH WHICH THE FOURTH AMENDMENT WAS ENACTED TO ABOLISH.**

The Fourth Amendment traces its roots to a revolt against general warrants issued by the government in England in the 1760s. Royal ministers (the equivalent of today's FBI) were in the practice of issuing warrants commanding investigators to search through London and find the identity of individuals who authored antigovernment pamphlets. Justice Potter Stewart, in *Stanford v. Texas*, 379 U.S. 476, 482 (1965), recounted this history:

> It was in the context of the latter kinds of general warrants that the battle for individual liberty and privacy was finally won - in the landmark cases of *Wilkes v. Wood*, 19 How. St. Tr. 1153 (1763). and *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765). The *Wilkes* case arose out of the Crown's attempt to stifle a publication called The North Briton, anonymously published by John Wilkes, then a member of Parliament - particularly issue No. 45 of that journal. Lord Halifax, as Secretary of State, issued a warrant ordering four of the King's messengers "to make strict and diligent search for the authors, printers, and publishers of a seditious and treasonable paper, entitled, The North Briton, No. 45, . . . and them, or any of them, having found, to apprehend and seize, together with their papers." "Armed with their roving commission, they set forth in quest of unknown offenders; and unable to take evidence, listened to rumors, idle tales, and curious guesses. They held in their hands the liberty of every man whom they were pleased to suspect."

*Stanford*, 379 U.S. at 482.

British investigators scoured through the streets of London, arresting and interrogating 40 printers until one printer confessed that the author of the notorious pamphlet was a member of Parliament: John Wilkes. The general warrant outraged the people of Britain, as well as America's Founding Fathers.[1]

> In an opinion which this Court has characterized as a wellspring of the rights now protected by the Fourth Amendment, Lord Camden declared the warrant to be unlawful. "This power," he said, "so assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper." Entick v. Carrington. Thereafter, the House of Commons passed two resolutions condemning general warrants . . . .

*Id.* at 484.

*Stanford v. Texas* involved a search warrant authorizing seizure of "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas." Some 2000 items were seized, most relating to petitioner's (Stanford's) mail order business. The Supreme Court held that the warrant was a general warrant forbidden by U.S. Const. amend. IV. The

---

[1] Note that the American Founding Fathers came to revere and idolize John Wilkes and Lord Camden (the British judge who invalidated the search warrants) so much that they named many American places, streets, cities, towns, and counties after them. Camden, New Jersey and Camden Yards (where the Baltimore Orioles play baseball) (on Camden Street), for example, are named for Lord Camden. Wilkes County, Georgia, Wilkes County, North Carolina, and Wilkes-Barre, Pennsylvania are named (in whole or in part) for John Wilkes.

Court held that the indiscriminate sweep of the language of the warrant was constitutionally intolerable. "The world has greatly changed," wrote Justice Stewart, "and the voice of nonconformity now sometimes speaks a tongue which Lord Camden might find hard to understand. But the Fourth and Fourteenth Amendments guarantee to John Stanford that no official of the State shall ransack his home and seize his books and papers under the unbridled authority of a general warrant." I*d.* at 486.

Here, in the case of defendant Kastner, the warrant(s) were even more general and disconnected from particularity.  The government didn't even know who they were searching for or even what specific crimes they were investigating. In application, there is little difference between a general warrant allowing "a search warrant for records in the possession of Google" of location data of all cell phones in the area of the Capitol on January 6 to identify suspects who breached the Capitol, and the general warrant in 1962 allowing investigators to search every printshop in London until they identified the printer who printed The North Britain 45.

The warrants here were general warrants by definition. Because the two warrants were general warrants and in violation of the Fourth Amendment, all evidence resulting therefrom must be suppressed and as a result excluded.

### III. ALL EVIDENCE AGAINST KASTNER COLLECTED AFTER THE TWO GENERAL WARRANTS IS FRUIT OF THE POISONOUS TREE

Evidence derived from an illegal search and seizure must be suppressed unless the government can show intervening circumstances sufficient to break the causal connection between the Fourth Amendment violation and the resulting evidence. *See Brown v. Illinois*, 422 U.S. 590, 602-03 (1975). Here there is no break in the connection whatsoever, as the FBI's identification and targeting of Kastner led directly to all other evidence. The exclusionary rule extends to any fruits of a Fourth Amendment violation — "whether such evidence be tangible, physical material actually seized in an illegal search, items observed, or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *See United States v. Crews*, 445 U.S. 463, 470 (1980); see also United States v. Jones, 374 F. Supp. 2d 143, 153 (D.D.C. 2005); *United States v. Wiggins*, 211 F. Supp. 2d 81, 87-90 (D.D.C. 2002); *United States v. Henry*, 797 F. Supp. 1, 5 (D.D.C. 1992).

Defendant Kastner would not have been charged by FBI but for the illegal general warrants executed upon Google. The two witness statements and the driver's license photo and Kastner's location are fruit of the poisonous tree.

## IV. CONCLUSION

For all of the foregoing reasons, the evidence in this case must be suppressed; and the case against Kastner must be dismissed.

Dated: April 25, 2023

*/s/ John M. Pierce*
John M. Pierce
JOHN PIERCE LAW
21550 Oxnard Street 3rd Floor, PMB #172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com
(213) 279-7846
COUNSEL FOR THE DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

*/s/ John M. Pierce*
John M. Pierce