UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES** | ) |
| V. | ) Case No. 21-cr-725-1 (RDM) |
| **JARED SAMUEL KASTNER,** | ) |
| Defendant. | ) |

### DEFENDANT KASTNER'S MOTION TO DISMISS ON FIRST AMENDMENT GROUNDS, AND FOR FAILURE TO STATE A CLAIM

COMES NOW, the Defendant Jared Kastner, with this Motion to dismiss on First Amendment grounds, and for failure to state a claim. This is a claim that the Court lacks jurisdiction in this matter entirely. The United States is without authority to use the federal courts as venues to pursue its philosophical or political enemies for their advocacy. The First Amendment, and binding case law, forbids this case from proceeding.

As a preliminary matter, the government's Statement of Facts on file in this case does not substantiate the crime allegations laid out in the information.

The government's "Statement of Facts" begins with boilerplate claims that the Capitol was a closed, secure, almost fortress-like facility on January 6.

> The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access

> inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the
> U.S. Capitol was also closed to members of the public.

Statement of Facts, ECF 1-1, at 1.

For the record, Kastner contests each sentence of this description. But even if they were true, the government's Statement of Facts fails to lay out a criminal accusation which might invoke the jurisdiction of the Court.

> The FBI has reviewed the available information to determine whether there was any evidence that devices associated with this address could have lawfully been inside the U.S. Capitol building on January 6, 2021. The information for this address did not match any information for persons lawfully within the Capitol. Accordingly, your affiant believes that the individual possessing this device was not authorized to be within the U.S. Capitol building on January 6, 2021

Statement of Facts, ECF 1-1, at 2.

    The Statement of Facts continues for several pages thereafter. On page 5, the Statement of Facts shows an image of Kastner "entering" the Capitol on January 6. There are no visible officers, posted signs, or other indicators which might signify that entering the Capitol at that time was prohibited. In fact, Kastner is seen looking at others around him who seem equally unprohibited from entering.



"Based on the foregoing, your affiant submits that there is probable cause to believe that Jared Kastner and Luke Faulkner violated 18 U.S.C. §§ 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions,"

****

"Your affiant submits there is also probable cause to believe that Jared Kastner and Luke Faulkner violated 40 U.S.C. §§ 5104(e)(2)(D) and (G), which make it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings."

Statement of Facts, pages 7-8.

**Nor does the indictment or Statement of Facts allege any conduct inconsistent with First-Amendment-protected advocacy.**

The government paints the U.S. Capitol on January 6 as if the Capitol was a fortress

like, near-maximum-security prison or military installation or underground nuclear missile base rather than a citadel of democracy. Yet the Capitol is historically recognized as a meeting place between citizens and their elected representatives.

The U.S. Capitol and its massive Grounds – a public, national park – are presumptively and normally open to the public, and have traditionally been the site for well over a century of many small and large public demonstrations exercising the right of free speech and the right to petition the government for the redress of grievances as is the right of all citizens guaranteed by the First Amendment to the U.S. Constitution.

As Federal courts in this District have reasoned in reaching legal conclusions:

> **<u>The Capitol Grounds</u>** (excluding such places as the Senate and House floors, committee rooms, etc.) **<u>have traditionally been open to the public</u>**; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*.

> The courts in this jurisdiction have long recognized that ***"[t]he United States Capitol is a unique situs for demonstration activity"*** and ***"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,*** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (quoting *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added)*.

So very public is the Capitol, that built into the physical building from its initial construction are public viewing galleries allowing any member of the public – for no reason other than a desire to watch their Representatives and Senators at work – may sit and watch the House of

Representatives and the U.S. Senate while in session. [12]

There is no physical barrier – even to this day – between the Chambers in session and the public watching from the balcony galleries. If a member of the public wished to – not advisable, of course – toss a candy bar down to her willing U.S. Senator, the physical structure of the Senate chambers would make that possible.

No greater message of the very public nature of the Capitol can be found than the very architecture of the building designed as a meeting place between citizens and their representatives.

