UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Complainant | : | |
| | : | |
| v. | : | Case No. 21-CR-725 (RDM) |
| | : | |
| JARED SAMUEL KASTNER, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF JARED SAMUEL KASTNER'S MOTION TO SUPPRESS OUT OF COURT IDENTIFICATION**

Defendant JARED SAMUEL KASTNER ("Kastner"), through the undersigned counsel, John L. Pierce, Esq. presents this Motion and Memorandum of Law and hereby moves the Court and presents this Memorandum of Law in support of his motion for this Court to suppress the Government's erroneous mis-identification of Defendant Kastner in out-of-court video evidence.

I.  INTRODUCTION AND OVERVIEW

The Acting Chief of Police of the U.S. Capitol Police estimated that there were "thousands" and in one place described the crowd as 10,000 demonstrators [1] (hundreds of whom out of 10,000 transgressed into violent acts and are frequently called rioters) who were present

---

[1] In a statement by Acting Chief of the U.S. Capitol Police, found at **https://twitter.com/MikevWUSA/status/135410495553067010/photo/1** , Yogananda D. Pittman documents during a topic otherwise *not* relevant to this motion nor adopted by the Accused that the U.S. Capitol Police estimated that "tens of thousands" of demonstrators were at the U.S. Capitol.  Elsewhere Pittman estimates the crowd at 10,000.  Note that this refers to people actually at or around the U.S. Capitol.  There are (as always with mass demonstrations in D.C.) disputes about the total number of demonstrators at the Ellipse and on the Washington Mall near the White House, etc. but hundreds of thousands were elsewhere in D.C.

1

at, around, and in many cases inside the U.S. Capitol building on the early afternoon of January 6, 2021.  Of the roughly 1,000 persons charged, many of them for minor charges of basically trespassing, less than 10% of the 10,000 demonstrators present at the U.S. Capitol building on January 6, 2021, transgressed from First Amendment demonstrating to unlawful rioting.

In a crowd of 10,000 people, the likelihood is very high that more than one person will appear on low-quality video (made so by the large number of people included in each scene) to look alike, even though on closer examination they are not the same person.

Given the low quality of video recordings (even with high quality equipment viewing hundreds of people at once, jammed in together and jostling, so that an individual's greatly-magnified face on the screen may be difficult to discern) and the large quantity of people, the presence of COVID-inspired masks, and a propensity for attendees to often wear similar clothes suitable to the cold January day, informal styles, often from certain regions or cultures concentrating certain kinds of clothing, active review and analysis of thousands of hours of video actually shows in reality, not just in possibility, many people appear at first glance to be the same person but on closer examination they are actually different people.

II.     FACTUAL CONTEXT:  DEFECTIVE PROCESS OF IDENTIFICATION

The problem with the Government's claims about what Kastner did on January 6, 2021, are not questions of disputed facts to be deferred to the jury.  The problem is a defective process.

The defective procedure is for Government staff who do not know Jared Kastner to look at poor-quality video and guess that someone they see on a video – with many wearing masks, wearing similar clothing, or jammed into small spaces – might be someone ***whom they don't actually know in the first place***.

The Government was not having someone ***who knows Kastner*** viewing videos, but

Government staff who don't know the Defendant purporting to identify someone they don't actually know out of thousands of hours of videos.

This is unlike any traditional identification of an accused.

### III.   GOVERNING LAW:

The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. See id.; see also *Patterson v. New York*, 432 U.S. 197, 215 (1977).

The test to be applied in determining whether an identification procedure is impermissibly suggestive is whether it is "so unnecessarily suggestive and *conducive to irreparable mistaken identification as to violate the accused's due process rights." United States v. Foster*, 394 U.S. at 442 & n.2. "[I]n some cases the procedures leading to an eyewitness identification may be so defective as to make the identification inadmissible as a matter of law." Id. In deciding whether to exclude identification evidence, courts must examine the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188 (U.S. 1972); *United States v. Bagley*, 772 F.2d 482 (9th Cir. 1985), *cert. denied,* 475 U.S. 1023 (1986). In *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Court set forth the standards for a motion to suppress due to suggestive pretrial identifications. The Court held that "reliability is the linchpin" in determining the admissibility of identification testimony and applied the "totality of the circumstances" standard. Relevant factors to be considered are: (1) the opportunity of the witness to view the criminal at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of any prior description by the witness; (4) the level of certainty demonstrated by the confrontation; and (5) the time between the occurrence of the crime and the confrontation. *Manson*, 432 U.S. at 104; *Biggers,* 409 U.S. at

199- 200; *United States v. Field*, 625 F.2d 862 (9th Cir. 1980).

From the time the Supreme Court recognized a due process right to exclude from evidence tainted eyewitness identifications, the Supreme Court has looked unfavorably on "show-up" procedures (procedures where the police show the witness a single suspect and ask whether or not the witness can identify the suspect as the perpetrator of the crime). In *Stovall v. Denno*, 388 U.S. 293 (1967), the first Supreme Court case regarding identification procedures, the Supreme Court acknowledged that the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302.

Forty-five years later, in 2012, the Supreme Court affirmed that the police-arranged showup at issue in *Stovall* was "undeniably suggestive," but explained that the *Stovall* court had upheld the procedure under the due process clause because the procedure was necessary (noting that necessity was "crucial" to the Stovall decision). *Perry v. New Hampshire*, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012).

