UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case: 21-cr-725-1 (RDM) |
| | : |
| JARED SAMUEL KASTNER | : |
| | : |
| Defendant. | : |

DEFENDANT KASTNER'S RESPONSE AND OPPOSITION TO UNITED STATES' MOTION IN LIMINE "TO PRECLUDE IMPROPER DEFENSE ARGUMENTS"

Defendant Kastner, by and through his attorney of record John Pierce, hereby responds and opposes the government's motion in limine regarding "improper defense arguments" (ECF #122).

By "improper defense arguments," the United States means a wide-ranging laundry list of evidentiary improprieties. With the exception of the First Amendment, defendant will not address this multitude of issues, except to say that the defense has a right to present a defense, and does not intend to violate any of the Federal Rules of Evidence.

**The Capitol is a Free Speech Forum where Congress Shall Make No Law Restricting Speech, Assembly, or the Right to Petition for Redress.**

There is a long line of cases holding that people have a right to use the Capitol Grounds as a free speech forum? *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575

(D.D.C. 1972). In *Jeannette Rankin Brigade* a special 3-judge panel of the DC District Court held that the Capitol Grounds are "an area to which access cannot be denied broadly or absolutely." 342 F. Supp. 575, 583-84 (D.D.C. 1972). The Supreme Court summarily affirmed, making *Jeannette Rankin Brigade* binding precedent. 409 U.S. 972 (1972). Later, in *Community for Creative Non-Violence v. Kerrigan*, the DC Circuit held that "there is no doubt that the Capitol Grounds are a public forum." 865 F.2d 382, 383, 387 (1989) (upholding "a reasonable time, place or manner restriction," a regulation limiting the length of time during which demonstration "props and equipment" may remain on the Grounds). Clearly, therefore, the "Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public," and "the primary purpose for which the Capitol was designed--legislating"--is entirely consistent "with the existence of all parades, assemblages, or processions which may take place on the grounds." *Jeannette Rankin Brigade*, 342 F. Supp. at 584.

Indeed, in *Jeannette Rankin Brigade*, the district court observed that "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Id*. See also, *Lederman v. United States*, 291 F.3d 36 (DC Cir. 2002) (striking down a regulation banning leafleting and other "demonstration activities" on the sidewalk at the foot of the House and Senate steps on the East Front of the Capitol). The *Lederman* Court found that sidewalks around the Capitol are a public forum, and that a regulation banning leafleting and other "demonstration activities" at the foot of the House and Senate steps on the east side of the Capitol is unconstitutional.

Note that courts have held that even the *interior* of the Capitol is an appropriate forum for organized prayer sessions, speeches, and organized walking through the halls.[1]

---

[1] The First Amendment literally says "Congress shall make no law" restricting speech, advocacy, or petitioning. The government's only path around this problem is the notion that the mere presence of the Vice President in the Capitol on Jan. 6 somehow allows for prosecutions of advocates, protestors or petitioners hundreds of yards away, outside, separated by numerous thick marble walls.

**No law makes the Capitol a restricted area.  No court case makes the Capitol a restricted area.  No published federal rule or regulation makes the Capitol a restricted area.**

---

But the Supreme Court has never held that the First Amendment can be evaded simply by a Secret Service proclamation that a protected government official lurks nearby.  The government often asserts on Judge Friedman's well-articulated opinion in *Bynum v. U.S. Capitol Police Board*, 93 F. Supp. 2d 50 (D.D.C. 2000), which the government says classified the interior of the Capitol as a nonpublic forum.  In fact, *Bynum* struck down a previous ban on picketing and parading in the Capitol as too broad. See id. (holding groups of visitors have 1st amendment rights to hold nondisruptive prayer sessions in Capitol hallways).

