## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-CR-00725 (MAU)** |
| **v.** | : | |
| | : | |
| **JARED SAMUEL KASTNER,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jared Kastner to 12 months' incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Jared Samuel Kastner, a 27-year-old design engineer, participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Kastner was convicted at trial of violations of 18 U.S.C §§ 1752(a)(1) and (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (2)(G). As explained herein, a sentence of 12 months' incarceration is appropriate in this case because Kastner: (1) positioned himself near the front of the mob on the West Front near rioters who were assaulting police officers; (2) advanced towards the Capitol building once police lines broke, where he observed rioters destroying property; (3) ignored multiple warning signs when he entered the Capitol building through the Senate Wing Door approximately four minutes after the Senate Wing Door was first breached; (4) protested in the Crypt while overwhelmed police officers struggled to push back the tide of rioters; and (5) at trial, repeatedly gave misleading and unreliable testimony regarding his actions and observations on January 6.

The Court must also consider that Kastner's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Kastner's participation in a riot that succeeded in halting the Congressional certification renders a sentence of 12 months' incarceration both necessary and appropriate. Furthermore, the aggravating factors above explain why Kastner is differently situated from his co-defendants and why probation not warranted in this case.

## II. Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 60 (Statement of Offense), at ¶¶ 1-7.

*Kastner's Role in the January 6, 2021 Attack on the Capitol*

On or about January 5, 2021, Jared Samuel Kastner traveled with his friend Graham Green ("Green") from Beavercreek, Ohio to the Washington, D.C. area to attend the "Stop the Steal" rally. As detailed below, Kastner later testified that he brought a firearm with him from Ohio and that he contemplated bringing a firearm with him to the rally, but Kastner denied bringing any firearms into the District of Columbia on January 6. *See* Sept. 6, 2023 Tr. of Status Hearing, 108:25—109:25.[2] Kastner spent the day of January 5 "scouting" Washington, D.C., referred to as "Caanan [sic]"[3] in the Defendant's text messages with his father. *See* GX 1101.

On January 6, 2021, Kastner traveled by car to Rosslyn, Virgina, where he took the Metro into the District of Columbia with Green and co-defendants Luke Faulkner ("Faulkner") and Kenneth Massie ("Massie"). Prior to January 6, Kastner shaved his facial hair in a distinctive mutton chop-style beard, as shown in Figure 1 (Government's Trial Exhibit ("GX") 221). Kastner wore a black raincoat with a black shirt underneath, khaki tactical pants, and brown boots. *Id.*

---

[2] Consistent with his testimony, Kastner's Google search history revealed that he researched bringing firearms with him to Washington, D.C. On January 4, 2021, at 7:04 p.m., Kastner searched, "virginia beach gun laws", and subsequently visited a website entitled, "Large Capacity Magazines in Virginia." At 7:05 p.m. on the same day, Kastner, a concealed carry permit holder, searched "concealed carry magazine limit washington DC." The next day, January 5, at 12:18 p.m., he searched, "concealed carry on train in DC … concealed carry on train in 'DC.'" Seconds later, Kastner visited a website entitled, "District of Columbia Concealed Carry Gun Law: CCPL… - USCCA." Kastner then searched, "metro to DC from VA." Notably, Washington, D.C. does not allow firearms on any Metrorail transit system. *See* https://mpdc.dc.gov/page/prohibited-places-carry-concealed-firearm (last visited Sept. 3, 2024). Apart from the above, the government does not have evidence that Kastner brought a firearm with him into the District of Columbia on January 6, 2021.

[3] The government believes "Canaan" is a biblical reference to the "Promised Land," or the land promised to the Israelites by God. *See* "Canaan," https://www.britannica.com/place/Canaan-historical-region-Middle-East (last visited Sept. 3, 2024).



*Figure 1 – Open-source photograph of Kastner (red) on January 6, 2021 (GX 221)*

At approximately 8:00 a.m., Kastner, Faulkner, Green, and Massie arrived at the Federal Triangle Metro station, and the group traveled together to the rally area near the Ellipse. *See* GX 204 (timecode 03:36). Throughout his time in Washington, D.C. on January 6, Kastner documented what he observed by taking photographs on his cellphone. *See* GX 1100.01—73. Kastner and his friends departed the rally area and went sightseeing around the National Mall. By approximately 8:45 a.m., Kastner, Green, and Massie arrived at the Capitol Reflecting Pool. There, Kastner photographed Green posing on a partially built wooden structure, shown in Figure 2 (GX 1100.25), which was later completed to form a makeshift gallows and noose.