The Government persistently diverts attention with its claim that the Capitol is "secured" 24 hours a day, 7 days a week. However, "secured" does not mean "closed." The museums of the Smithsonian Institution are "secured 24 hours a day, 7 days a week" yet open to tourists from around the world in the millions, subject to the protection of its Office of Protection Services, during business hours. Indeed, welcoming the public is their purpose. Not only are the Capitol Grounds a national park, but the Capitol building is in fact a museum in which hangs some of our nation's most iconic and important historic art, such as the nation's historic paintings.[3]

Note that courts have held that even the interior of the Capitol is an appropriate forum for organized prayer sessions and organized walking through the halls.[4]

---

[1] See: Large Public Galleries in New Legislative Chambers, Library of Congress exhibit, https://www.loc.gov/exhibits/uscapitol/s5.html : Thomas U. Walter. "Details of Gallery in Hall of Representatives," 1856. Ink and water color on paper. Architect of the Capitol (204)

[2] This is changed only in the sheer quantity of citizens in our growing nation and the number of persons who want to watch from the viewing galleries, leading to time limits for rationing. But the public purpose of the U.S. Capitol has been set since the first construction blueprints were drawn.

[3] https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/rotunda

[4] The First Amendment literally says "Congress shall make no law" restricting speech, advocacy, or petitioning.
The government's only path around this problem is the notion that the mere presence of the Vice President in the Capitol on Jan. 6 somehow allows for prosecutions of advocates, protestors or petitioners hundreds of yards away, outside, separated by numerous thick marble walls.
But the Supreme Court has never held that the First Amendment can be evaded simply by a Secret Service proclamation that a protected government official lurks nearby. The government often asserts on Judge Friedman's well-articulated opinion in *Bynum v. U.S. Capitol Police Board*, 93 F. Supp. 2d 50 (D.D.C. 2000), which the government says classified the interior of the Capitol as a nonpublic forum. In

**Trespass Law requires both proof of notice and proof of actual license to restrict.**

The federal "restricted area" statutes at issue here are analogous to trespassing laws at the state levels. These are derived from ancient common law going back in Anglo-American history for centuries. In general a person commits criminal trespass if he enters or remains on or in the property of another without effective consent and (1) had *notice* that the entry was forbidden, or (2) received notice to depart but failed to do so. See, e.g., TEX.PENAL CODE ANN. § 30.05(a)(West

---

fact, *Bynum* struck down a previous ban on picketing and parading in the Capitol as too broad. See id. (holding groups of visitors have 1st amendment rights to hold nondisruptive prayer sessions in Capitol hallways).

Judge Friedman himself wrote that his conclusion to categorize the inside of the Capitol as a 'nonpublic forum' was "somewhat surprising." Id. at 56 ("Which brings the Court to what may seem a somewhat surprising conclusion that the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes"). And despite the *Bynum* Court's pronouncement that the inside of the Capitol is a nonpublic forum for protesting, the Court held that some, limited expression, prayer and petitioning is nonetheless permitted inside the Capitol:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking . . . or other expressive conduct. . . ." Traffic Regulations for the Capitol Grounds § 158. Because the regulation's proscriptions are not limited to the legitimate purposes set forth in the statute, it is an unreasonable and therefore an unconstitutional restriction on speech. *See Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987) (general prohibition of First Amendment activity in airport cannot be justified even if airport is nonpublic forum "because no conceivable government interest would justify such an absolute prohibition of speech"). For these reasons, and those discussed in Section II B of this Opinion, the regulation is both unreasonable and unconstitutionally overbroad.

*Bynum*, at 57.

Judge Friedman also found that the "picketing and parading" ban violated due process because it was vague: "While there certainly are types of expressive acts that rise to the level of a demonstration, any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." Id.

> The regulation as written allows a police officer to restrict any sort of expressive conduct when, in the eyes of the particular officer, it might attract onlookers -- without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs. The determination of what conduct is prohibited by such a regulation therefore necessarily will vary depending on the subjective judgment of the particular officer regarding what conduct in his or her judgment has a "propensity to attract a crowd of onlookers." Such a regulation does not provide any standard at all. Rather, it "confers on the police a virtually unrestrained power to arrest and charge persons with a violation" and "the opportunity for abuse . . . is self-evident." [citations omitted].
> The virtually standardless, broad discretion given to the Capitol Police by this regulation also causes it to be unconstitutionally vague.

Bynum, at 58-59.