The Tenth Circuit Court of Appeals has also declared that "show-up identifications are less than ideal" and "should be employed only if compelled by extraordinary circumstances." *United States v. Natalini*, 42 F. App'x 122, 127 (10th Cir. 2002). In other words, show-up procedures are inherently suggestive and their use is improper unless the procedures are necessary under the circumstances. See *United States v. De Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993) (agreeing that in-person show-up procedure was impermissibly suggestive); *Mason v. United States*, 414 F.2d 1176, 1182 (D.C. Cir. 1969) (excluding pre-trial eyewitness identification because "[t]he showing of a single photograph is, like all identification procedures involving a single suspect, highly suggestive"); *United States v. Thomas*, 981 F. Supp. 2d 229, 234 (S.D.N.Y. 2013) ("The Second Circuit has consistently condemned the exhibition of a single

photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one.").

The reason for this rule is sound: [T]he single photo or one-person show-up ***implies*** that the police "have their man" and suggests that the witness give assent to what is already well-known and established.  Suggestibility is one of the principal ways in which memory plays tricks and leads to improper identifications. *United States v. Brown,* 471 F.3d 802, 804 (7th Cir. 2006). Avoiding the use of show-up procedures, where feasible, minimizes the risks of misidentification that are associated with asking a victim or witness to accurately remember and identify a stranger, who was observed only briefly, during a traumatic crime. *Id.*

Prosecutors while enjoying many advantages such as nearly limitless government resources, must also meet more compelling and strict burdens than usual for attorneys in other context:

> In *Berger v. United States*, Justice George Sutherland, who was part of the Schechter majority, said the following about ***the role of the prosecutor:***
>
> > **[He] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.** [7]

*Bennett L. Gershman, "Hard Strikes and Foul Blows:" Berger v. United States 75 Years After, 42 Loy. U. Chi. L. J. 177, 179 (2010). Available at:*
***http://lawcommons.luc.edu/luclj/vol42/iss1/8*** *(citing to  Berger v. United States*, 295 U.S. 78, 88 (1935) *(emphases added).*

Perhaps even more compelling:

> Also, there is little doubt that Justice Sutherland's articulation of the special obligation of the prosecutor to ensure that "justice shall be done" was influenced by then-Canon 5 of the Canons of Professional Ethics of the American Bar Association, which stated:
>
> **"The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."**

*Gershman,* at 194.

### IV.   ARGUMENT:

Here, the identification of Jared Kastner out of thousands of hours of surveillance and private video recordings were performed by some Government staff with absolutely no knowledge of Kastner whatsoever.[2] These are not witnesses. They are not eyewitnesses. They lack any foundation of knowledge. They were merely looking for a similarity in one video to another video or to a photograph of someone they don't actually know.

Kastner was among a large crowd many of whom were similarly attired, wearing facemasks and headgear.  The facts here weigh heavily in favor of precluding any identification testimony and an analysis of the facts at hand under the judicially required criteria amply demonstrates the reasons for this.

Note that the problem is with a procedure that does not pass constitutional muster for due

---

[2]   Interestingly, FBI "case agent" Dubrowski, one of several supervising the activities of entire teams of FBI agents and other investigators, testified in the Proud Boys case *United States v. Nordean*, Case No. 1:21-cr-00175, extensively about the process being followed in the review of as many as 500,000 videos and other evidence.  (Unfortunately the testimony of interest here was scattered throughout cross-examination by many Defendants and not all in one place.) This supports the imperfect processing and review by the FBI of these videos, many of which are still pouring in as Defendants are already going to trial or already concluded trials.

process. While it can be disputed as a fact question "Is that on the video Kastner or not?" first this almost requires a witness to testify and waive his Fifth Amendment rights to deny that that actually is him on the video. This also turns the burden of proof on its head. Kastner is presumed to be in the videos unless he proves he is not.

Instead, the Government must prove that Kastner actually did what they accuse, that evidence shows that it is Kastner – not someone else – shown on videos doing this or that at different times.

Again, this is not the usual case by any means. While it may seem far-fetched to wonder if two people look alike, not in a crowd of 10,000 people (as estimated by the USCP then Deputy Chief Pittman).

Therefore, Kastner by counsel challenges the procedure used and respectfully requires an identification on evidentiary video that is constitutionally sufficient and reliable.

V.  CONCLUSION

The Defendant requests this Court to grant this Motion and such other relief as may be deemed just. Defendant Jared Kastner, demands that any identification of him on videos be suppressed unless where the identification is done in a constitutionally valid and persuasive manner. Identification must at a minimum be performed by someone with first-hand, personal knowledge of Kastner.

Dated: July 5, 2023

RESPECTFULLY SUBMITTED,
/s/ John M. Pierce
John M. Pierce
JOHN PIERCE LAW
21550 Oxnard Street 3rd Floor, PMB #172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com
(213) 279-7846
Counsel for the Defendant

## CERTIFICATE OF SERVICE

      I hereby certify that this document is being filed on this July 5, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants. From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

                                      */s/ John M. Pierce*
                                      John M. Pierce