Judge Friedman himself wrote that his conclusion to categorize the inside of the Capitol as a 'nonpublic forum' was "somewhat surprising." Id. at 56 ("Which brings the Court to what may seem a somewhat surprising conclusion that the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes").  And despite the *Bynum* Court's pronouncement that the inside of the Capitol is a nonpublic forum for protesting, the Court held that some, limited expression, prayer and petitioning is nonetheless permitted inside the Capitol:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking . . . or other expressive conduct. . . ." Traffic Regulations for the Capitol Grounds § 158. Because the regulation's proscriptions are not limited to the legitimate purposes set forth in the statute, it is an unreasonable and therefore an unconstitutional restriction on speech. *See Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987) (general prohibition of First Amendment activity in airport cannot be justified even if airport is nonpublic forum "because no conceivable government interest would justify such an absolute prohibition of speech"). For these reasons, and those discussed in Section II B of this Opinion, the regulation is both unreasonable and unconstitutionally overbroad.

*Bynum*, at 57.

Judge Friedman also found that the "picketing and parading" ban violated due process because it was vague:  "While there certainly are types of expressive acts that rise to the level of a demonstration, any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." Id.

> The regulation as written allows a police officer to restrict any sort of expressive conduct when, in the eyes of the particular officer, it might attract onlookers -- without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs. The determination of what conduct is prohibited by such a regulation therefore necessarily will vary depending on the subjective judgment of the particular officer regarding what conduct in his or her judgment has a "propensity to attract a crowd of onlookers." Such a regulation does not provide any standard at all. Rather, it "confers on the police a virtually unrestrained power to arrest and charge persons with a violation" and "the opportunity for abuse . . . is self-evident." [citations omitted].
> The virtually standardless, broad discretion given to the Capitol Police by this regulation also causes it to be unconstitutionally vague.

Bynum, at 58-59.

Significantly, no law of Congress makes the Capitol a restricted area. No detailed court case ever published[2] makes the Capitol a restricted area. Indeed, these sources of law resoundingly say the opposite. So how do prosecutors in these cases contend the Capitol or its grounds were restricted areas on Jan. 6?

**Trespass Law requires both proof of notice and proof of actual license to restrict.**

The federal "restricted area" statutes at issue here are analogous to trespassing laws at the state levels. These are derived from ancient common law going back in Anglo-American history for centuries. The basic principles of criminal trespass are enunciated in the Model Penal Code. See, e.g., *State v. Pixley*, 200 A.3d 174 (Vt. 2018). In general, a conviction for trespassing requires <u>two</u> distinct elements: first, the license element—that the person is entering the land "without legal authority" or consent, and second, the notice element—that notice against trespass is provided for the property in question. Id. Said differently, conviction requires <u>proof of both</u> *subjective* notice (the defendant's state of mind) and the *objective* fact of restrictedness. In this case, each element is contested.

It is not enough for "the State to show that defendant should have known he was not licensed or privileged to enter the dwelling." *State v. Fanger*, 665 A.2d 36, 38 (Vt. 1995) (quoting Model Penal Code § 221.2(1) (1962)). The government must prove a <u>defendant actually knew</u>.

Case reporters are filled with cases evincing messy facts which are in some ways analogous to the circumstances of January 6. There are both cases where defendants are convicted of trespassing in circumstances <u>without</u> posted warnings; and other cases where courts hold that even heavily-posted 'no trespassing' areas are <u>not</u> restricted areas. *See, e.g., State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005) ("[a] person does not have an expectation of privacy in the area in front of his or her residence leading from the public way to the front door").

---

[2] Ironically the only courts that have ever pronounced the Capitol grounds to be a restricted area are some trial courts in Jan. 6 cases. Most of these rulings are unpublished.