*Figure 2 – Kastner's photograph of Green posing on wooden structure
near Capitol Reflecting Pool (GX 1100.25)*

Kastner testified that he had a clear, unobstructed view of the Capitol building and grounds before any riot had occurred. Apr. 11 Tr. 42:16—43:25. The restricted area of the Capitol grounds had not been breached, and it was marked with waist-high metal bike rack fencing, snow fencing, and area closed signs. *See* GX 009—009.5; *see also* Apr. 4 AM Tr. 69:15—82:24 (Testimony of U.S. Capitol Police ("USCP") Capt. Mendoza), GX 012. Additionally, the area was patrolled by USCP officers on foot and motorcycles. Apr. 8 AM Tr. 72:14—79:20 (Testimony of USCP Officer Getz). There were a few commuters and rallygoers like Kastner in the area, and Kastner testified that the Capitol was otherwise quiet when he first observed it. Apr. 11 Tr. 42:16—43:25; *see also* Apr. 8 AM Tr. 72:14—79:20 (Testimony of USCP Officer Getz). The evidence showed Kastner was located approximately 600 feet from the restricted area, as shown in Figure 3 (GX 005). *See also* Apr. 9 PM Tr. 36:22—38:3 (Testimony of FBI Task Force Officer Metz).



*Figure 3 – Restricted area of the Capitol on January 6 (GX 005) with arrow to Kastner's approximate location at Capitol Reflecting Pool*

Kastner and his friends then crossed the National Mall to the Lincoln Memorial. *See* GX 814, 1100.26—36. Just before 12:00 p.m., the group returned to the rally area and listened to a speech given by former President Donald J. Trump. *See* GX 016, 814, 1100.37—45. At the conclusion of the speech, Kastner, Faulkner, Green, and Massie marched east towards the Capitol down Constitution Avenue NW. *See* GX 814, 1100.46—51.

At approximately 1:53 p.m., Kastner entered the restricted grounds of the Capitol at the Peace Circle. *See* GX 1100.52—53; *see also* Apr. 11 Tr. 65:3—69:12. The evidence showed, prior to Kastner's arrival, other rioters had breached the restricted area at the Peace Circle at approximately 12:54 p.m., tearing down metal bike racks and snow fencing, and their debris was scattered throughout the area. *See* GX 001.2; *see also* Apr. 8 AM Tr. 80:10—82:12 (Testimony of USCP Officer Getz), GX 009.4, 223 (timecode 00:11—09:35), Defense Exhibit ("DX") 25. The noise on the West Front was deafening, with chants, small explosions, fireworks, and rioters and police using means of sound amplification. Apr. 8 AM Tr. 83:5—96:2 (Testimony of USCP

Officer Getz); *see also* GX 001.2, 210, 220 (timecode 11:00), 223 (timecode 00:22—09:35). The air was filled with the smell of smoke and chemical irritants. Apr. 8 AM Tr. 84:18—85:6 (Testimony of USCP Officer Getz); *see also* GX 001.2, 223 (timecode 00:22—09:35). On the West Plaza, rioters were actively fighting police officers in an effort to advance through the West Plaza and Northwest Stairs to breach the Capitol building. Apr. 8 AM Tr. 83:5—96:2 (Testimony of USCP Officer Getz); *see also* GX 223 (timecode 00:22—09:35), DX 25.

Kastner made his way to the Northwest Lawn with Green[4] and Faulkner. See GX 207, 220, 303, 303.1, 306. There, rioters near Kastner threw various objects at police officers holding a police line on Northwest Stairs, including an orange traffic cone, beer cans, soda cans, and batteries. See GX 303, 104 (timecode 04:41); *see also* Apr. 8 AM Tr. 99:5—99:13 (Testimony of USCP Officer Getz). Rioters around Kastner shouted at police officers protecting the stairs, calling them "traitors" (GX 207, timecode 10:18) and yelling, "We have you surrounded" (GX 306, timecode 00:19). Rioters climbed on the wall of the Northwest Stairs in front of the defendant. *See* GX 303.

At approximately 2:09 p.m., rioters overwhelmed police officers on Northwest Stairs and breached the police line. Apr. 8 AM Tr. 96:3—125:13 (Testimony of USCP Officer Getz). Rioters chased police officers up the stairs to the Upper West Terrace, where a temporary police line was established and subsequently breached. *Id*.; *see also* GX 103 (timecode 04:45), 104 (timecode 04:45), 213 (timecode 00:01), 223 (timecode 09:35), 303 (timecode 00:27), 306 (timecode 00:34). Kastner and Faulkner followed the mob from the Northwest Lawn up the Northwest Stairs and under scaffolding, as shown in Figure 4 (GX 209). *See also* GX 103 (timecode 06:53),

---

[4]  At this time, the government does not have information that Green entered the Capitol building, assaulted law enforcement, or otherwise engaged in criminal activity apart from entering the restricted area on January 6, 2021.