Supp. 2017). "Notice" includes: "oral or written communication by the owner or someone with apparent authority to act for the owner," or "fencing or other enclosure obviously designed to exclude intruders," or "a sign or signs posted on the property or at the entrance ... reasonably likely to come to the attention of intruders, indicating that entry is forbidden." *See id* at § 30.05(b)(2).

Circumstantial evidence can be relied upon to establish proof of a culpable mental state and can ordinarily be inferred from the "acts, words, and conduct of the accused and the surrounding circumstances." *Knight v. State*, 457 S.W.3d 192, 199 (Tex.App.—El Paso 2015, pet. ref'd).

The basic principles of criminal trespass are enunciated in the Model Penal Code. See, e.g., *State v. Pixley*, 200 A.3d 174 (Vt. 2018). In general, a conviction for trespassing requires <u>two</u> distinct elements: first, the license element—that the person is entering the land "without legal authority" or consent, and second, the notice element—that notice against trespass is provided for the property in question. Id. Said differently, conviction requires <u>proof of both</u> *subjective* notice (the defendant's state of mind) and the *objective* fact of restrictedness. In Kastner's case, assertions of both are lacking from the Statement of Facts.

No source of law makes the Capitol a restricted area—with the only possible exception of the government's contrived construction of the Secret Service protectee provisions at certain times. Next, the subjective evidence that Kastner knew the area was restricted is sorely lacking. It is not enough for "the State to show that defendant should have known he was not licensed or privileged to enter the dwelling." *State v. Fanger*, 665 A.2d 36, 38 (Vt. 1995) (quoting Model Penal Code § 221.2(1) (1962)). The government must prove a <u>defendant actually knew</u>.

Case reporters are filled with cases evincing messy facts which are in some ways analogous to the circumstances of January 6. For example there are cases where defendants are convicted of trespassing in circumstances <u>without</u> posted warnings; and other cases where courts hold that <u>even heavily-posted</u> 'no trespassing' areas are not restricted areas. *See, e.g., State v. Carter*, 160 S.W.3d

526, 533 (Tenn. 2005) ("[a] person does not have an expectation of privacy in the area in front of his or her residence leading from the public way to the front door").[5]

---

[5] *Brown v. State*, 152 So.3d 619, 624 (Fla.Dist.Ct.App.2014) ("While this Court has found that a policeman may enter the curtilage surrounding a home in the same way as a salesman or visitor could, no such person would reasonably go through both a gated four-foot fence and a gated six-foot fence, surrounded by several 'No Trespassing' signs in order to conduct business with the residents."); *Wysong v. State*, 614 So.2d 670, 671 (Fla.Dist.Ct.App.1993) (holding that officers did not illegally enter yard to knock on door despite "no trespassing" sign); *State v. Rigoulot*, 846 P.2d 918, 923 (Idaho Ct.App.1992) ("Posting 'No Trespassing' signs may indicate a desire to restrict unwanted visitors.... However, such signs cannot reasonably be interpreted to exclude normal, legitimate, inquiries or visits by mail carriers, newspaper deliverers, census takers, [etc.] who restrict their movements to the areas of one's property normally used to approach the home." (citations omitted)); *Mundy v. State*, 21 N.E.3d 114, 118–19 (Ind.Ct.App.2014) (holding that it was unreasonable for officers to enter property when it was posted, there was a chain across the driveway, and a security camera was on a tree near the chain); *State v. Fisher*, 154 P.3d 455, 470–75 (Kan.2007) (ruling that deputy was legally on property to conduct "knock and talk" but could not seize evidence from curtilage; presence of "no trespassing" signs was part of curtilage analysis); *Jones v. State*, 943 A.2d 1, 12 (Md.2008) ("For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the 'No Trespassing' sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation."); *State v. Kruse*, 306 S.W.3d 603, 611–12 (Mo.Ct.App.2010) (stating that signage is one consideration when determining whether police intrusion into backyard was reasonable); *State v. Pasour*, 741 S.E.2d 323, 326 (N.C.Ct.App.2012) ("[W]hile not dispositive, a homeowner's intent to keep others out and thus evidence of his or her expectation of privacy in an area may be demonstrated by the presence of 'no trespassing' signs". ); *State v. Mittleider*, 809 N.W.2d 303, 307–08 (N.D.2011) (holding that "no trespassing" signs on farm did not create reasonable expectation of privacy in entrance to the farm but leaving open the question of whether such signs could ever create a reasonable expectation of privacy); *State v. Morgan*, No. 13–CA–30, 2014 WL 1836015, at *3–4 (Ohio Ct.App. May 1, 2014) (holding that initial "knock and talk" was "unobjectionable"—despite "no trespassing" signs in front of house but entry into backyard was unreasonable, partly because of the signage), no perm. app. filed ; *State v. Roper*, 294 P.3d 517, 520 (Or.Ct.App.2012) (holding that fence plus signage "objectively manifested intent to exclude the public"); *State v. Gabbard*, 877 P.2d 1217, 1221 (Or.Ct.App.1994) (concluding that "no trespassing" sign on boundary fence, without more, would not have served to exclude the "reasonable visitor ... who desired to contact the residents" and that, therefore, officers could rightfully use driveway to approach house); *Robinson v. Commonwealth*, 639 S.E.2d 217, 222 (Va.2007) ("Implied consent can be negated by obvious indicia of restricted access, such as posted 'no trespassing' signs, gates, or other means that deny access to uninvited persons."); *State v. Johnson*, 879 P.2d 984, 992 (Wash.Ct.App.1994) (holding that the defendants manifested "their subjective intent to close their property by fencing it, erecting a gate, and placing signs near the gate saying 'No Trespassing' and 'Private Property.' ").