The vast majority of states that have directly addressed the issue consider signage to be but one consideration when determining whether a person has demonstrated a legitimate expectation of privacy or restricted area. *See, e.g., Michel v. State*, 961 P.2d 436, 437–38 (Alaska Ct.App.1998) (holding that "[p]ersons visiting the residence for social or commercial purposes" would not construe "no trespassing" signs along driveway "as meant to prohibit their entry"); *Burdyshaw v. State*, 10 S.W.3d 918, 921 (Ark.Ct.App.2000) ("[E]ven though the property was posted, the gates were open, the driveway was not blocked, and entry onto the property was not an intrusion prohibited by the Fourth Amendment."); *Burkholder v. Superior Court*, 96 Cal.App.3d 421, 428 (Cal.Ct.App.1979) (holding that expectation of privacy was objectively reasonable when "[e]ntry to the property was openly restricted by posted signs along, and locked gates across[ ] the rural access road signif[ied] an intention to deny access to the public in general, including government agents").[3]

---

[3] *Brown v. State*, 152 So.3d 619, 624 (Fla.Dist.Ct.App.2014) ("While this Court has found that a policeman may enter the curtilage surrounding a home in the same way as a salesman or visitor could, no such person would reasonably go through both a gated four-foot fence and a gated six-foot fence, surrounded by several 'No Trespassing' signs in order to conduct business with the residents."); *Wysong v. State*, 614 So.2d 670, 671 (Fla.Dist.Ct.App.1993) (holding that officers did not illegally enter yard to knock on door despite "no trespassing" sign); *State v. Rigoulot*, 846 P.2d 918, 923 (Idaho Ct.App.1992) ("Posting 'No Trespassing' signs may indicate a desire to restrict unwanted visitors.... However, such signs cannot reasonably be interpreted to exclude normal, legitimate, inquiries or visits by mail carriers, newspaper deliverers, census takers, [etc.] who restrict their movements to the areas of one's property normally used to approach the home." (citations omitted)); *Mundy v. State*, 21 N.E.3d 114, 118–19 (Ind.Ct.App.2014) (holding that it was unreasonable for officers to enter property when it was posted, there was a chain across the driveway, and a security camera was on a tree near the chain); *State v. Fisher*, 154 P.3d 455, 470–75 (Kan.2007) (ruling that deputy was legally on property to conduct "knock and talk" but could not seize evidence from curtilage; presence of "no trespassing" signs was part of curtilage analysis); *Jones v. State*, 943 A.2d 1, 12 (Md.2008) ("For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the 'No Trespassing' sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation."); *State v. Kruse*, 306 S.W.3d 603, 611–12 (Mo.Ct.App.2010) (stating that signage is one consideration when determining whether police intrusion into backyard was reasonable); *State v. Pasour*, 741 S.E.2d 323, 326 (N.C.Ct.App.2012) ("[W]hile not dispositive, a homeowner's intent to keep others out and thus evidence of his or her expectation of privacy in an area may be demonstrated by the presence of 'no trespassing' signs". ); *State v. Mittleider*, 809 N.W.2d 303, 307–08 (N.D.2011) (holding that "no trespassing" signs on farm did not create reasonable expectation of privacy in entrance to the farm but leaving open the question of whether such signs could ever create a reasonable expectation of privacy); *State v. Morgan*, No. 13–CA–30, 2014 WL 1836015, at *3–4 (Ohio Ct.App. May 1, 2014) (holding that initial "knock and talk" was "unobjectionable"—despite "no trespassing" signs in front of house but entry into backyard was unreasonable, partly because of the signage), no perm. app. filed ; *State v. Roper*, 294 P.3d 517, 520 (Or.Ct.App.2012) (holding that fence plus signage "objectively manifested intent to exclude the public"); *State v. Gabbard*, 877 P.2d 1217, 1221

Michel, 961 P.2d at 438. Likewise, we conclude that the sign in this case would not have prevented the casual visitor or the reasonably respectful citizen from approaching appellant's residence. Therefore, the sign did not revoke the implied invitation of the front door, and Investigators Green and Chunn lawfully entered appellant's property when they drove up his driveway and approached