104 (timecode 06:55), 219.1, 223, 223.1, 301 (timecode 05:37), 303 (timecode 00:40), 306 (timecode 00:44).



*Figure 4 – Kastner (red) advancing up the Northwest Stairs (GX 209)*

At approximately 2:12 p.m., Kastner walked directly past a rioter holding an area closed sign above her head at the top of the Northwest Stairs, as shown in Figures 5 and 6 (GX 208, timecode 02:39).

 

*Figure 5 (left) and Figure 6 (right) – Kastner (red) walking past rioter holding an area closed sign (blue) (GX 208)*

Also, at the top of the Northwest Stairs, Kastner passed by metal bike rack fencing that had

been pulled open by rioters who had breached police lines, as shown in Figure 7 (GX 301, timecode

05:59). Area closed signs were visible in the area.



*Figure 7 – Breached metal fencing with area closed sign (blue)*
*at the top of Northwest Stairs (GX 301)*

Rioters who were minutes ahead of Kastner made their way up across the Upper West

Terrace to the Senate Wing Door. *See* GX 223 (11:00—13:00). There, rioters smashed glass

windows and kicked at the Senate Wing Door from the outside in an attempt to gain entry to

Capitol building. *See id.*; *see also* GX 100 (timecode 07:00), 105 (timecode 01:45), 223.1.

At approximately 2:13 p.m., the Capitol building was first breached by a rioter who jumped

through a broken window adjacent to the Senate Wing Door, as shown in GX 100 (timecode

08:03). *See also* Apr. 4 AM Tr. 97:9—105:19 (Testimony of USCP Capt. Mendoza).

Less than one minute later, rioters who had entered through the broken window kicked

open the Senate Wing Door from the inside. *See* GX 100 (timecode 08:15). Many rioters who had

amassed outside the Senate Wing Door then entered the Capitol building. *Id.; see also* Apr. 4 AM

Tr. 97:9—105:19 (Testimony of USCP Capt. Mendoza).

Contemporaneously, at 2:13 p.m., Kastner made his way across the Upper West Terrace and photographed his approach to the Senate Wing Door, as shown in Figure 8 (GX 1100.54).



*Figure 8 – Kastner's photograph of his approach to the Senate Wing Door (GX 1100.54)*

Kastner and Faulkner walked up to the Senate Wing Door via an accessibility ramp, as shown in Figure 9 (GX 301, timecode 07:26, 301.1); *see also* GX 105 (timecode 03:12), 105.1. Kastner testified that he pointed to a rioter attempting to break a window on the Capitol building and that he understood property damage to the building was unlawful. Apr. 11 Tr. 83:11—84:25.



*Figure 9 – Kastner (red) pointing to rioter breaking a window (orange) (GX 301, 301.1)*

Kastner remained outside the Senate Wing Door for approximately three minutes. During that time, the alarm on the Senate Wing Door was blaring. *See* GX 300. By this point, rioters had smashed windows to the right and left of the door and were jumping through them. *See* GX 100 (timecode 08:30). At 2:17 p.m., approximately four minutes after above-described breach, Kastner entered the Capitol building with Faulkner through the Senate Wing Door. Kastner and Faulkner joined other rioters who were unlawfully inside the building, as shown in Figure 10 (GX 100, timecode 12:50, 100.1).



*Figure 10 – Kastner (red) and Faulkner (yellow) enter the Capitol building (GX 100, 100.1)*

Kastner and Faulkner turned to their right and walked with other rioters directly past broken furniture and broken glass on the floor from the smashed-in windows, while other rioters entered the Capitol building through a broken window. *See* GX 100 (timecode 12:50); *see also* GX 300 (timecode 00:20). Kastner and Faulkner traveled towards the House of Representatives side of the Capitol building to the Crypt, where Kastner took photographs of other rioters and of police officers who were maintaining a police line, as shown in Figure 11 (GX 1100.61). *See also* Apr. Tr. 11 107:13-21, GX 302 (timecode 03:11), 1100.57—61. At that time, police officers in the

Crypt were telling rioters to disperse and exit the building, and rioters were verbally hostile towards those officers and threw objects at the police line. Apr. 8 PM Tr. 66:12—75:20 (Testimony of USCP Officer Adonis).



*Figure 11 – Kastner's photograph of the police line (blue line) in the Crypt (GX 1100.61)*

Kastner and Faulkner exited the Crypt, and they were subsequently reunited with Massie, as shown in Figure 12 (GX 205, timecode 24:30). Massie was greeted by Faulkner with a high-five and a pat on the head, and by Kastner with a hug. *See id.*



*Figure 12 – Faulkner (yellow), Massie (green), and Kastner (red) near the Crypt (GX 205)*

At approximately 2:22 p.m., Kastner traveled back into the Crypt with Faulkner and Massie, as shown in Figure 13 (GX 101, timecode 07:16).