In addition, the United States Supreme Court in *Oliver v. United States*, when determining whether "no trespassing" signs created a legitimate expectation of privacy in open fields when there would otherwise be no expectation of privacy stated, "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Oliver*, 466 U.S. at 183 n.13. Even under the Jardines search test, which focuses more on trespass law than on expectation of privacy, the officers' actions in merely conducting a "knock and talk" would not be proscribed as a warrantless search. *See Jardines*, 1415–18 (ruling that bringing a drug-sniffing canine into defendant's curtilage objectively demonstrated that the police were intruding upon a constitutionally protected area to search, not merely conducting a "knock and talk"). "The law of trespass generally gives members of the public a license to use a walkway to approach the front door of a house and to remain there for a brief time." Id. at 1420 (Alito, J., dissenting). Consequently, if the officers' actions were not a search, then the Fourth Amendment protections would not apply.

Taking all of these cases into consideration, the emerging rule appears to be that the implied

**The presence of so many hundreds of others around Kastner who regarded the area as unrestricted also contributed to Kastner's innocent state of mind regarding the restrictedness or no restrictedness of the area.**

Grounds and public buildings in frequent use by pedestrians, such as the Capitol, become a right-of-way over time. *See, e.g., McKinnon v. Northeast Illinois Regional Commuter R.R. Corp.*, 263 Ill. App. 3d 774, 779 (1994) (reversing the trial court's dismissal where complaint alleged that there was a particular right-of-way extending through a densely populated village that was easily accessible to the public and that the defendant permitted the use of the right-of-way to the extent that it became the custom of persons to do so). So it is that Kastner's assessment that hundreds of people around him who evidently believed they were rightfully in the area is a defense for Kastner.

The case law regarding the open-public-free-speech-forum area of the Capitol cannot be overcome by a decree of the Capitol Police, or the Secret Service, or federal prosecutors. The U.S. Capitol is one of America's largest public buildings, with well over 1.5 million square feet, over 600 rooms, and miles of corridors.[6] Previous case law in other federal jurisdictions has invalidated government attempts to extend no-advocacy zones beyond a few feet.

For example, the Supreme Court invalidated attempts to ban protesting within 300 feet of an abortion clinic in *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 771 (1994). The Supreme Court invalidated such a ban but found a thirty-six-foot buffer was acceptable. "[C]itizens must

---

invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property. *See State v. Grice*, 767 S.E.2d 312, 319 (N.C.2015) ("The implicit license enjoyed by law enforcement and citizens alike to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners and is already limited by our social customs."). Thus, in this case, we must determine whether a small sign reading "no trespassing[,] hunting[,] or fishing," posted in a field next to appellant's driveway that is difficult to see when driving down the driveway, as evidenced by the "dashcam" video presented in this case, is sufficient to revoke the implied invitation. *See, e.g., U.S. v. Ventling*, 678 F.2d 63, 66 (8th Cir.1982); Michel, 961 P.2d at 438. Several courts when ruling on this issue have noted that such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent a casual visitor from approaching the residence) *Ventling*, 678 F.2d at 66.