---

(Or.Ct.App.1994) (concluding that "no trespassing" sign on boundary fence, without more, would not have served to exclude the "reasonable visitor ... who desired to contact the residents" and that, therefore, officers could rightfully use driveway to approach house); *Robinson v. Commonwealth*, 639 S.E.2d 217, 222 (Va.2007) ("Implied consent can be negated by obvious indicia of restricted access, such as posted 'no trespassing' signs, gates, or other means that deny access to uninvited persons."); *State v. Johnson*, 879 P.2d 984, 992 (Wash.Ct.App.1994) (holding that the defendants manifested "their subjective intent to close their property by fencing it, erecting a gate, and placing signs near the gate saying 'No Trespassing' and 'Private Property.' ").

In addition, the United States Supreme Court in *Oliver v. United States*, when determining whether "no trespassing" signs created a legitimate expectation of privacy in open fields when there would otherwise be no expectation of privacy stated, "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Oliver*, 466 U.S. at 183 n.13. Even under the Jardines search test, which focuses more on trespass law than on expectation of privacy, the officers' actions in merely conducting a "knock and talk" would not be proscribed as a warrantless search. *See Jardines*, 1415–18 (ruling that bringing a drug-sniffing canine into defendant's curtilage objectively demonstrated that the police were intruding upon a constitutionally protected area to search, not merely conducting a "knock and talk"). "The law of trespass generally gives members of the public a license to use a walkway to approach the front door of a house and to remain there for a brief time." Id. at 1420 (Alito, J., dissenting). Consequently, if the officers' actions were not a search, then the Fourth Amendment protections would not apply.

Taking all of these cases into consideration, the emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property. *See State v. Grice*, 767 S.E.2d 312, 319 (N.C.2015) ("The implicit license enjoyed by law enforcement and citizens alike to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners and is already limited by our social customs."). Thus, in this case, we must determine whether a small sign reading "no trespassing[,] hunting[,] or fishing," posted in a field next to appellant's driveway that is difficult to see when driving down the driveway, as evidenced by the "dashcam" video presented in this case, is sufficient to revoke the implied invitation. *See, e.g., U.S. v. Ventling*, 678 F.2d 63, 66 (8th Cir.1982); Michel, 961 P.2d at 438. Several courts when ruling on this issue have noted that such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent a casual visitor from approaching the residence) *Ventling*, 678 F.2d at 66.

his front door. See also *Borrico v. State*, 276 So.3d 458 (Florida App. 2019) (overturning conviction where evidence of notice was confusing, contradictory or nonexistent).

**The presence of so many hundreds of others around defendants who regarded the area as unrestricted also contributed to defendants' innocent states of mind regarding the restrictedness or nonrestrictedness of the area.**

Grounds in frequent use by pedestrians, such as the Capitol grounds, become a right-of-way over time. *See, e.g., McKinnon v. Northeast Illinois Regional Commuter R.R. Corp.*, 263 Ill. App. 3d 774, 779 (1994) (reversing the trial court's dismissal where complaint alleged that there was a particular right-of-way extending through a densely populated village that was easily accessible to the public and that the defendant permitted the use of the right-of-way to the extent that it became the custom of persons to do so).  So it is that defendants' assessments that hundreds of people around them who evidently believed they were rightfully in the area is a defense.

The case law regarding the open-public-free-speech-forum area of the Capitol cannot be overcome by mere decree of the Capitol Police, or the Secret Service, or federal prosecutors.  The U.S. Capitol is one of America's largest public buildings, with well over 1.5 million square feet, over 600 rooms, and miles of corridors.[4] Previous case law in other federal jurisdictions has invalidated government attempts to extend no-advocacy zones beyond a few feet.

For example, the Supreme Court invalidated attempts to ban protesting within 300 feet of an abortion clinic. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 771 (1994) (finding thirty-six-foot buffer was acceptable).  "[C]itizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to freedoms protected by the First Amendment." *Id*. at 774.