*Figure 13 – Massie (green), Kastner (red), and Faulkner (yellow) in the Crypt (GX 101)*

Kastner and Faulkner positioned themselves near front of the police line in the Crypt, approximately two to three persons deep into the crowd, as shown in Figure 14 (GX 305, timecode 06:03). *See also* GX 214 (timecode 14:29), 215 (timecode 14:41), 216 (timecode 19:29).



*Figure 14 – Kastner (red) near the police line (blue) in the Crypt (GX 305)*

At approximately 2:25 p.m., Kastner was part of the mob in the Crypt that pushed through a line of police officers attempting to hold back the crowd, as shown in Figure 15 (GX 203); *see also* Apr. 8 PM Tr. 66:17—104:7 (Testimony of USCP Officer Adonis), GX 101 (timecode 10:00),

102 (timecode 10:00). Kastner and Faulkner were near the middle of the crowd during the breach of the police line. *See* GX 203, and 215.1.



*Figure 15 – Kastner (red) and Faulkner (yellow) in the Crypt (GX 203)*

Kastner, Faulkner, and Massie reached the other side of the Crypt, entering the hallway to the Small House Rotunda. *See* GX 215 (timecode 17:36). After remaining in the Crypt area for approximately ten minutes, Kastner, Faulkner, and Massie returned to the Senate Wing Door by the route that they had entered. *See* GX 100 (timecode 26:00). By this time, police officers had retaken control of the Senate Wing Door and were ordering rioters to exit. At approximately 2:32 p.m., Kastner exited the Capitol building through a broken window adjacent to the Senate Wing Door. *See id*. Kastner was inside the Capitol building for approximately 15 minutes.

Upon exiting, Kastner remained within the restricted area at the Northwest Courtyard and Upper West Terrace for approximately 20 minutes. There, Kastner celebrated with his co-defendants Faulkner and Massie, taking photographs, including a selfie-style photograph with Faulkner and Massie shown in Figure 16 (GX 1100.63), photographs of rioters climbing on

suspended scaffolding meant for window washing, and photographs of rioters standing on stone balustrades. *See also* GX 211, 212, 217, 218, 221, 1100.62—73.



*Figure 16 – Kastner's photograph on the Upper West Terrace*
*with Kastner (red), Massie (green), and Faulkner (yellow) (GX 1100.62)*

During that time, Kastner received text messages from Green, telling Kastner, "Watch the roof… Time to scoot… Get moving… Surrounded… Surrounded… You need to get out… You're surrounded." *See* GX 1101. Kastner subsequently met with Green and left the Capitol grounds, after spending approximately one hour within the restricted area at the Capitol.

For his participation in the riot, Kastner was charged by criminal complaint on December 7, 2021, and arrested on December 8, 2021. ECF Nos. 1, 5. Investigators executed a search warrant at the time of arrest, and, among other items, seized the Defendant's cellphone.

*Pretrial Violation for Firearms in Kastner's Residence*

On August 22, 2022, Pretrial Services filed a Pretrial Violation Report recommending that Kastner "be removed from Pretrial Supervision due to non-compliance" for having firearms in his residence. ECF No. 45 at 2. Judge Moss held a hearing on September 6, 2022, and heard testimony from Pretrial Services Officers, Kastner, Kastner's father, and Kastner's wife.

Following the hearing, Judge Moss issued an order finding by clear and convincing evidence that Kastner had knowingly violated the conditions of his pretrial release for having firearms in his residence. ECF No. 57 at 8-9. Judge Moss further found that Kastner refused to comply immediately with Pretrial Services' directions to remove the firearms from his residence and that Kastner claimed "he could keep firearms in his residence and went so far as to accuse D.C. Pretrial Services of making false statements." *Id.* at 8-9. Judge Moss found "when [a Pretrial Services Officer] asked Kastner on August 29th to confirm that the firearms were out of the residence, he disingenuously claimed confusion and that [the Pretrial Services Officer's] orders were 'unclear.'" *Id.* at 9. Judge Moss found "Kastner's assertions of continuing confusion . . . are not credible, and they amount to gamesmanship designed to resist the Court's order and the clear direction from [Pretrial Services]." *Id.* Likewise, Judge Moss found "[o]ther aspects of Kastner's testimony . . . were evasive or less than forthright." *Id.*

Notwithstanding Kastner's testimony, Judge Moss held that "conditions short of incarceration offer a less restrictive means of reasonably assuring the safety of the community, at least at this time." *Id.* at 10. Judge Moss warned Kastner that he was on "thin ice," and ordered the conditions of Kastner's pretrial release modified to preclude Kastner from residing in any residence where firearms were present and to preclude Kastner from possessing firearms "at any time and under any circumstances." *Id.* at 11-12. Additionally, Judge Moss committed Kastner to home detention for a period of 30 days. *Id.* at 12; *see also* Draft PSR ¶¶ 12-13.