[6] See Architect of the Capitol, "U.S. Capitol Building," **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building** (accessed 9/27/2022).

tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to freedoms protected by the First Amendment." *Id*. at 774.

ISSUES TO BE CONSIDERED AND DETERMINED IN THIS TRIAL

Citizen protest and participation <u>is part</u> of every legitimate official proceeding. Members of Congress recognized and anticipated disruptions, protests, and challenges to the election certification on January 6. Such disruptions are not "obstructions" of the proceedings; but are *an integral part* of the proceedings. The government cannot use the 'Secret Service protectee' laws to declare that the entirety of one of America's largest free speech forum complexes is off-limits to all speech and advocacy.[7]

**The First Amendment as a Defense to trespass.**

The First Amendment, in some circumstances, is a defense to trespass. For example, in *People v. Millhollen*, 5 Misc. 3d 810, 786 N.Y.S.2d 703, 194 Ed. Law Rep. 395 (N.Y. City Ct. 2004) a court held that a university student who climbed a tree on a university campus, and <u>remained there after being ordered</u> by a police officer and a university official to descend, was not guilty of trespass, absent evidence that the student's presence in the tree was incompatible with the university's normal activities).

---

[7] In *Blair v. City of Evansville*, 361 F. Supp. 2d 846 (S.D.In. 2005), a district court upheld a lawsuit by a protestor (Blair) who was wrongly arrested for picketing a speech by Vice President Dick Cheney in 2002. *Blair* held that "the restriction of protesters to an area 500 feet away from the only entrance used by attendees, and on the opposite end of the building from where Vice President Cheney would enter the facility and from where the majority of people attending the event would park, burdened speech substantially more than was necessary to further the [government's] goals of safety."
The 1st amendment requires that the vice president and Congress cannot be entirely insulated from picketing and advocacy. *See, e.g., Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 861-62 (9th Cir. 2004) (200 and 265 feet security zones found over broad); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (seventy-five yard security zone found over broad because it prevented demonstration from reaching intended audience); but see *Madsen*, 512 U.S. at 771 (holding that a thirty-six-foot buffer zone on public property was narrow enough).
*Blair,* 361 F. Supp. 2d at 858. Judge McKinney found that the location of the protest zone in *Blair* "eliminated any meaningful avenue for the communication of ideas by the protestors to at least one intended audience, the attendees."

The Supreme Court has agreed that First Amendment protections are a defense to trespassing in some circumstances. In *Adderley v. State of Fla.*, 385 U.S. 39, 48 (1966), the Court considered whether student protestors at the grounds of a jail could be convicted of trespassing when their conduct was plainly aimed at vocalizing grievances regarding arrests and jail policies. Although the Supreme Court upheld—by split decision—the students' trespass convictions, the Court unanimously held that the students <u>would not have been convicted for trespassing at a legislative Capitol</u> under similar circumstances.

The dissenting opinion in *Adderley v. State of Fla.*, authored by Justice Douglas and joined by Brennan and Fortus, found that the student protestors' trespassing arrests <u>should be overturned on First Amendment grounds</u>. 385 U.S. 39, 48 (1966) (Douglas, J., dissenting). "We do violence to the First Amendment when we permit this 'petition for redress of grievances' to be turned into a trespass action," wrote the dissenters. *Id*. at 52.

Three members of the Supreme Court held in 1966 that protestors who entered the grounds of a jail—which (unlike Capitol Grounds) had never been a forum for free speech—blocked traffic, prevented a worker from leaving, and defied orders from a sheriff to disperse were <u>fully protected</u> by the First Amendment.  And <u>*every member of the Supreme Court*</u> held that the First Amendment would have protected the protestors from a trespassing conviction under the same facts *if the facility had been a capitol rather than a jail*.[8]

---

[8] The Court compared the jail protest with the protest upheld in *Edwards v. South Carolina*, 372 U.S., at 235, 83 S.Ct., at 683 (1963). In *Edwards*, the Supreme Court overturned convictions of protestors at a state capitol who refused commands to disperse.