**The First Amendment as a Defense to trespass.**

---

[4] See Architect of the Capitol, "U.S. Capitol Building," https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building (accessed 9/27/2022).

In general, violence is not First-Amendment protected.  <u>But trespassing sometimes is</u>.  For example, in *People v. Millhollen*, 5 Misc. 3d 810, 786 N.Y.S.2d 703, 194 Ed. Law Rep. 395 (N.Y. City Ct. 2004) a court held that a university student who climbed a tree on a university campus, and <u>remained there after being ordered</u> by a police officer and a university official to descend, was not guilty of trespass, absent evidence that the student's presence in the tree was incompatible with the university's normal activities).

The government contends that there is <u>no</u> First Amendment protection for the thousands of people present on Capitol Grounds on January 6.  <u>None</u>.  But given the binding case law holding that the Capitol grounds is a public free-speech forum, the government's claims that the grounds were totally restricted on Jan. 6 must withstand strict scrutiny analysis.  And the evidence in this case illustrates the presence of flags, banners, megaphones, and group persuasive chants—all of which are archetypes of protected petitioning and advocacy rather than assaultive militancy.

A policy, law, barrier, or forum restriction that regulates protected speech must meet First Amendment muster, whether or not it also regulates conduct. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."); *Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999) (rejecting the argument "that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech alone."). The inquiry "is not whether trespassing is protected conduct," but whether the law contains other restrictions on conduct that also "qualif[y] as protected speech." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (quoting *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1194–96 (10th Cir. 2017) (*W. Watersheds Project I*)).

This conclusion is consistent with Supreme Court precedent which has emphasized that First Amendment analysis applies when speech is implicated by a law even if the law "generally functions as a regulation of conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28

(2010) (emphasis in original).  Thus, the erection of barriers on Capitol grounds regulates protected speech and accordingly implicates the First Amendment.  Exempting the Jan. 6 demonstration from any First Amendment review could result in the criminalization of core free speech, such as criticism of a politician. *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1209 (D. Utah 2017) (observing "[i]f a person's First Amendment rights were extinguished the moment she stepped foot on [a given property], the State could, for example, criminalize any criticism of the Governor, or any discussion about the opposition party, or any talk of politics whatsoever, if done on [a given] property.").

Some acts amount to speech protected by the First Amendment, and may not be prosecuted as trespass, depending on the location of the protest.  The Supreme Court of the United States has held that since 'time out of mind,' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). In this regard, the right of free speech attaches to premises which have traditionally served as a place for free public assembly by private citizens. *People v. O'Grady*, 147 Misc. 2d 118, 560 N.Y.S.2d 602 (App. Term 1990). And courts have previously held that the Capitol grounds on all sides of the building are just such a free speech forum. *See Jeannette Rankin Brigade, supra*. The government's claim that all of the demonstrators on Capitol Grounds on Jan. 6 were "attackers" rather than protestors conflicts with settled First Amendment law.

**A Court Holding that the Hundreds of Protestors on January 6 have no First Amendment Protection will have a Chilling Effect on Fundamental First Amendment Protections.**

Of all the First Amendment cases ever decided by the Supreme Court, the case of *Adderley v. State of Fla.*, 385 U.S. 39, 48 (1966) may provide the clearest path for analysis.  In *Adderly*, the Court upheld the trespassing arrest of 13 college students who entered the grounds of the Leon County, Florida jail to protest prior arrests and city segregation policies.  The students blocked a driveway to the jail entrance not normally used by the public and refused to disperse after being

ordered by sheriff. Significantly, the majority opinion authored by Justice Black indicated that the same facts *would lead to First Amendment protection from a trespass conviction* <u>if the facility had been a capitol with a history of political protest and speech advocacy</u>.