*Fundraising Efforts*

As noted in the Draft PSR, Kastner has a GiveSendGo account that he has used to raise money. Draft PSR ¶ 114; *see also* Attachment 1. The account associated with Kastner is titled

16

"Jared Kastner",[5] and states that "funds from this campaign will be received by National Constitutional Law Union Inc." The National Constitutional Law Union ("NCLU") is chaired by Kastner's defense attorney, Mr. John Pierce, and lists Kastner's case on its website as one of its cases.[6] Kastner's fundraising webpage contains a first-person narrative, claiming, "I am asking for your support in this fight. I believe it is the duty of all Americans to defend the rights that were given to us by our forefathers and secured by the blood of patriots who gave their lives to win our freedom. That is why I must do everything I can to fight for the rights this court has unlawfully taken away." *See* Attachment 1. As of September 9, 2024, the Defendant's fundraising account contains $5,935. *See infra,* fn. 5.

*The Charges and Convictions*

On April 2024, Kastner was convicted following a jury trial on all four Counts of the Information: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) (Count One); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds) (Count Three); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing, in a Capitol Building) (Count Four).

## III.  Statutory Penalties

Kastner now faces sentencing on Counts One through Four. On each of Counts One and Two, Kastner faces up to one year of imprisonment and a fine of up to $100,000. 18 U.S.C. §§

---

[5]  *See*  https://www.givesendgo.com/campaign/grabwidget?urllink=JaredKastner  (last visited Sept. 9, 2024). The Defendant's fundraising webpage has since been deactivated; however, Attachment 1 to this memorandum contains the Defendant's narrative from the period when the webpage was active.

[6]  *See* https://nclu.org/#cases (last visited Sept. 9, 2024).

1752(b)(2), 3571(b). On each of Counts Three and Four, Kastner faces up to six months of imprisonment and a fine of up to $5,000. 40 USC § 5109(b); 18 U.S.C. § 3571(b).

## IV.   The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The government proffers that the Sentencing Guidelines calculation set forth below is correct. Although the draft PSR only includes a guidelines calculation for Count Two—which is the highest count—the government has set out calculations for Counts One and Two below:

Count One (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)): Trespass | +4 |
| Special Offense Characteristic (U.S.S.G. § 2B2.3(b)(1)(A)(vii)) | +2 |
| Adjustment (U.S.S.G. § 3C1.1): Obstruction | +2 |
| Adjustment (U.S.S.G. § 4C1.1): Zero-Point Offender | -2 |
| **Total Adjusted Offense Level** | **8** |

Count Two (18 U.S.C. § 1752(a)(2)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)): Obstructing Officers | +10 |
| Adjustment (U.S.S.G. § 3C1.1): Obstruction | +2 |
| Adjustment (U.S.S.G. § 4C1.1): Zero-Point Offender | -2 |
| **Total Adjusted Offense Level** | **10** |

Kastner's convictions in Counts Three and Four are for Class B misdemeanors and, therefore, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

The draft PSR correctly states that Counts One and Two group, Draft PSR ¶ 54, U.S.S.G. § 3D1.2(a); and that because Count Two provides the higher offense level, it provides the offense level for the group. Draft PSR ¶ 54; U.S.S.G. § 3D1.3(a).

**a.  Adjustment Under U.S.S.G. § 3C1.1 for Obstructing the Administration of Justice**

Section 3C1.1 provides, "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."

As detailed below, a two-level increase for obstructing or impeding the administration of justice applies under U.S.S.G. §3C1.1, based on Kastner's false and misleading testimony at trial.

*Kastner's False Testimony at Trial*

Kastner chose to present a defense based on his allegedly reasonable belief that he could enter the U.S. Capitol grounds and building. To support this belief, he called defense witness Suzanne Monk to testify that her name was listed as a speaker on a map showing January 6 protest sites, including one site located at the U.S. Capitol. Apr. 10 AM Tr. 56:20—58:17 (Testimony of Suzanne Monk). Ms. Monk further testified that she was located in front of the Trump International Hotel on Pennsylvania Avenue NW during and after former President Trump's speech. *Id*. 58:23—59:2, 83:16—85:5. Kastner testified that after the speech he traveled to the Capitol via Pennsylvania Avenue NW, past the Trump International Hotel, where he purportedly saw Ms. Monk and viewed the above-referenced map showing speeches would be held at the U.S. Capitol. Apr. 11 Tr. 22:14—24, 36:5—24, 58:10—59-14.