> In *Edwards*, the demonstrators went to the South Carolina State Capital grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. The demonstrators at the South Carolina Capital went in through a public driveway and as they entered they were told by state officials there that they had a right as citizens to go through the State House grounds as long as they were peaceful. Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff.

Adderly at 41.
The dissent even gently mocked the majority's proffered distinction between jail grounds and

Justice Douglas cited numerous Supreme Court cases standing for the proposition that the 'custodian' of public property cannot arbitrarily decide "when public places shall be used for the communication of ideas," e.g., Hague v. C.I.O. 307 U.S. 496 (1939); Schneider v. State of New Jersey, 308 U.S. 147, 163—164; Cantwell v. State of Connecticut, 310 U.S. 296; Largent v. State of Texas, 318 U.S. 418; Niemotko v. State of Maryland, 340 U.S. 268; Shuttlesworth v. City of Birmingham, 382 U.S. 87. "For to place such discretion in any public official, be he the 'custodian' of the public property or the local police commissioner (cf. Kunz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280), is to place those who assert their First Amendment rights at his mercy." Id. at 54. "It gives him the awesome power to decide whose ideas may be expressed and who shall be denied a place to air their claims and petition their government." Id.

Thus, any policy, law, barrier, or forum restriction that regulates protected speech must meet First Amendment muster, whether or not it also regulates conduct. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."); *Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999) (rejecting the argument "that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech alone."). The inquiry "is not whether trespassing is protected conduct," but whether the law contains other restrictions on conduct that also "qualif[y] as protected speech." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (quoting *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1194–96 (10th Cir. 2017) (*W. Watersheds Project I*)).

Here, the conduct of Kastner and those alongside him on Jan. 6 was plainly aimed at persuading policymakers—not merely attacking, killing, obstructing or harming them. This makes this case different from cases in which conduct of an advocacy group "symbolizes nothing" and

---

legislative grounds. "Would the case be any different if, as is common, the demonstration took place outside a building which housed both the jail and the legislative body? I think not." *Id.* at 53 (Douglas, J. dissenting).

receives no First Amendment protections. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1207–08 (9th Cir. 2018) (Bea, J., dissenting) (involving an advocacy group that breaks into zoos and releases exotic animals).

This conclusion is consistent with Supreme Court precedent which has emphasized that First Amendment analysis applies when speech is implicated by a law even if the law "generally functions as a regulation of conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010) (emphasis in original). Thus, the erection of barriers on Capitol grounds regulates protected speech and accordingly implicates the First Amendment.  Exempting the Jan. 6 demonstration from any First Amendment review could result in the criminalization of core free speech, such as criticism of a politician. *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1209 (D. Utah 2017) (observing "[i]f a person's First Amendment rights were extinguished the moment she stepped foot on [a given property], the State could, for example, criminalize any criticism of the Governor, or any discussion about the opposition party, or any talk of politics whatsoever, if done on [a given] property.").

Some acts amount to speech protected by the First Amendment, and may not be prosecuted as trespass, depending on the location of the protest.  The Supreme Court of the United States has held that since 'time out of mind,' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). In this regard, the right of free speech attaches to premises which have traditionally served as a place for free public assembly by private citizens. *People v. O'Grady*, 147 Misc. 2d 118, 560 N.Y.S.2d 602 (App. Term 1990). And courts have previously held that the Capitol grounds on all sides of the building are just such a free speech forum. *See Jeannette Rankin Brigade, supra*. The government's claim that all of the demonstrators on Capitol Grounds on Jan. 6 were "attackers" rather than protestors conflicts with settled First Amendment law.

      For all the foregoing reasons, Kastner moves this Honorable Court for an order dismissing this action, with prejudice, as violative of the First Amendment.

| | |
|---|---|
| Date: June 6, 2023 | Respectfully Submitted,<br>*/s/ John M. Pierce*<br>John M. Pierce<br>21550 Oxnard Street<br>3rd Floor, PMB #172<br>Woodland Hills, CA 91367<br>Tel: (213) 400-0725<br>Email:jpierce@johnpiercelaw.com<br>Attorney for Defendant |

CERTIFICATE OF SERVICE

I hereby certify that, on June 6, 2023, this motion was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

/s/ John M. Pierce
John M. Pierce