The dissenting opinion in *Adderley v. State of Fla.*, authored by Justice Douglas and joined by Brennan and Fortus, found that the student protestors' trespassing arrests <u>should be overturned on First Amendment grounds</u>. 385 U.S. 39, 48 (1966) (Douglas, J., dissenting). "We do violence to the First Amendment when we permit this 'petition for redress of grievances' to be turned into a trespass action," wrote the dissenters. *Id*. at 52.

The parallels between the *Adderly* case and January 6 could not be more compelling. In fact, there was evidence in the *Adderly* case that workers in the jail were obstructed and afraid to leave the jail facility during the protest. And in some ways, the disruption of the Leon County jail by the *Adderly* protestors was less supported by the law than the protests of January 6.[5] Even so, three Supreme Court justices pronounced that the student protestors' conduct was First Amendment protected. "In the first place the jailhouse grounds were not marked with 'NO TRESPASSING!' signs," wrote Douglas, *id*. at 52, and "[o]nly the sheriff's fiat [ordering trespassers to disperse" transformed lawful conduct into an unlawful trespass." *Id*.

Three members of the Supreme Court held in 1966 that protestors who entered the grounds of a jail—which (unlike Capitol Grounds) had never been a forum for free speech—blocked traffic, prevented a worker from leaving, and defied orders from a sheriff to disperse were <u>fully protected</u> by the First Amendment. *And <u>every member of the Supreme Court</u>* held that the First Amendment

---

[5] "The fact that no one gave a formal speech, that no elaborate handbills were distributed, and that the group was not laden with signs would seem to be immaterial" to the question of First Amendment protection, wrote the dissent. Justice Douglas wrote that the First Amendment protected the *Adderly* protestors nonetheless. Id. at 51.

would have protected the protestors from a trespassing conviction under the same facts *if the facility had been a capitol rather than a jail.*[6]

Justice Douglas cited numerous Supreme Court cases standing for the proposition that the 'custodian' of public property cannot arbitrarily decide "when public places shall be used for the communication of ideas," e.g., Hague v. C.I.O. 307 U.S. 496 (1939); Schneider v. State of New Jersey, 308 U.S. 147, 163—164; Cantwell v. State of Connecticut, 310 U.S. 296; Largent v. State of Texas, 318 U.S. 418; Niemotko v. State of Maryland, 340 U.S. 268; Shuttlesworth v. City of Birmingham, 382 U.S. 87. "For to place such discretion in any public official, be he the 'custodian' of the public property or the local police commissioner (cf. *Kunz v. People of State of New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280), is to place those who assert their First Amendment rights at his mercy." Id. at 54. "It gives him the awesome power to decide whose ideas may be expressed and who shall be denied a place to air their claims and petition their government." Id.

CONCLUSION

The Court should deny the government's motion in limine.

Date: July 10, 2023                                     Respectfully Submitted,
                                                                        */s/ John M. Pierce*
                                                                        John M. Pierce

---

[6] The Court compared the jail protest with the protest upheld in *Edwards v. South Carolina*, 372 U.S., at 235, 83 S.Ct., at 683 (1963). In *Edwards*, the Supreme Court overturned convictions of protestors at a state capitol who refused commands to disperse.

> In *Edwards*, the demonstrators went to the South Carolina State Capital grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. The demonstrators at the South Carolina Capital went in through a public driveway and as they entered they were told by state officials there that they had a right as citizens to go through the State House grounds as long as they were peaceful. Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff.

Adderly at 41.
The dissent even gently mocked the majority's proffered distinction between jail grounds and legislative grounds. "Would the case be any different if, as is common, the demonstration took place outside a building which housed both the jail and the legislative body? I think not." *Id*. at 53 (Douglas, J. dissenting).

21550 Oxnard Street
3rd Floor, PMB #172

Woodland Hills, CA 91367
Tel: (213) 400-0725
Email:jpierce@johnpiercelaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that, on July 10, 2023, this motion was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

<u>*/s/ John M. Pierce*</u>

John M. Pierce