Contrary to Kastner's testimony, geolocation information from Kastner's cellphone, shown in Figure 17 (GX 814), and photographs taken by Kastner (GX 1100.43—51) demonstrated that he did not travel to the Capitol via Pennsylvania Avenue NW or pass the Trump International Hotel where Ms. Monk was located. Rather, Kastner travelled via Constitution Avenue NW. Kastner testified that he viewed one of the maps while walking along Pennsylvania Avenue NW, when that was not the route he took. The government contends that Kastner never passed Ms. Monk and he never viewed a protest site map before breaching the Capitol grounds.



*Figure 17 – Geolocation information showing Kastner's route of travel (red) (GX 814)*

Kastner further testified that he did not observe any downed fencing or area closed signs upon entry to the restricted area of the Capitol grounds. Apr. 11 Tr. 65:3—69:12. However, the evidence showed intact snow fencing and area closed signs near the Peace Circle entrance to the Capitol grounds, as shown in Figure 18 (GX 210, timecode 00:05).



*Figure 18 - Kastner (red) inside the restricted area and intact snow fencing
with area closed signs (blue) near the Peace Circle (purple) (GX 210)*

Kastner testified that the Capitol grounds appeared different than when he had first observed it, but he denied observing anything that would indicate entry to the area by the public was restricted. Apr. 11 Tr. 64:6—69:12. As detailed above, witnesses for the government testified to the chaotic scene on the West Front at that time, which included scattered debris from destroyed fencing, deafening noise, smoke and chemical irritants, and rioters openly fighting police officers. It was clear to Kastner when he entered the restricted grounds that this was not normal, and he was not allowed to be there, despite his testimony to the contrary.

Kastner testified that he observed other rioters throwing objects on the Northwest Lawn, but he denied witnessing any objects being thrown at police officers. Apr. 11 Tr. 69:14-22, 72:17—73:5. However, the evidence showed police officers were clearly within Kastner's line of sight, as shown in Figure 19 (GX 303), where it would have been obvious to Kastner that the objects being thrown were being thrown at those police officers. *See also* GX 303.1, 104 (timecode 04:40), 207 (timecode 10:35), 306 (timecode 00:05).



*Figure 19 – Kastner (red) observing traffic cone (orange) thrown at police (blue)
and rioter climbing on wall (yellow) (GX 303)*

Kastner testified that he never observed metal fencing or area closed signs as he approached the Capitol building. However, the evidence showed he walked directly past a rioter holding up an area closed sign, as shown above in Figures 5 and 6 (GX 208). At the top of the Northwest Stairs, Kastner passed by metal bike rack fencing, as shown above in Figure 7 (GX 301).

Kastner testified that he observed a police officer in the lobby of the Senate Wing Door area, whom Kastner claimed nodded to Kastner upon entry. Apr. 11 Tr. 96:3—101:8. However, Kastner was unable to identify the officer in any contemporaneous videos of his entry, nor was Kastner able to otherwise describe the officer who allegedly nodded to him. *Id.* The government contends that there were no police officers located Senate Wing Door lobby at that time and no officer ever nodded to Kastner when he entered the Capitol building.

Kastner denied witnessing evidence of property damage or other rioters entering through a broken window when Kastner entered the Capitol building. Apr. 11 Tr. 101:9—103:25. Yet, the

evidence showed Kastner walked directly past broken furniture and broken glass, while other rioters entered the building through a broken window, as shown in Figure 20 (GX 100). The evidence further showed property damage to the Capitol occurred in the hallway connecting the Senate Wing Door and the Crypt, and in the Crypt itself. Kastner was located within the Capitol building for approximately 15 minutes, and his claims regarding his observations while inside were blatantly false.



*Figure 20 – Rioter jumping through broken window (orange)*
*while Kastner (red) enters the U.S. Capitol building (GX 100)*

As detailed above, CCTV footage, third-party video, geolocation information from Kastner's phone, photographs taken by Kastner, witness testimony, and his own testimony proved many of Kastner's statements false, and by its verdict, the jury clearly rejected his self-serving testimony. Likewise, this Court should not credit Kastner's testimony and, considering his false and misleading statements, should apply a two-level adjustment under Section 3C1.1.

**b. Adjustment Under U.S.S.G. § 4C1.1 for Certain Zero-Point Offenders**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

23

While the Government concedes that Section 4C1.1 applies to Kastner, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because Kastner's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that Kastner in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. See U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at   https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on

January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g., United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Kastner's criminal history as a Category I. Draft PSR ¶ 66. Kastner's total adjusted offense level, after factoring in §§ 3C1.1 and 4C1.1, is calculated at 10, and his corresponding Guidelines imprisonment range at 6 to 12 months' imprisonment.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months' incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

### A.    The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp.3d 1, at 8 (D.D.C. 2021). While assessing Kastner's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kastner, the absence of violent or destructive acts is not a mitigating factor. Had Kastner engaged in such conduct, he would have faced additional criminal charges.

Kastner's conduct and actions on January 6 in many ways were those of an opportunist, remaining undaunted but changing his path in ways that took advantage of the situation at the expense of the law. As detailed above, Kastner scouted "Canaan" on the day before the riot, defiantly ignored all warnings signs on January 6 that he should not proceed further, witnessed assaults on police officers and property damage to the Capitol building, entered the Capitol about four minutes after the building was first breached, joined a mob in the Crypt that broke through a police line, and then lied about what he had seen and done at trial.

Therefore, the nature and circumstances of the offense support the recommended sentence of 12 months' incarceration.

### B.    Kastner's History and Characteristics

As set forth in the Draft PSR, Kastner is a 27-year-old resident of Indiana. Draft PSR ¶¶ 76—77. Kastner holds a bachelor's degree in science, and he is currently pursuing his master's degree. Draft PSR ¶ 97. For approximately five years until April 16, 2024, Kastner was employed

as a full-time design engineer at VS Dover. Draft PSR ¶ 101. Kastner's history includes his violation of a pretrial release condition precluding his possession of a firearm; when addressing this violation, Judge Moss characterized Kastner as resistant to the Court's order and the direction of Pretrial Services. In response to Kastner's attempt to explain away the violation, Judge Moss characterized Kastner as someone who had engaged in "gamesmanship."[7]

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two ideas: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B)–(C), *United States v. Russell*, 600 F.3d 631 (D.C. Cir. 2010).

---

[7] Kastner's father was interviewed by U.S. Probation regarding Kastner's personal history and characteristics. Draft PSR ¶¶ 80—83. While perhaps still distraught over the outcome of the trial, he chose during the interview to voice unfounded claims of prosecutorial, judicial, and juror misconduct. Such statements, from a defense witness who was sequestered for much of Kastner's trial, seek to place the blame on anyone other than his son and do not align with the evidence in this case. Therefore, the Court should not credit the statements and should disregard them.

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Kastner's conduct on January 6 demonstrates the need for specific deterrence. Kastner repeatedly ignored warning signs that he should not enter the Capitol building on January 6, and he eagerly participated in the riot. He remains unrepentant and presents a serious risk of recidivism.

While on pretrial release, Kastner violated his release conditions by having firearms in his residence. Not only did Judge Moss find that Kastner was resistant to a Court order, Judge Moss found Kastner's testimony concerning violation of the order to be "disingenuous[]," "not credible," and "evasive and less than forthright." ECF No. 57 at 8-9.  Kastner's dishonesty continued during his trial and after his oath to testify truthfully, indicating a sense of impunity and disrespect for legal procedures that demonstrate the need to deter his further misconduct.

At this juncture, Kastner has not accepted responsibility for his actions or indicated his remorse, either at trial or when interviewed by U.S. Probation in advance of sentencing. A period

of significant incarceration is necessary to ensure Kastner does not pursue similar conduct in pursuit of his political goals or for any other reason.

E.     **The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Kastner based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his role in the January 6 riot.

Kastner was found guilty of all four counts in the Superseding Information. Counts One and Two, violations of 18 U.S.C. § 1752(a)(1) and (a)(2), respectively, are Class A misdemeanors. 18 U.S.C. § 3559. Counts Three and Four, violations of 40 U.S.C. § 5104(e)(2)(D) and (G), respectively, are Class B misdemeanors. Although the Sentencing Guidelines apply only to Counts One and Two, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply to all four counts.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See* Sent. Hrg. Tr. 24–25, *United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Russell Alford*, 21-cr-263-TSC, the defendant was convicted of the same charges as Kastner following a jury trial. Like Kastner, Alford walked past the violence that was occurring in an attempt to get deeper into the Capitol. And, like Kastner, Alford showed no remorse for his actions. Notably, Alford also received the 3C1.1 enhancement "because he provided misleading testimony at trial." *United States v. Alford*, 89 F.4th 943, 945 (D.C. Cir. 2024). The D.C. Circuit affirmed Alford's sentence, holding, "It was not unreasonable for the district court to conclude that Alford warranted a sentence greater than other January 6 defendants because he was ineligible for the acceptance-of-responsibility reduction and brought upon himself the penalty of a two-level enhancement through his testimony." *Id.* In this case, Kastner was not only untruthful during his trial, but as Judge Moss found, he was misleading in his statements to the Court about Pretrial Services and his release conditions. Judge Chutkan sentenced Alford to 12 months' incarceration followed by 12 months of supervised release.

In *United States v. Anthony Vo*, 21-cr-509-TSC, the defendant was convicted of the same charges as Kastner following a jury trial. Like Kastner, Vo entered the Capitol building after watching a mob of rioters overrun the outnumbered police on the Capitol's west side. Vo was inside the Capitol for approximately 27 minutes, which is slightly longer than Kastner's approximately 15 minutes. Like Kastner, Vo violated his conditions of pretrial release and received additional, more restrictive conditions as result. Unlike Kastner, however, Vo did not testify falsely at trial, nor he did otherwise receive an enhancement for obstruction under Section 3C1.1. Judge Chutkan sentenced Vo to 9 months of incarceration followed by 12 months of supervised release. Kastner's false and misleading testimony at trial supports a lengthier sentence.

As the Court heard at trial, Kastner's co-defendants Faulkner and Massie engaged in conduct that was almost identical to Kastner's. Notably, however, Kastner was the first in the group to join the mob and advance up the Northwest Stairs. Likewise, Kastner was the first in the group to enter the Capitol building through the breached Senate Wing Door. Additionally, Kastner was the only defendant who contemplated bringing firearms to Washington, D.C. Neither Faulkner nor Massie violated their conditions of pretrial release. In stark contrast to all defendants in this case, Kastner's friend Green entered and remained in the restricted grounds of the Capitol. Green chose not to follow the mob and enter the Capitol building, and he has not been charged. Unlike Kastner, Faulkner and Massie accepted responsibility for their actions at the earliest opportunity and expressed deep remorse for their actions on January 6. Moreover, neither Faulkner nor Massie falsely represented their actions or observations on January 6 in open court. Both Faulkner and Massie pleaded guilty to a single count of violating U.S.C. § 5104(e)(2)(G), Parading and Demonstrating. Judge Moss sentenced both Faulkner and Massie to 24 months' probation,

30 days' home detention with location monitoring, 60 hours community service, and $500 restitution. ECF Nos. 90, 107.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Kastner was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23–24 (D.D.C. 2019)

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because Kastner engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Kastner responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476–77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Kastner to pay $500 in restitution for his convictions on Counts One and Two. This amount fairly reflects Kastner's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

guilty plea agreement like Faulkner and Massie, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

The Defendant's convictions subject him to a statutory maximum fine of $100,000 for Counts One and Two, and $5,000 for Counts Three and Four. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); See U.S.S.G. § 5E1.2(d).

The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the government respectfully disagrees with U.S. Probation that the Defendant has shown an inability to pay. U.S. Probation notes that Kastner did not provide information on his current source of financial sustenance, did not provide supplementary financial documentation, and failed to provide a financial release form as requested. Draft PSR ¶¶ 101, 109, 115. Pursuant

to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). With an offense level of 10, the guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. The defendant has received almost $6,000 in an online fundraising campaign. *See infra.* fn. 5. The request for donations, apparently written by Kastner, casts the Defendant as the victim of a firearms restriction imposed as a condition of pretrial release. The narrative does not specify that the funds are earmarked for legal expenses; however, the fundraising webpage includes that NCLU would receive the funds. It is unclear from NCLU's webpage whether donations to the organization go towards legal fees for Kastner or other defendants. It is also unclear whether funds donated to NCLU are redistributed to individual defendants like Kastner. To the extent any donated funds were ever received by Kastner through his online fundraising efforts, the Defendant should not be able to use his own notoriety gained in the commission of his crimes to "capitalize" on his participation in the Capitol riot in this way.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Kastner pursuant to 18 U.S.C. § 3563(b)(10) to 12 months' incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community,

promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a

consequence of his behavior, while recognizing his acceptance of responsibility for his crime.


Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:     */s/ Will N. Widman*
        WILL N. WIDMAN
        NC Bar No. 48158
        Trial Attorney, Detailee
        U.S. Attorney's Office
        For the District of Columbia
        601 D. Street, NW
        Washington, D.C. 20001
        (202) 353-8611
        Will.Widman@usdoj.gov


        */s/ Cytheria D. Jernigan*
        CYTHERIA D. JERNIGAN
        Assistant U.S. Attorney
        DC Bar No. 494742
        U.S. Attorney's Office WDLA
        Detailed to the U.S. Attorney's Office
        For the District of Columbia
        601 D. Street, NW
        Washington, D.C. 20001
        (318) 676-3611
        Cytheria.Jernigan@usdoj.gov